**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
  achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
  ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002

*Attorneys for Plaintiff Natalie Ocegueda*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NATALIE OCEGUEDA, derivatively on behalf of FACEBOOK, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MARK ZUCKERBERG, SHERYL SANDBERG, MARC ANDREESSEN, ANDREW W. HOUSTON, ERSKINE B. BOWLES, JEFFREY D. ZIENTS, SUSAN DESMOND-HELLMANN, NANCY KILLEFER, TRACEY T. TRAVIS, ROBERT M. KIMMITT, REED HASTINGS, PETER A. THIEL, and DOES 1–30, <br><br> Defendants, <br><br> - and - <br><br> FACEBOOK, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> 1. **BREACH OF FIDUCIARY DUTY;** <br> 2. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;** <br> 3. **ABUSE OF CONTROL;** <br> 4. **UNJUST ENRICHMENT; and** <br> 5. **VIOLATION OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934.** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Natalie Ocegueda ("Plaintiff"), by and through counsel, brings this shareholder derivative action on behalf of Facebook and against certain present and former directors and officers of Facebook, Inc. ("Facebook" or the "Company"). In support of these claims, Plaintiff alleges the following (1) upon personal knowledge with respect to the matters pertaining to Plaintiff and Plaintiff's ownership of Facebook stock; and (2) upon information and belief with respect to all other matters, based upon the investigation undertaken by counsel, which included, *inter alia*, (a) the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) news articles, conference call transcripts, analysts' reports, and press releases; and (c) other publicly available information pertaining to Facebook and the topics addressed herein. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

*"There were high hopes when Kenneth Chenault joined the all-white board of Facebook in January 2018* as the social media giant worked to fix its tarnished image and battered brand."[1]

*"Most corporations do not have black people on their boards and few, if any, black people in senior management. This is part of the reason that we have a high level of racial inequality in the US.*"[2]

*"We have an obligation to build a culture of inclusion where everyone can thrive.*"[3]

---

[1] *See "Former Amex CEO Kenneth Chenault Quits Facebook Board After Zuckerberg Rejected His Advice,"* THE MOGULDOM NATION, Mar. 16, 2020.

[2] *See* John Streur, "More engagement needed to get companies to address racial inequality risks and issues," Calvert Research and Management, June 19, 2020, available at https://www.calvert.com/impact.php?post=more-engagement-needed-to-get-companies-to-address-racial-inequality-risks-and-issues-&sku=35910, last visited June 29, 2020.

[3] Facebook's 2020 Proxy Statement at p. 53.

1.    At Facebook, apparently Zuckerberg wants Blacks to be seen but not heard. In 2018, Facebook created the image that it was trying to diversify its all-white Board by hiring highly-respected and experienced Kenneth Chenault to join its Board.  Chenault's appointment gave Facebook the guidance of a highly regarded finance executive and the first Black director on its all-white board, USA Today reported at the time. But then Chenault unexpectedly resigned in March of 2020 because he said Zuckerberg was not listening to his advice.  *See* Jeff Horwitz, "Chenault Leaves Facebook Board After Disagreements With Zuckerberg," THE WALL STREET JOURNAL, March 13, 2020 ("Mr. Chenault grew frustrated that the CEO wasn't taking his advice").

2.    In short, Facebook's approach to diversity has been characterized by tokenism:  make a small gesture to satisfy appearances, but don't make any underlying substantial change.  The message at Facebook is set at the top – by Zuckerberg and the rest of the Board of Directors ("Board").

3.    But Zuckerberg and the Board have failed to curtail hate speech against Black individuals and other minorities and have failed to achieve real diversity on the Board and among the senior executive ranks, leading to an employee walkout and massive boycott of ad spending on Facebook by over 184 of the Company's advertisers.

4.    On June 1, 2020, after Zuckerberg refused to take down a Trump post stating "When the looting starts, the shooting starts," which had been widely interpreted to reflect racist views that violence should be used against Black Lives Matters protesters, employees participated in a walkout to protest the Board's broader failure to curtail hate speech against Blacks and minorities:

> **June 1, 2020.  OAKLAND, Calif. —** Hundreds of Facebook employees, in rare public criticism on Monday of their own company, protested executives' decision not to do anything about inflammatory posts that President Trump had placed on the giant social media platform over the past week.
>
> Many of the employees, who said they refused to work in order to show their support for demonstrators across the country, added an automated message to their digital profiles and email responses saying that they were out of the office in a show of protest. . . More than a dozen current and former employees have described the unrest as the most serious challenge

to the leadership of Mark Zuckerberg, the chief executive, since the company was founded 15 years ago.

"*The hateful rhetoric advocating violence against black demonstrators by the US President does not warrant defense under the guise of freedom of expression,*" *one Facebook employee wrote* in an internal message board, according to a copy of the text viewed by The New York Times.

The employee added: "*Along with Black employees in the company, and all persons with a moral conscience, I am calling for Mark to immediately take down the President's post advocating violence, murder and imminent threat against Black people.*"

. . . *Twitter added fact-check and warning labels to two tweets from the president* that broke Twitter's rules around voter suppression and glorification of violence. *But as Twitter acted on Mr. Trump's tweets, Facebook left his posts on its platform alone. Mr. Zuckerberg said Mr. Trump's posts did not violate the social network's rules*.

*See* Sheera Frenkel, "*Facebook Employees Stage Virtual Walkout to Protest Trump Posts,*" THE NEW YORK TIMES, June 1, 2020.

5.      As Trump and Zuckerberg were well aware, Trump's statement that "When the looting starts, the shooting starts" has a racially charged history.  It dates back to the civil rights era and is known to have been invoked by a white police chief cracking down on protests and a segregationist politician.  In 1967, Miami police Chief Walter Headley used the phrase "when the looting starts, the shooting starts" during hearings about crime in the Florida city, invoking angry reactions from civil rights leaders, according to a news report at the time. "He had a long history of bigotry against the black community," said professor Clarence Lusane of Howard University.

6.      "The NAACP and other black organizations had for years complained about the treatment of the black community by Miami police. At this hearing, in discussing how he would deal with what he called crime and thugs and threats by young Black people, he issued this statement that the reason Miami had not had any riots up to that point, was because of the message he had sent out that "when the looting starts, the shooting starts,'" Lusane said.  Headley was head of the police force for 20 years and referred to his "get tough" policy on crime during a 1967 news conference as a war on "young hoodlums, from 15 to 21, who have taken advantage of the civil rights

campaign. ... We don't mind being accused of police brutality." According to Lusane, Headley may have borrowed the phrase from Eugene "Bull" Connor, who had been the notorious public safety commissioner in Birmingham, Alabama. Connor was a segregationist who directed the use of police dogs and fire hoses against black demonstrators.[4]

7.     As demonstrated herein, not only has it failed to achieve meaningful diversity and inclusion among Black individuals and other minorities, Facebook's Board and executives have allowed discriminatory advertising on its platform. In addition, Facebook's Board has repeatedly made gross misrepresentations in the Company's public statements by representing that the Company has effective policies, internal controls, and procedures designed to ensure diversity and to eliminate discriminatory advertising.

8.     In 2016, Facebook CEO Mark Zuckerberg wrote, "We care deeply about diversity. That's easy to say when it means standing up for ideas you agree with. It's a lot harder when it means standing up for the rights of people with different viewpoints to say what they care about. That's even more important." But since these words were uttered, Zuckerberg and Facebook have failed to achieve the diversity they claim to prize.

9.     Simply put, Facebook's goals and policies are not being achieved or enforced. Facebook appointed Kenneth Chenault to its Board but did not solicit or listen to Mr. Chenault's advice. Facebook's Board, which currently has only one Black individual, has consciously failed to carry out the Company's written proclamations about increasing diversity in its ranks. Black people and other minorities remain conspicuously underrepresented on the Board as well as among the Company's executive officers. In short, Facebook remains one of the oldest and most egregious

_____

[4] *See* Barbara Sprunt, "The History Behind 'When The Looting Starts, The Shooting Starts'," NPR, May 29, 2020, available at https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-looting-starts-the-shooting-starts, last visited June 29, 2020.

"Old Boy's Club" in Silicon Valley. A sign advising applicants "Blacks Need Not Apply" might as well hang at the entrance to the Company's headquarters at 1 Hacker Way, Menlo Park, California.

10.     Under pressure to make its workforce more closely resemble the more than 2 billion users it serves, Facebook increased the number of black employees to 4 percent of U.S. employees in 2018 from 2 percent in 2016. Yet just 1 percent of technical roles are held by blacks and 2 percent of leadership roles. Black women account for an even smaller fraction of the workforce. Overall, Facebook employs 278 black women out of a U.S. workforce of just under 20,000.[5]

11.     While Facebook's Board does have one Black member – non-defendant Peggy Alford – Facebook's entire slate of Executive Officers are all white, with no minorities whatsoever:

### FACEBOOK'S MANAGEMENT[6]

**Mark Zuckerberg**
**Founder, Chairman and Chief Executive Officer**



Mark Zuckerberg is the founder, chairman and CEO of Facebook, which he founded in 2004. Mark is responsible for setting the overall direction and product strategy for the company. He leads the design of Facebook's service and development of its core technology and infrastructure. Mark studied computer science at Harvard University before moving the company to Palo Alto, California.

---

[5] *See* Jessica Guynn, "*Facebook Has a Problem With Black People, Former Employee Charges,*" USA TODAY, Nov. 27, 2018.

[6] Source: https://investor.fb.com/corporate-governance/default.aspx, last visited June 27, 2020.

**Sheryl Sandberg**
**Chief Operating Officer**



Sheryl Sandberg is chief operating officer at Facebook, overseeing the firm's business operations. Prior to Facebook, Sheryl was vice president of Global Online Sales and Operations at Google, chief of staff for the United States Treasury Department under President Clinton, a management consultant with McKinsey & Company, and an economist with the World Bank.

**Dave Wehner**
**Chief Financial Officer**



Dave Wehner is chief financial officer of Facebook, where he leads the finance, facilities and information technology teams. Prior to becoming CFO in June 2014, Dave served as Facebook's vice president of Corporate Finance and Business Planning. From 2010 through 2012, Dave served as Chief Financial Officer of Zynga Inc. Before Zynga, Dave was a Managing Director at Allen & Company, an investment bank focused on media and technology, which he joined in 2001.

**Mike Schroepfer**
**Chief Technology Officer**



Mike Schroepfer is chief technology officer at Facebook. In that role, he leads the development of the technology strategies and teams that will enable Facebook to connect billions of people around the world and make significant breakthroughs in fields like artificial intelligence and virtual reality. Before Facebook, Mike was vice president of engineering at Mozilla Corporation, where he led the global and open product development process behind Firefox.

**David Fischer**
**Chief Revenue Officer**



David Fischer is chief revenue officer of Facebook, overseeing the company's advertising business and managing the sales and marketing teams worldwide. Prior to joining Facebook in 2010, David spent eight years at Google in various roles, including vice president of global online sales and operations, where he helped globalize the company's business and operations. David previously served as deputy chief of staff of the U.S. Treasury Department and worked on a variety of economic policy issues within the federal government. Prior to that, David was an Associate Editor at U.S. News & World Report, where he covered economics and business from Washington, DC.



**Jennifer Newstead**
**General Counsel**

Jennifer G. Newstead is General Counsel of Facebook, where she oversees all legal matters, including corporate governance and securities compliance, regulatory oversight, litigation, intellectual property and commercial matters. Prior to joining Facebook in 2019, Jennifer served as the Legal Adviser of the U.S. Department of State, where she led the legal team responsible for advising the Secretary of State on all domestic and international legal issues affecting the conduct of U.S. foreign relations. Earlier in her career, she served as General Counsel of the White House Office of Management and Budget, as a Principal Deputy Assistant Attorney General of the Office of Legal Policy at the Department of Justice, and as Special Assistant to the President and Associate White House Counsel. Jennifer was a partner for twelve years at Davis Polk & Wardwell LLP, where she advised global corporations in litigation, regulatory investigation and compliance matters.

12. Zuckerberg and the Company's Directors have deceived stockholders and the market by repeatedly making false assertions about the Company's commitment to diversity. In doing so, the Directors have breached their duty of candor and have also violated the federal proxy laws. Their conduct has also irreparably harmed Facebook. For those who care about diversity, inclusion, and honesty, those who do not adhere to these principles should be boycotted, especially if the perpetrator is one of the largest and most influential corporations in Silicon Valley.

13. Going back to at least 2016, Facebook has been accused of facilitating illegal discrimination based on race, ethnicity, and other protected categories. On August 13, 2018, the United States Department of Housing and Urban Development filed a complaint against Facebook in which it alleged that Facebook has violated the Fair

Housing Act by allowing advertising on its platform which discriminates based on race, ethnicity, gender, and other protected categories.  The HUD complaint alleged that:

> ***Facebook unlawfully discriminates by enbling advertisers to restrict which Facebook users receive housing-related ads based on race, color, religion, sex, familial status, national origin and disability***.  Facebook mines extensive user data and classifies its users based on protected characteristics.  Facebook's ad targeting tools then invite advertisers to express unlawful preferences by suggesting discriminatory options, and Facebook effecuates the delivery of housing-related ads to certain users and not others based on those users' actual or imputed protected traits.

14.    As an example of Facebook's illegal conduct, HUD's complaint stated that:

> ***Facebook enables advertisers to discriminate based on race and color by drawing a red line around majority-minority zip codes and not showing ads to users who live in those zip codes***.[7]

15.    On September 18, 2018, a complaint was filed against Facebook by the ACLU for gender discrimination, claiming that Facebook allowed advertisers to target men for ads such as "Help Wanted" and job ads, and prevent the ads from being seen by women.

16.    As noted *supra*, in late May 2020, Facebook came under heavy criticism by its own employees for refusing to censor or moderate a post from President Trump.  In that post, Trump said "when the looting starts, the shooting starts," in regards to Black Lives Matter protesters.

17.    Then, in late June 2020, advertisers announced their intention to boycott Facebook due to, among other things, the Company's failure to ban hate speech directed to Blacks and other minorities

18.    On June 22, 2020, North Face, REI, and Patagonia announced plans to boycott Facebook and pledged not to pay for advertising on Facebook platforms:

> Several companies have suspended advertising on Facebook over the company's failure to address hate speech on the platform.

---

[7] HUD Complaint at ¶7.

*The outdoor apparel and product retailers the North Face, REI, and Patagonia have pledged not to pay for advertising on Facebook platforms as part of the "Stop Hate for Profit" campaign, launched Wednesday by advocacy groups including the Anti-Defamation League, the NAACP, and the Color Of Change*. The freelance job listing site Upwork and the internet company Mozilla have also joined the pledge.

The movement asks advertisers to pressure the tech giant to adopt stricter policies against racist and hateful content on its platforms by pausing all spending on advertising with the company for the month of July.
*Facebook makes $70bn in annual advertising revenue while "amplifying the messages of white supremacists"* and "permitting incitement to violence", according to the campaign.

"We have long seen how Facebook has allowed some of the worst elements of society into our homes and our lives," said Jonathan Greenblatt, chief executive officer of the Anti-Defamation League, in a statement. *"Our organizations have tried individually and collectively to push Facebook to make their platforms safer, but they have repeatedly failed to take meaningful action*. We hope this campaign finally shows Facebook how much their users and their advertisers want them to make serious changes for the better."

Facebook plans voter turnout push – but will not bar false claims from Trump.

James Steyer, founder and CEO of Common Sense, a partner in the campaign, said he expected more companies to join in coming weeks. "Companies clearly have heightened awareness around issues of racial justice in the US right now," he said. "We are heartened by the progress and we think it is the right time for this."

*The campaign cites a number of examples to argue Facebook has failed to address misinformation and hate speech: it made Breitbart News a "trusted news source" despite its history of working with white nationalists and neo-Nazis, was accused of allowing housing discrimination against communities of color, and failed to remove Holocaust denial posts*.

See Kari Paul, "*Facebook Faces Advertiser Revolt Over Failure to Address Hate Speech*," THE GUARDIAN, June 22, 2020.

19.     On Friday, June 26, 2020, Unilever announced it was boycotting Facebook and would discontinue its advertising on Facebook:

*Unilever, the company behind brands such as Dove, Lipton and Hellmann's, is pulling advertising from Facebook and Twitter in the U.S. for the rest of the year,* adding to a growing list of companies protesting the social media site's handling of hate speech online.

Unilever said in a statement it also plans to pull ads from Facebook-owned Instagram this year. *Civil rights groups have been pushing companies to put their financial weight behind a Facebook boycott because the social*

*media sites continue to allow hateful and harmful content on their sites, according to the Anti-Defamation League.*

"Continuing to advertise on these platforms at this time would not add value to people and society," Unilever wrote in a statement on its website. It cited "the polarized atmosphere in the U.S."

*Unilever joins Patagonia, The North Face and others in announcing a temporary advertising boycott on Facebook in the last week.* Unilever's ice cream brand Ben & Jerry's had joined the boycott earlier in the week, before its parent company. The Hershey Company also said it would halt advertising on Facebook during July and cut its advertising on the site by one-third for the rest of this year.

*See* Rachel Lerman, "*Facebook faces a growing advertising boycott after consumer goods giant Unilever joins,*" The Washington Post, June 26, 2020.

20.    In response to the growing list of **over 100 advertisers** like Unilever that had announced plans by Friday, June 26, 2020 to boycott Facebook due to its repeated failure to ban hate speech, Facebook's stock tanked 8.3% on June 26, 2020.[8]

21.    On Sunday, June 28, 2020, several additional advertisers announced plans to join Unilever in its boycott of Facebook. Facebook announced plans to finally take some steps to ban hate speech, but the advertisers refused to withdraw from their plans to boycott Facebook, indicating that Zuckerberg's steps came too late:

*Facebook's efforts to stem a growing client boycott by introducing new policies failed over the weekend, with big brands including Diageo, Starbucks and Levi's pulling spending.*

*Facebook will head into July with dozens of brands including Unilever, Verizon and Coca-Cola cancelling advertising* for between a month and six months — despite last-ditch attempts by the social media network to stop the boycott gathering steam.

Facebook's chief executive Mark Zuckerberg on Friday announced plans on a live stream to prohibit hate speech in ads and better protect groups such as immigrants from attack. He also said the group would label posts that violate its policies but remain published because the platform deems it "in the public interest", citing certain speech by politicians as an example.

*The last-minute changes came just hours after Unilever, among Facebook's larger blue-chip clients, said it would pause spending on the platform* — as

---

[8] By Sunday, June 28, 2020, the list had grown to 184 advertisers that had joined the boycott. The list of advertisers had increased to over 300 by July 1, 2020. *See* "*Facebook boycott: View the list of companies pulling ads,*" CNN Business, July 1, 2020.

well as on Twitter — in the US, citing concerns about the proliferation of divisive content in the run-up to the 2020 presidential election.

***Facebook shares fell more than 10 per cent over the course of the week,*** to $212.50 in after-hours trading on Sunday, while Twitter is down by around 14 per cent over the same period.

***Despite Mr. Zuckerberg's concessions, however, others have joined the list with pledges to pull back spending*** across social media more widely, which could also deal a blow to smaller groups such as Snap, Twitter and newer entrant TikTok.

In a statement on Sunday, Starbucks said it would "pause advertising on all social media platforms while we continue discussions internally, with our media partners and with civil rights organizations in the effort to stop the spread of hate speech."

*See* Hannah Murphy, "*Facebook Fails to Stem Advertising Boycott Over Hate Speech,*" THE FINANCIAL TIMES, June 28, 2020.

22. Every business entity -- whether publicly traded or not -- has certain legal obligations and responsibilities to its shareholders, customers, investors, and the public. These responsibilities include the obligation to be truthful and honest; to actually implement the policies and procedures that it represents it has adopted; and to not engage in racial discrimination, whether it is in its workforce or leadership positions. Facebook has failed on all counts.

23. Facebook's Directors have long failed to ensure that Facebook curbs hate speech towards Blacks and minorities. In 2018, Facebook's Chief Information Security Officer ("CISO"), Alex Stamos, resigned after internal disagreement with the way the Company handled concerns regarding third parties' alleged use of the Facebook platform to spread misinformation.

24. The same year, What's App founder Jan Koum resigned from Facebook's Board over disagreements with Zuckerberg and other Board members over Facebook's failure to ensure compliance with certain policies and laws.

25. Platitudes in proxy statements are not progress. Simply put, Facebook has no *real* commitment to diversity and its Board is turning a blind eye to the Company's miserable failure to ensure the "diversity" trumpeted by the Directors in the Company's filings with the SEC and its annual reports to shareholders.

26.     As demonstrated herein, Defendants knew of, but failed to disclose, fraudulent business practices at Facebook that put the Company at material risk, including: (1) discriminatory hiring and pay practices; (2) discriminatory advertising policies that allowed advertisers to unlawfully target protected minorities and protected classes; and (3) the Company's failure to curb hate speech. Facebook's failure to disclose this information violated the federal proxy laws since the omitted information would have been material to shareholders' voting decisions regarding the election of directors, approval of executive compensation packages, and shareholder proposals to require an independent board chairman.

27.     The Director Defendants named herein signed one or more of Facebook's annual proxy statements. With such signatures come an obligation to ensure that the statements in the Proxy were true and accurate, and to correct any misleading statements. They failed to do so.

28.     The time for change has come. If Facebook's directors want to continue to be part of the problem, not the solution, then they at least need to be held liable for their breaches of fiduciary duties to the Company's stockholders. If, on the other hand, they want to be part of real change, they hold the keys themselves. They can (and should), stand up and exercise the control of the Company that they possess to make change NOW.

29.     The shareholder derivative lawsuit has been the only judicial mechanism for shareholders to hold directors accountable for engaging in wrongdoing. Like the United States Supreme Court, California courts have long recognized that derivative suits play an important role in corporate governance where directors fail to do their jobs:

> The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution. Where a derivative suit is against outsiders for wrongs against the corporation the directors can usually be expected to decide impartially on the advisability of suing. But the management cannot be expected to sue themselves for their own misdeeds.

*Pearce v. Super. Ct.*, 149 Cal. App. 3d 1058, 1065 (1983); *see also Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 297 (2004); *accord Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)).  As the California Supreme Court recognized in *Jones v. H. F. Ahmanson & Co.*, where, as here, the company's board and management fail to perform their duties, stockholders have a "right" to bring derivative actions.  *See* 1 Cal. 3d 93, 107 (1969).  The courts of Delaware, the Company's state of incorporation, likewise acknowledge that derivative actions serve an important function: "The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), o*verruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

30.    Plaintiff, derivatively on behalf of the Company, seeks the following relief from the Director Defendants:

(a)    At least two of the Company's directors should immediately resign prior to the Company's next annual meeting and should insist that the Company nominate two new persons to serve in their stead, which applicants should include Black and minority persons;

(b)    All Director Defendants named in this suit should return all their 2020 compensation received from Facebook (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Black people and minorities in corporate America;

(c)    Facebook should replace Zuckerberg as Chairman of the Board; Zuckerberg is not independent, and the lack of an independent Chairman at the Company has been a big part of the reason Facebook has not sufficiently made any real progress at achieving diversity;

(d)    Facebook should create a $1 billion fund to hire Black individuals and other minorities, promote minorities to more management positions at the Company, establish and maintain a mentorship program at the Company for

minorities that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(e)     The Company should require annual training of its entire Board and all executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, pay equity, and other relevant topics;

(f)     The Company should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals;

(g)     The Company should replace Ernst & Young ("E&Y") as its auditor. Facebook is one of E&Y's largest customers, and E&Y has served as Facebook's auditor *since 2007* and was paid *$22.3 million in fees* by the Company in 2019, giving rise to a cozy and clubby relationship between E&Y and the Company which is not conducive to effective auditing.  The Company's compliance with anti-discrimination laws and its stated policies concerning the alleged commitment to diversity have been very poor.  The very purpose of an auditor is to assess the Company's internal controls and determining if they are functioning effectively.  Rather than doing so, Ernst & Young has wrongfully and consistently given Facebook's internal controls a clean bill of health and has failed to point out the obvious – that Facebook lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and other protected classes and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

**JURISDICTION AND VENUE**

31.     This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a), and

SEC regulation 14a-9 promulgated thereunder. The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

32. This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

33. This Court has jurisdiction over Defendants. Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice. Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets. The Court has jurisdiction over Facebook because Facebook is headquartered in Menlo Park, California and has substantial business operations in California.

34. Venue is proper in this District in accordance with Section 27 of the Exchange Act. Venue is also proper under 28 U.S.C. § 1391(b) because: (i) Facebook maintains its principal place of business in, and has its most significant contacts with, this District; (ii) one or more of the Defendants resides in this District; (iii) a substantial portion of the transactions and wrongs complained of in this complaint occurred in this District; and (iv) Defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had effects in this District.

## INTRADISTRICT ASSIGNMENT

35. In compliance with Local Rule 3-2(b), Plaintiff requests that this action be assigned to the San Francisco Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of San Mateo.

## I. Plaintiff

36.     Plaintiff Natalie Ocegueda is a current Facebook shareholder and has continuously held her Facebook stock since May 21, 2012.

## II. Nominal Defendant

37.     Nominal defendant Facebook is a Delaware corporation headquartered at 1601 Willow Road, Menlo Park, California 94025.    Facebook operates a social networking website that allows people to communicate with their family, friends, and coworkers.  Facebook develops technologies that facilitate the sharing of information, photographs, website links, and videos.  Facebook users have the ability to share and restrict information based on their own specific criteria. By the end of 2017, Facebook had more than 2.2 billion active users.  The Company's mission is "to give people the power to build community and bring the world closer together.  People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."   Facebook's securities trade on the NASDAQ under the ticker symbol "FB."   Facebook is a citizen of Delaware and California.

## III. Individual Defendants

38.     Defendant Mark Zuckerberg is the Founder, Chairman and Chief Executive Officer ("CEO") of Facebook.  Zuckerberg is responsible for Facebook's day-to-day operations, as well as the overall direction and product strategy of the Company, and is the Company's controlling stockholder with ownership of stock and proxies for stock representing more than 60% of Facebook's voting power, though he owns 16% of Facebook's total equity value.  Zuckerberg is a citizen of California.

39.     Defendant Sheryl Sandberg is the Chief Operating Officer ("COO") of Facebook since 2008.  Sandberg is also a member of Facebook's Board and has been a director since 2012.  Sandberg is a citizen of California.

40.     Defendant Marc Andreessen is a member of the Board and has been a

director since June 2008.  Andreessen is a member of Facebook's Audit Committee and Compensation & Governance Committee.  Andreessen is a citizen of California.

41.     Defendant Andrew W. Houston is a Director of Facebook and has been a director since February 2020.  Houston reviewed & approved Facebook's 2020 Proxy Statement.  Houston is not sued herein for any conduct that pre-dated his joining of the Board in February 2020.

42.     Defendant Erskine B. Bowles was a member of the Board from September 2011 until at least April 12, 2019.  Bowles serves as the Chair of the Company's Audit Committee.  Bowles is a citizen of North Carolina.   Bowles reviewed and approved the Company's 2019 Proxy.

43.     Defendant Jeffrey D. Zients was a member of the Board from May 2018 until April 10, 2020.   Zients served as the Chair of the Company's Audit & Risk Oversight Committee.  Zients is a citizen of Maryland.   Zients reviewed and approved the Company's 2019 Proxy.

44.     Defendant Dr. Susan Desmond-Hellmann was a member of the Board from March 2013 until October 30, 2019.  Desmond-Hellmann was a member of Facebook's Audit Committee and was the Company's Lead Independent Director; she reviewed and approved the Company's 2019 Proxy Statement.  Desmond-Hellmann is a citizen of Washington.

45.     Defendant Nancy Killefer is a Director of Facebook and has been a director since March 2020.   Killefer reviewed & approved Facebook's 2020 Proxy Statement.  Killefer is not sued herein for any conduct that pre-dated her joining of the Board in March 2020.

46.     Defendant Tracey T. Travis is a Director of Facebook and has been a director since March 2020.   Travis reviewed & approved Facebook's 2020 Proxy Statement.  Tracey is not sued herein for any conduct that pre-dated her joining of the Board in March 2020.

47.     Defendant Robert M. Kimmitt is a Director of Facebook and has been a

director since March 2020. Kimmitt reviewed & approved Facebook's 2020 Proxy Statement. Kimmitt is not sued herein for any conduct that pre-dated his joining of the Board in March 2020.

48. Defendant Reed Hastings was a member of the Board from June 2011 until at least April 12, 2019. Hastings reviewed and approved the Company's 2019 Proxy. Hastings served as Chair of the Company's Compensation & Governance Committee during his tenure on the Board. Hastings is a co-founder of Netflix, and currently serves as its CEO and Chairman of its board of directors. Hastings is a citizen of California.

49. Defendant Peter A. Thiel is a member of the Board and has been a director since April 2005. Thiel is a member of the Company's Compensation & Governance Committee. Thiel was one of the early investors in Facebook. He co-founded PayPal, Inc., and has been a Partner of the Founders Fund, a venture capital firm that strives to keep founders in control of the companies they have created, since 2005. Thiel is a citizen of California.

50. Defendants Zuckerberg, Sandberg, Andreessen, Thiel, Kimmitt, Hastings, Bowles, Desmond-Hellmann, Travis, Killefer, and Houston are collectively referred to as the "Director Defendants," "Individual Defendants," or "Defendants."

## IV. The Doe Defendants

51. Various other individuals, partnerships, corporations, and other business entities have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants Does 1 through 30, inclusive, are unknown to Plaintiff at this time. Plaintiff therefore sues Defendants Does 1 through 30 by such fictitious names. Plaintiff further alleges that each of the Doe Defendants is responsible for the acts and occurrences hereinafter set forth. Plaintiff will amend this complaint to (a) show their true names and capacities when such information is ascertained; and (b) allege the manner in which each Doe Defendant is responsible for the damages sustained by Facebook and its shareholders

**FACTUAL ALLEGATIONS**

**I.    During the Relevant Period, the Individual Defendants Repeatedly Emphasized the Importance of Diversity and Preventing Discrimination**

52.    Facebook has repeatedly stated that it is committed to diversity and inclusion.  The Company's 2019 Proxy stated:

**Diversity & Inclusion**

We are committed to building a workforce that is as diverse as the communities we serve. We support an open culture and encourage our workforce to bring their authentic selves to work.

We publish our global gender diversity and U.S. ethnic diversity workforce data annually. Our diversity report for 2018 is available at https://www.facebook.com/careers/diversity-report. To support our goals of diversifying our workforce, we globally rolled out our Diverse Slate Approach, which sets the expectation that hiring managers will consider candidates from underrepresented backgrounds when interviewing for an open position. We have seen steady increases in hiring rates for underrepresented people since we started testing this approach in 2015. We also continue to expand our recruiting team and develop internship programs for women and minorities. Over 500 students have graduated from Facebook University, our training program for college freshmen from underrepresented groups with an interest in STEM/CS. Many have returned to work at Facebook.

We believe retention, people development, and inclusion are just as crucial as recruiting. This is why we invest in our thriving Facebook Resource Groups and our annual Community events such as Women's Community Summit, Black Community Summit, Latin Community Summit, and Pride Community Summit. These all help build community and support professional development. They are designed to empower, inspire, and provide resources to help our people grow professionally. We encourage all employees to take our "Managing Unconscious Bias" training to help reduce the effects of bias in the workplace and to help employees better understand diverse perspectives. In 2015, we made this training available publicly at https://managingbias.fb.com. We have since added many new internal programs, including: Managing Inclusion and Be The Ally. Managing Inclusion trains managers to understand the issues that affect underrepresented communities and to actively solicit input from people who may feel excluded. Be The Ally gives everyone at Facebook the common language, tools, and space to identify when someone may be experiencing bias and to stand up in support of them.

We are committed to a policy of inclusiveness and to pursuing diversity in terms of background and perspective when evaluating candidates for membership on our board of directors. Under our corporate governance guidelines, it is the policy of our board of directors to consider candidates with diverse backgrounds in terms of knowledge, experience, skills, and other characteristics, and to ensure that the initial list of candidates from which new director nominees are chosen includes candidates with a

diversity of race, ethnicity, and gender. Our corporate governance guidelines are available at http://investor.fb.com/governance.cfm.

We are also committed to promoting diversity among the companies that do business with Facebook. We believe that having diverse suppliers helps us build better products for our global community. Through our Supplier Diversity Program, we connect qualified diverse-owned businesses to our community while also helping these companies grow their businesses by using our apps and services. We publish information on our Supplier Diversity Program at https://www.facebook.com/suppliers/diversity.[9]

53.    The 2020 Proxy Statement approved by the Individual Defendants stated:

"*We have an obligation to build a culture of inclusion where everyone can thrive.*"

## II.    Defendants Had Knowledge of the Company's Violations of Law and Failed to Act in the Face of Numerous "Red Flag" Warnings

54.    The Board was required to oversee Facebook's compliance with anti-discrimination and other applicable laws, and to implement and monitor a reasonable system of internal controls and policies relating to anti-discrimination, diversity, and inclusion.

55.    Yet, during the relevant period, Defendants failed to act in the face of numerous "red flag" warnings indicating that the Company's internal controls and policies were not only insufficient, but actually fostered the discriminatory issues that ultimately resulted in discriminatory practices, a lack of diversity on the Board and among the Company's executive ranks, and the Company's repeated failure to stop hate speech that resulted in a massive boycott by advertisers.

56.    Going back to at least 2016, Facebook has been accused of facilitating illegal discrimination based on race, ethnicity, and other protected categories.

57.    On April 10, 2018, Zuckerberg was called to testify before the Senate Judiciary and Commerce Committees about Facebook's history allowing advertisers to discriminate by race in housing ads.  The hearing was noteworthy for many reasons, including the fact that it was Zuckerberg's first testimony before Congress.  In the past, Zuckerberg had sent deputies to testify, but due to the severity of the problems facing

---

[9] *See* 2019 Proxy at pp. 47-48.

Facebook Congress had demanded that Zuckerberg himself appear. The Individual Defendants were well aware of these facts which had required Zuckerberg to make a personal appearance on the Hill. As noted by NPR at the time:

> The remarkable hearing was a bit of a spectacle, at least by Senate committee hearing standards. It was also Zuckerberg's first appearance before Congress. He was the only witness in the joint session and will also be testifying before the House Energy and Commerce Committee on Wednesday.[10]

58. The following is a picture of Zuckerberg's testimony that appeared in the New York Times at the time:



59. While Zuckerberg was grilled on many topics at the hearing, he was asked many questions about Facebook's facilitation of discriminatory ads, as noted by news articles at the time:

"Topics Zuckerberg addressed include:

---

[10] *See* Camilia Domonoske, "*Mark Zuckerberg Tells Senate: Election Security Is An 'Arms Race'*," NPR, April 10, 2018.

Who's responsible for identifying violations: Sen. Chris Coons, D-Del., asked why Facebook puts the burden on users to flag content that needs to be taken down. Zuckerberg cited the "sheer volume" of material on Facebook and said new hires and AI tools will help improve the process over time. *"We can't wait five years for Facebook to get rid of housing discrimination content," Coons said, referring to allegations that the site lets housing and rental companies restrict who can see their ads, by excluding, for example, certain races*.

60.    The New York Times also ran an article regarding questions from Senator Booker about Facebook's discriminatory ads:

**Booker raised concerns about racial targeting**

*Senator Cory Booker*, Democrat of New Jersey, *questioned Mr. Zuckerberg over discriminatory uses of Facebook's advertising platform to target ads to users by race, and tools that law enforcement officials have reportedly used to surveil activists of color*.

Mr. Booker's questioning is notable given that he and Mr. Zuckerberg have a history of friendly collaboration dating back to 2010, when Mr. Zuckerberg donated $100 million to the public school system in Newark, where Mr. Booker was mayor at the time.

Mr. Booker has long been seen as a tech-friendly lawmaker, and he has known Mr. Zuckerberg for longer than most lawmakers. His tough stance today is a sign of how dramatically the political winds around Facebook have shifted.[11]

61.    Moreover, in his prepared written remarks disseminated to Congress and publicly posted prior to his testimony before Congress, Zuckerberg admitted the need to fix issues with Facebook's advertising policies:

**Strengthening our advertising policies**. We know some Members of Congress are exploring ways to increase transparency around political and issue advertising, and we're happy to keep working with Congress on that. *But we aren't waiting for legislation to act*.[12]

62.    Thus, Zuckerberg and the Individual Defendants were aware of, and admitted, problems with Facebook's advertising policies on April 10, 2018.    The following picture accompanied one of the New York Times articles at the time to emphasize the widespread call for substantial change necessary at Facebook:

---

[11] *See "Mark Zuckerberg Testimony: Senators Question Facebook's Commitment to Privacy,"* THE NEW YORK TIMES, April 10, 2018.

[12] Available at https://apps.npr.org/documents/document.html?id=4435458-Zuckerberg-Opening-Statement-Senate-Testimony, last visited June 30, 2020.

63.     Nonetheless, and despite Zuckerberg's representation that Facebook would fix the problems on its own and would not wait for Congress to pass a law to force it to make the changes, the Individual Defendants failed to take the admitted necessary corrective action subsequent to April 10, 2018. Indeed, the illegal and discriminatory advertising continued and even proliferated after the April 10, 2018 Congressional hearing.

64.     On July 12, 2018, an article was published in *USA Today* entitled "Facebook's diversity efforts failing African-American and Hispanic women." The article noted that:

SAN FRANCISCO — Facebook is inching toward increasing the diversity of its workforce but it still has a big problem: It's hiring very few black and Hispanic women.

The social media giant's latest diversity report released Thursday shows strides in boosting the ranks of some groups who've been underrepresented at Facebook from the beginning, but a closer look at the raw numbers reveals that these women of color are being largely left out of any progress.

You can almost count on one hand the number of black women – six – who work as senior managers or executives at Facebook in the U.S., accounting for less than 1 percent of those 769 jobs. The next layer of managers at Facebook isn't more diverse: 34 out of a total of 2,816, or 1.2 percent.

65.     On August 13, 2018, the United States Department of Housing and Urban Development filed a complaint against Facebook in which it alleged that Facebook has violated the Fair Housing Act by allowing advertising on its platform which discriminates based on race, ethnicity, gender, and other protected categories.  The HUD complaint alleged that:

> *Facebook unlawfully discriminates by enbling advertisers to restrict which Facebook users receive housing-related ads based on race, color, religion, sex, familial status, national origin and disability*.  Facebook mines extensive user data and classifies its users based on protected characteristics.  Facebook's ad targeting tools then invite advertisers to express unlawful preferences by suggesting discriminatory options, and Facebook effecuates the delivery of housing-related ads to certain users and not others based on those users' actual or imputed protected traits.

66.     As an example of Facebook's illegal conduct, HUD's complaint stated that:

> *Facebook enables advertisers to discriminate based on race and color by drawing a red line around majority-minority zip codes and not showing ads to users who live in those zip codes*.[13]

67.     On September 18, 2018, a complaint was filed against Facebook by the ACLU for gender discrimination, claiming that Facebook allowed advertisers to target men for ads such as "Help Wanted" and job ads, and prevent the ads from being seen by women.  This complaint was brought to the attention of the Individual Defendants.

68.     On November 27, 2018, an article entitled "Facebook Has a Problem With Black People, Former Employee Charges" was published in USA Today.  The article stated in part:

> SAN FRANCISCO – *Facebook has a problem with black people*.
> *That's the assessment of Mark Luckie, a former employee who says racial discrimination is real, both on the company's Silicon Valley campus and on the social media giant's platform.*
>
> A Facebook post he shared with management and employees earlier this month and released publicly on Tuesday exposes racial fault lines that Luckie says should be a matter of grave public alarm, with *the lack of*

---

[13] HUD Complaint at ¶7.

*representation and agency of black people inside Facebook directly affecting how black people on Facebook are treated.*[14]

69.    The USA Today article went on to state:

*Facebook has struggled for years to reverse hiring patterns that excluded underrepresented minorities and to create a corporate culture that welcomes them. At the same time, the lack of diversity in its workforce has translated into problems with the black community, which has high rates of engagement on Facebook.* Complaints have escalated from African-Americans that they are being unfairly targeted and censored for fighting back against racism on the platform after being falsely accused of using hate speech.

*That disenfranchisement of black people on Facebook is a direct result of how the few black employees who work there are marginalized inside the company, says Luckie,* a digital strategist and former journalist who's also worked at Twitter and Reddit, as well as The Washington Post and The Los Angeles Times.

*Black staffers at Facebook frequently complain of colleagues or managers calling them aggressive or hostile for how they share their thoughts, he says.* A few black employees said they were dissuaded by managers from becoming involved in internal groups for black employees or doing "black stuff." Black employees also told stories of being "aggressively accosted" by campus security. Luckie says at least two to three times a day, a Facebook employee would clutch their wallet when walking by him.[15]



Former employee Mark S. Luckie says Facebook has a problem with Black people.

[14] *See* Jessica Guynn, "*Facebook Has a Problem With Black People, Former Employee Charges,*" USA TODAY, Nov. 27, 2018.

[15] *Id.*

70.    These stories from the Company's own employees demonstrate that Facebook has very few Blacks among its employees.  The employees indicate that *"colleagues or managers call[] them aggressive or hostile for how they share their thoughts."* Even among the very top, on the Board itself, Mr. Chenault resigned because Zuckerberg himself did not want to hear Mr. Chenault's opinions; he just wanted him on the Board as a token Black for appearances, to make it look like Facebook valued diversity.

71.    And the Individual Defendants had actual knowledge of the *USA Today* article, as reflected by the fact that the reporter contacted Facebook prior to publication of the article for the Company's position on the article, and Facebook responded. As noted in the article:

> In an emailed statement, Facebook spokesman Anthony Harrison said the company is working to increase the range of perspectives of those who build its products.
>
> "The growth in representation of people from more diverse groups, working in many different functions across the company, is a key driver of our ability to succeed," Harrison said.[16]

72.    Facebook's response to the discrimination voiced by its own employees was again platitudes and empty promises to change.  Mr. Luckie was all too aware of this and told USA Today that:

> "*I know from being inside Facebook that Facebook doesn't take any action against the bad things that it has done unless it's held publicly accountable*," Luckie told USA TODAY.[17]

73.    The USA Today article reported on an internal post that Mr. Luckie made on Facebook's employee platform while he was still working there.  After Mr. Luckie made the post, other Black employees responded to his post and indicated they too had experienced discrimination and marginalization at Facebook:

---

[16] *Id.*

[17] *Id.*

*This truly resonated with me and flooded me with emotions and sadness that I am sure that plenty of us are all too familiar with from experiencing many of the examples you provided," commented one fellow employee.*

*One employee, who is new to Facebook, said she had already observed and heard stories of marginalization and mistreatment.* "Very disheartening considering how much love Black employees have for this company," she commented.

Others said they hoped Luckie's post would get the attention of senior management. Luckie tagged Facebook's Chief Executive Mark Zuckerberg and Chief Operating Officer Sheryl Sandberg in the Facebook post but he says they never responded.[18]

74.     The article also noted that:

At Facebook, which is mostly white, Asian and male, sensitivity to the Black Lives Matter movement has not always been evident. In 2016, Facebook employees crossed out "Black Lives Matter" and wrote "All Lives Matter" on the walls of the company's campus. . .

Brought on board to build partnerships with the black community, *Luckie says he arrived at Facebook hopeful that he could bring about change, only to have his efforts stymied and underfunded at every turn. On Facebook's Menlo Park, California, campus, where Black Lives Matter posters frequently outnumber black employees, he says he encountered racism*.[19]

75.     On February 22, 2020, an article was published in SHRM ONLINE entitled "Black Tech Employees Continue to Face Workplace Racism" which followed up on the Nov. 27, 2018 *USA Today* article about Mr. Luckie.  The article noted that:

An anonymous memo alleging Facebook still has a problem with racial bias is circulating inside the company one year after a former employee complained of racism and discrimination there, USA Today reported in November 2019.

The post from 12 current and former employees, first reported by Business Insider, details a number of incidents, suggesting *morale has sunk even lower since Mark Luckie published his Facebook post about discrimination on the company's Silicon Valley campus and on the social media giant's platform.*

76.     In March 2019, the Company settled five discrimination lawsuits in part by removing age, gender and ZIP Code targeting for housing, employment and credit-related ads.

---

[18] *Id.*

[19] *Id.*

77. Also in 2019, the Individual Defendants received an audit performed by Ernst & Young concerning how Facebook measures and reports data about video advertisements, which revealed deficiencies in Facebook's processes and internal controls. In addition, in the spring of 2020 the Media Rating Council warned Facebook that it could be denied a seal of approval that gives companies confidence they are getting what they pay for when it comes to advertising on its platforms. The notice said that Facebook had failed to address advertiser concerns identified in the E&Y 2019 audit.

78. On October 24, 2019, Mr. Zuckerberg was required to testify before the House Financial Services Committee about several issues, during which he faced questions about Facebook's discrimination in advertising from Rep. Maxine Waters and Rep. Alexandria Ocasio-Cortez. The testimony was broadcast live on television and all major news outlets ran stories about the testimony, of which the Individual Defendants were well aware. Forbes ran an article which noted:

> Facebook cofounder and CEO Mark Zuckerberg was hauled before Congress on Wednesday. . . ***Democratic congresswoman and committee chair, Maxine Waters, immediately laid into Zuckerberg right from the start. Waters made it abundantly clear that the hearing***, in addition to the core focus on Libra, ***would also include an array of charges previously levied against the social network. This includes allegations of violations of user privacy, running a monopoly, permitting discrimination within the company, allowing advertisements that engage in housing discrimination***, violations of election security, permitting misleading political ads, ***offering a haven for hate groups*** and raising the issue of breaking up Facebook.

> "I have come to the conclusion that it would be beneficial for all if Facebook concentrates on addressing its many existing deficiencies and failures before proceeding any further on the Libra project," said Waters.[20]

79. In late May 2020, Facebook came under heavy criticism by its own employees for refusing to censor or moderate a post from President Trump. In that post, Trump said "when the looting starts, the shooting starts," in regards to Black Lives Matter protesters.

---

[20] *See* Jack Kelly, "*Facebook CEO Mark Zuckerberg Lambasted Before Congress Over Libra, Data Privacy and Fake Political Ads*," FORBES, Oct. 24, 2019.

80. Then, in late June 2020, advertisers have announced their intention to boycott Facebook due to, among other things, the Company's failure to ban hate speech directed to Blacks and other minorities

81. On June 22, 2020, North Face, REI, and Patagonia announced plans to boycott Facebook and pledged not to pay for advertising on Facebook platforms:

> Several companies have suspended advertising on Facebook over the company's failure to address hate speech on the platform.
>
> *The outdoor apparel and product retailers the North Face, REI, and Patagonia have pledged not to pay for advertising on Facebook platforms as part of the "Stop Hate for Profit" campaign, launched Wednesday by advocacy groups including the Anti-Defamation League, the NAACP, and the Color Of Change*. The freelance job listing site Upwork and the internet company Mozilla have also joined the pledge.
>
> The movement asks advertisers to pressure the tech giant to adopt stricter policies against racist and hateful content on its platforms by pausing all spending on advertising with the company for the month of July.
> *Facebook makes $70bn in annual advertising revenue while "amplifying the messages of white supremacists"* and "permitting incitement to violence", according to the campaign.
>
> "We have long seen how Facebook has allowed some of the worst elements of society into our homes and our lives," said Jonathan Greenblatt, chief executive officer of the Anti-Defamation League, in a statement. *"Our organizations have tried individually and collectively to push Facebook to make their platforms safer, but they have repeatedly failed to take meaningful action*. We hope this campaign finally shows Facebook how much their users and their advertisers want them to make serious changes for the better."
>
> Facebook plans voter turnout push – but will not bar false claims from Trump.
>
> James Steyer, founder and CEO of Common Sense, a partner in the campaign, said he expected more companies to join in coming weeks. "Companies clearly have heightened awareness around issues of racial justice in the US right now," he said. "We are heartened by the progress and we think it is the right time for this."
>
> *The campaign cites a number of examples to argue Facebook has failed to address misinformation and hate speech: it made Breitbart News a "trusted news source" despite its history of working with white nationalists and neo-Nazis, was accused of allowing housing discrimination against communities of color, and failed to remove Holocaust denial posts*.

*See* Kari Paul, "*Facebook Faces Advertiser Revolt Over Failure to Address Hate Speech*," THE GUARDIAN, June 22, 2020.

82.     On Friday, June 26, 2020, Unilever announced it was boycotting Facebook and would discontinue its advertising on Facebook:

> *Unilever, the company behind brands such as Dove, Lipton and Hellmann's, is pulling advertising from Facebook and Twitter in the U.S. for the rest of the year,* adding to a growing list of companies protesting the social media site's handling of hate speech online.
>
> Unilever said in a statement it also plans to pull ads from Facebook-owned Instagram this year. *Civil rights groups have been pushing companies to put their financial weight behind a Facebook boycott because the social media sites continue to allow hateful and harmful content on their sites, according to the Anti-Defamation League.*
>
> "Continuing to advertise on these platforms at this time would not add value to people and society," Unilever wrote in a statement on its website. It cited "the polarized atmosphere in the U.S."
>
> *Unilever joins Patagonia, The North Face and others in announcing a temporary advertising boycott on Facebook in the last week.* Unilever's ice cream brand Ben & Jerry's had joined the boycott earlier in the week, before its parent company. The Hershey Company also said it would halt advertising on Facebook during July and cut its advertising on the site by one-third for the rest of this year.

*See* Rachel Lerman, "*Facebook faces a growing advertising boycott after consumer goods giant Unilever joins*," THE WASHINGTON POST, June 26, 2020.

83.     In response to the growing list of **over 100 advertisers** like Unilever that had announced plans by Friday, June 26, 2020 to boycott Facebook due to its repeated failure to ban hate speech, Facebook's stock tanked 8.3% on June 26, 2020.[21]

84.     On Sunday, June 28, 2020, several additional advertisers announced plans to join Unilever in its boycott of Facebook. Facebook announced plans to finally take some steps to ban hate speech, but the advertisers refused to withdraw from their plans to boycott Facebook, indicating that Zuckerberg's steps came too late:

> *Facebook's efforts to stem a growing client boycott by introducing new policies failed over the weekend, with big brands including Diageo, Starbucks and Levi's pulling spending.*

---

[21] By Sunday, June 28, 2020, the list had grown to 184 advertisers that had joined the boycott. The list of advertisers is available at https://docs.google.com/spreadsheets/d/1VSGhDwXm18yFf2BVCz0QJYFjCHrPhDuO-m5rCo0zoqI/edit#gid=0, last visited June 28, 2020.

*Facebook will head into July with dozens of brands including Unilever, Verizon and Coca-Cola cancelling advertising* for between a month and six months — despite last-ditch attempts by the social media network to stop the boycott gathering steam.

Facebook's chief executive Mark Zuckerberg on Friday announced plans on a live stream to prohibit hate speech in ads and better protect groups such as immigrants from attack. He also said the group would label posts that violate its policies but remain published because the platform deems it "in the public interest", citing certain speech by politicians as an example.

*The last-minute changes came just hours after Unilever, among Facebook's larger blue-chip clients, said it would pause spending on the platform* — as well as on Twitter — in the US, citing concerns about the proliferation of divisive content in the run-up to the 2020 presidential election.

*Facebook shares fell more than 10 per cent over the course of the week,* to $212.50 in after-hours trading on Sunday, while Twitter is down by around 14 per cent over the same period.

*Despite Mr. Zuckerberg's concessions, however, others have joined the list with pledges to pull back spending* across social media more widely, which could also deal a blow to smaller groups such as Snap, Twitter and newer entrant TikTok.

In a statement on Sunday, Starbucks said it would "pause advertising on all social media platforms while we continue discussions internally, with our media partners and with civil rights organizations in the effort to stop the spread of hate speech."

*See* Hannah Murphy, "*Facebook Fails to Stem Advertising Boycott Over Hate Speech,*" THE FINANCIAL TIMES, June 28, 2020.

85.    Every business entity -- whether publicly traded or not -- has certain legal obligations and responsibilities to its shareholders, customers, investors, and the public. These responsibilities include the obligation to be truthful and honest; to actually implement the policies and procedures that it represents it has adopted; and to not engage in racial discrimination, whether it is in its workforce or leadership positions. Facebook has failed on all counts.

86.    Facebook's Directors have long failed to ensure that Facebook curbs hate speech towards Blacks and minorities.    In 2018, Facebook's CISO, Alex Stamos, resigned after internal disagreement with the way the Company handled concerns regarding third parties' alleged use of the Facebook platform to spread misinformation.

87.    The same year, What's App founder Jan Koum resigned from Facebook's Board over disagreements with Zuckerberg and other Board members over Facebook's failure to ensure compliance with certain policies and laws.

88.    As Calvert Research & Management recently noted:

*"We are a country suffering from racial inequality. And we want the inequality and suffering to end.* Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. *Companies that are capable of understanding their roles in taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers."*[22]

89.    Facebook's directors have failed to take effective action against discrimination in all its various forms, and have failed to effectuate diversity and inclusion on the Board itself and the Company's executive ranks.  The time has come for them to be held liable for causing damage to the Company, including damage to its reputation and competitive position.

### III.    Defendants' Duties and Roles at Facebook

90.    The following chart reflects the Director Defendants' roles on the committees at the time of the 2019 Annual Meeting and Proxy:

[this space intentionally left blank]

---

[22] *See* John Streur, "More engagement needed to get companies to address racial inequality risks and issues," Calvert Research and Management, June 19, 2020, available at https://www.calvert.com/impact.php?post=more-engagement-needed-to-get-companies-to-address-racial-inequality-risks-and-issues-&sku=35910, last visited June 29, 2020.

| Director | Audit & Risk Oversight Committee[1][2] | Compensation & Governance Committee[3] |
|---|:---:|:---:|
| Marc L. Andreessen | * | |
| Erskine B. Bowles[4] | * | |
| Kenneth I. Chenault | * | |
| Susan D. Desmond-Hellmann | | * |
| Reed Hastings[4] | | + |
| Sheryl K. Sandberg | | |
| Peter A. Thiel | | * |
| Jeffrey D. Zients | + | |
| Mark Zuckerberg | | |

*Committee member
+Committee chair

91.     The following chart reflects the Director Defendants' roles on the committees at the time of the 2020 Annual Meeting and Proxy:

| Director | Audit & Risk Oversight Committee[1] | Compensation, Nominating & Governance Committee[2][3] |
|---|:---:|:---:|
| Peggy Alford | * | |
| Marc L. Andreessen | * | * |
| Kenneth I. Chenault[4] | * | |
| Andrew W. Houston | | * |
| Nancy Killefer | | |
| Robert M. Kimmitt | | |
| Sheryl K. Sandberg | | |
| Peter A. Thiel | | + |
| Tracey T. Travis | * | |
| Jeffrey D. Zients[4] | + | |
| Mark Zuckerberg | | |

(1)     In 2019, Erskine B. Bowles also served on Facebook's audit & risk oversight committee until May 2019. Tracey T. Travis and Peggy Alford were appointed to the audit & risk oversight committee in March 2020 and April 2020, respectively. Following the Annual Meeting, Ms. Travis served as chair of the audit & risk oversight committee.

(2)     In October 2019, Facebook's board of directors amended the charter of the compensation & governance committee to incorporate certain additional nominating functions and re-named the committee as the compensation, nominating & governance committee. Facebook does not distinguish between the prior and current committee names and referred to the compensation, nominating & governance committee throughout the proxy statement.

(3)    In 2019, the chair of Facebook's compensation, nominating & governance committee was Reed Hastings from January until May, Susan D. Desmond-Hellmann from May until October, and Peter A. Thiel from October through the end of 2019. Andrew W. Houston was appointed to the compensation, nominating & governance committee in April 2020.

(4)    Chenault and Zients were not nominees for election at the Annual Meeting and their terms as directors ended at the Annual Meeting.

92.    The duties of the Audit & Risk Oversight Committee were described by the Company in the 2019 Proxy as follows:

**Audit & Risk Oversight Committee**

As more fully described in its charter, our audit & risk oversight committee is directly responsible for, among other things:

•    selecting the independent registered public accounting firm to audit our financial statements;

•    ensuring the independence of the independent registered public accounting firm;

•    discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and that firm, our interim and year-end operating results;

•    developing procedures to enable submission of anonymous concerns about accounting or auditing matters;

•    considering the adequacy of our internal accounting controls and audit procedures;

•    reviewing related party transactions;
•    reviewing our program for promoting and monitoring compliance with applicable legal and regulatory requirements;

•    overseeing our major risk exposures and the steps management has taken to monitor and control such exposures, and assisting our board of directors in overseeing the risk management of our company;

•    pre-approving all audit and non-audit services to be performed by the independent registered public accounting firm; and

•    overseeing our internal audit function.

93.    As the Company's 2019 Proxy admitted, the Board itself, through its committees, is directly responsible for risk management:

**Board Role in Risk Oversight**

*Our board of directors as a whole has responsibility for overseeing our risk management* and believes that a thorough and strategic approach to risk oversight is critical. *The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by regular reports from our management team, including senior personnel that lead a variety of functions across the business, and from our internal audit department,* as well as input from external advisors, as appropriate. These reports are designed to provide timely visibility to the board of directors and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

IV. **Defendants Cause Facebook to File Materially Misleading Proxy Statements**

A. **The 2019 & 2020 Proxy Statements**

94. Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Facebook to issue the 2019 and 2020 Proxy Statements.

95. The Exchange Act requires publicly traded companies to disclose to shareholders "material information," the kind of information that an investor would want to know to protect their investment.

96. On April 12, 2019, Defendants caused Facebook to file the 2019 Proxy in connection with the 2019 annual stockholders meeting. The 2019 Proxy was reviewed and approved by Defendants Zuckerberg, Sandberg, Andreessen, Bowles, Desmond-Hellman, Hastings, Thiel, and Zients.

97. On April 10, 2020, Defendants caused Facebook to file the 2020 Proxy in connection with the 2020 annual stockholders meeting. The 2020 Proxy was reviewed and approved by Defendants Zuckerberg, Sandberg, Andreessen, Houston, Kimmitt, Killefer, Travis, Thiel, and Zients.

98. Notwithstanding their knowledge about the Company's failure to promote and achieve diversity and curtail discriminatory pay practices, the Director Defendants have caused the Company to consistently make false statements about the Company's commitment to diversity and the promotion of Blacks and other minority employees to positions of management and power.

99. The 2019 Proxy admitted that Zuckerberg controls Facebook:

**Controlled Company Status**

Because Mr. Zuckerberg controls a majority of our outstanding voting power, we are a "controlled company" under the corporate governance rules of The Nasdaq Stock Market LLC (Nasdaq).

100. In the 2019 Proxy, despite the concession that Zuckerberg completely controls Facebook, the Directors represented that the Board actively seeks diversity among its members:

*Facebook is committed to a policy of inclusiveness and to pursuing diversity in terms of background and perspective*. As such, when evaluating candidates for nomination as new directors, *it is the policy of our board of directors to consider candidates with diverse backgrounds* in terms of knowledge, experience, skills, and other characteristics, *and to ensure that the initial list of candidates from which new director nominees are chosen by the board includes candidates with a diversity of race, ethnicity, and gender*. In evaluating potential candidates for nomination, our board of directors considers the foregoing in light of the specific needs of the board of directors at that time and also considers advice and recommendations from our compensation & governance committee and Mr. Zuckerberg.

101. The Proxy also stated:

**Board Performance and Composition**

Our board of directors and its committees conduct an annual self-assessment of the performance of the board of directors, each committee, and each director. Our compensation & governance committee, which includes our Lead Independent Director, oversees the self-assessment process, and the results are reported to the board of directors. *Our board of directors also periodically reviews its composition to ensure that it appropriately reflects the knowledge, experience, skills, diversity, and other characteristics required to fulfill its duties*.

*Our board of directors believes that its composition appropriately reflects the knowledge, experience, skills, diversity, and other characteristics required to fulfill its duties*.

102. These statements were false and misleading. In reality, regardless of whether the Company's Compensation and Governance Committee (comprised of Defendants Thiel, Hastings, and Desmond-Hellmann in 2019 and Thiel, Andreessen, and Houston in 2020) ever made any efforts to recruit any Black individuals and other minorities to the Board, only one Black individual currently serves on the Board and Kenneth Chenault resigned from the Board because Zuckerberg would not listen to his

recommendations. Actions speak louder than words. In fact, the Board has never in good faith actively sought minority candidates and/or has only wanted minorities to be seen not heard. The phrase "committed to a policy of inclusiveness" implies that in fact active, good faith efforts have been made to include Blacks and minorities and to solicit and accept their advice. Instead of doing so, Facebook has just attempted to create the false impression that it is "committed" to doing so. This is the very definition of a misleading statement.

103. The 2019 Proxy also stated that Facebook takes steps to ensure diversity in its workforce:

**Diversity & Inclusion**
***We are committed to building a workforce that is as diverse as the communities we serve***. We support an open culture and encourage our workforce to bring their authentic selves to work.

We publish our global gender diversity and U.S. ethnic diversity workforce data annually. Our diversity report for 2018 is available at https://www.facebook.com/careers/diversity-report. ***To support our goals of diversifying our workforce, we globally rolled out our Diverse Slate Approach, which sets the expectation that hiring managers will consider candidates from underrepresented backgrounds when interviewing for an open position***. We have seen steady increases in hiring rates for underrepresented people since we started testing this approach in 2015. We also continue to expand our recruiting team and develop internship programs for women and minorities. Over 500 students have graduated from Facebook University, our training program for college freshmen from underrepresented groups with an interest in STEM/CS. Many have returned to work at Facebook.

***We believe retention, people development, and inclusion are just as crucial as recruiting. This is why we invest in our thriving Facebook Resource Groups and our annual Community events such as Women's Community Summit, Black Community Summit, Latin Community Summit, and Pride Community Summit***. These all help build community and support professional development. They are designed to empower, inspire, and provide resources to help our people grow professionally. We encourage all employees to take our "Managing Unconscious Bias" training to help reduce the effects of bias in the workplace and to help employees better understand diverse perspectives.

104. While Facebook states that it is committed to building a diverse workforce, the fact remains that there are no Blacks or other minorities among its senior executives.

105. Elsewhere in the 2019 Proxy Statement, a shareholder advanced the following proposal for the consideration of fellow shareholders:

*Resolved*, that the shareholders of the Facebook, Inc. (the "Company") request the Board adopt a policy to disclose to shareholders the following:

1. A description of the specific minimum qualifications that the Board's nominating committee believes must be met by a nominee to be on the board of directors; and

2. Each nominee's skills, ideological perspectives, and experience presented in a chart or matrix form.

The disclosure shall be presented to the shareholders through the annual proxy statement and the Company's website within six (6) months of the date of the annual meeting and updated on an annual basis.

**Supporting Statement**
We believe that boards that incorporate diverse perspectives can think more critically and oversee corporate managers more effectively. By providing a meaningful disclosure about potential Board members, shareholders will be better able to judge how well-suited individual board nominees are for the Company and whether their listed skills, experience and attributes are appropriate in light of the Company's overall business strategy. . .

***We believe a diverse board is a good indicator of sound corporate governance and a well-functioning board. Diversity in board composition is best achieved through highly qualified candidates with a wide range of skills, experience, beliefs, and board independence from management***.
We are requesting comprehensive disclosures about board composition and what qualifications the Company seeks for its Board, therefore we urge shareholders to vote FOR this proposal.

106. The Director Defendants opposed this resolution. In order to convince shareholders to vote against the resolution, the Director Defendants caused the following false statement to be included in the Proxy:

**FACEBOOK OPPOSING STATEMENT**

***We believe that implementing the proposal is unnecessary*** because our current disclosures effectively describe our board membership criteria and the experiences, qualifications, attributes, or skills that led our board of directors to recommend each of our current nominees for director.

In 2018, we updated our corporate governance guidelines, which are available on our website at investor.fb.com, regarding our board membership criteria and the role of diversity on our board of directors. ***The policy of our board of directors is to encourage the selection of directors who will contribute to our success and our mission to give people the power to build community and bring the world closer together.***

*Facebook is committed to a policy of inclusiveness and to pursuing diversity in terms of background and perspective*. As such, when evaluating candidates for nomination as new directors, *it is the policy of our board of directors to consider candidates with diverse backgrounds* in terms of knowledge, experience, skills, and other characteristics, and to ensure that the initial list of candidates from which new director nominees are chosen *includes candidates with a diversity of race, ethnicity, and gender*. Our board of directors also periodically reviews its composition to ensure that it appropriately reflects the knowledge, experience, skills, diversity, and other characteristics required to fulfill its duties.

107. The 2019 Proxy also contained a shareholder proposal to require an independent Board Chairman which stated:

*Resolved: Shareholders request the Board of Directors adopt as policy, and amend the bylaws as necessary, to require henceforth that the Chair of the Board of Directors, whenever possible, be an independent member of the Board*. This independence policy shall apply prospectively so as not to violate any contractual obligations. If the Board determines that a Chair who was independent when selected is no longer independent, the Board shall select a new Chair who satisfies the requirements of the policy within a reasonable amount of time. Compliance with this policy is waived if no independent director is available and willing to serve as Chair.

**Supporting Statement**:
Facebook CEO Mark Zuckerberg has been Board Chair since 2012. His dual-class shareholdings give him approximately 60% of Facebook's voting shares, leaving the board, even with a lead independent director, with only a limited ability to check Mr. Zuckerberg's power. We believe this weakens Facebook's governance and oversight of management. Selecting an independent Chair would free the CEO to focus on managing the Company and enable the Chairperson to focus on oversight and strategic guidance. The Council of Institutional Investors argues:

Having an independent chair helps the board carry out its primary duty — to monitor the management of the company on behalf of its shareowners. A CEO who also serves as chair can exert excessive influence on the board and its agenda, weakening the board's oversight of management. Separating the chair and CEO positions reduces this conflict, and an independent chair provides the clearest separation of power between the CEO and the rest of the board.

Facebook has resisted recent shareholder requests to separate these roles. In 2017, according to our calculations, a similar proposal received the support of 51% of the votes cast when excluding the shares of 13 executives and board members. However, the board has not acted on this important signal from its non-insider shareholders.

Google, Microsoft, Apple, Facebook, and Twitter have separate CEO and chairperson roles. More broadly, 59% of the S&P 1500 separated these roles as of April 2018.

*We believe this lack of independent board Chair and oversight has contributed to Facebook missing, or mishandling, a number of severe controversies, increasing risk exposure and costs to shareholders.* Examples from past years include:

- Russian meddling in U.S. elections
- Sharing personal data of 87 million users with Cambridge Analytica
- Data sharing with device manufacturers, including Huawei that is flagged by U.S. Intelligence as a national security threat
- Proliferating fake news
- Propagating violence in Myanmar, India, and South Sudan
- Depression and other mental health issues, including stress and addiction
- *Allowing advertisers to exclude black, Hispanic, and other "ethnic affinities" from seeing ads.*

In apologies, Mr. Zuckerberg has stated, "We didn't take a broad enough view of our responsibility." This broader view is what an independent Board Chair would provide, which we believe would benefit the company, its shareholders, and its global community of users.

108.   The Director Defendants caused Facebook to oppose the proposal, stating:

**FACEBOOK OPPOSING STATEMENT**

We believe that our current board structure is effective in supporting strong board leadership. Implementing the proposal is unnecessary because the leadership structure of our board of directors already provides for independent leadership and oversight of management.

109.   These statements were false and misleading because the Director Defendants did not genuinely believe them.  Facebook at all times has lacked an independent Chairman, resulting in great harm to Facebook as the Company, controlled by Zuckerberg, engaged in unlawful conduct with respect to discriminatory advertising, hiring, and pay practice.  The Individual Defendants actually believed that an independent chairman would help protect Facebook's interests, but agreed to include this opposition statement in the Proxy because it was what Facebook wanted and demanded.   A statement of support from the Directors would have likely substantially altered the votes at the 2019 Annual Meeting and been material to the voting decisions of shareholders.

110.   The 2019 Proxy also contained a Workforce Diversity shareholder proposal which asked Facebook to prepare a diversity report:

WHEREAS:

In 2016, Facebook CEO Mark Zuckerberg wrote, "We care deeply about diversity. That's easy to say when it means standing up for ideas you agree with. It's a lot harder when it means standing up for the rights of people with different viewpoints to say what they care about. That's even more important."

111. Facebook opposed the proposal and stated:

**FACEBOOK OPPOSING STATEMENT**

*Diversity of ideas is core to our business at Facebook. It enables us to build better products, make better decisions, and better serve the people who use our services.* We have a globally distributed workforce of more than 35,000 people, and it's in our interest as a business to ensure people feel safe, heard, and respected. We support an open culture and encourage our diverse workforce to bring their authentic selves to work.

*We offer trainings to help employees better understand diverse perspectives. In 2015, we publicly rolled out our comprehensive "managing bias training"* (https://managingbias.fb.com). We have since added several new internal programs, including Managing Inclusion and Be The Ally. *Managing Inclusion trains managers to understand the issues that affect underrepresented communities and actively solicit input from people who may feel excluded.* Be The Ally gives everyone at Facebook the common language, tools, and space to identify when someone may be experiencing bias and to stand up in support of them.

112. Facebook's 2019 Proxy contained representations regarding executive compensation. In 2019, the Compensation & Governance Committee was comprised of Defendants Desmond-Hellman, Hastings (Chair), and Thiel, who issued a report which was included in the Proxy concerning executive compensation, and who stated in the Proxy that:

Our compensation & governance committee has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and based on such review and discussions, the compensation & governance committee recommended to our board of directors that the Compensation Discussion and Analysis be included in this proxy statement.

THE COMPENSATION & GOVERNANCE COMMITTEE
Susan D. Desmond-Hellmann
Reed Hastings (Chair)
Peter A. Thiel

113.    The 2019 Proxy also contained a "Proposal No. 2:  ADVISORY VOTE TO APPROVE THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS" which stated:

> *In accordance with the rules of the Securities and Exchange Commission (SEC), we are providing stockholders with a non-binding advisory vote on the compensation program for our named executive officers*. This non-binding advisory vote is commonly referred to as a "say on pay" vote. The non-binding advisory vote on the compensation program for our named executive officers, as disclosed in this proxy statement, will be determined by the vote of a majority of the voting power of the shares present or represented at the 2019 Annual Meeting of Stockholders and voting affirmatively or negatively on the proposal.
>
> *Stockholders are urged to read the "Executive Compensation" section of this proxy statement, which discusses how our executive compensation policies and practices implement our compensation philosophy and contains tabular information and narrative discussion about the compensation of our named executive officers. Our compensation & governance committee and our board of directors believe that these policies and practices are effective in implementing our compensation philosophy and in achieving our goals*. Accordingly, our board of directors is asking the stockholders to approve the following resolution at the Annual Meeting:
>
> **RESOLVED**, that the stockholders approve, on an advisory basis, the compensation awarded to Facebook's named executive officers, as disclosed under SEC rules, including the Compensation Discussion and Analysis, the compensation tables, and related narrative disclosures included in this proxy statement.
>
> As an advisory vote, this proposal is not binding. However, *our board of directors and compensation & governance committee, which is responsible for designing and administering our executive compensation program, value the opinions expressed by stockholders in their vote on this proposal*, and will consider the outcome of the vote when making future compensation decisions for our named executive officers.

114.    As the proposal stated, "Stockholders are urged to read the 'Executive Compensation' section of this proxy statement" before voting on the proposal.  The Executive Compensation section of the Proxy, in turn, provided the following information regarding executive compensation at Facebook:

/ / /

/ / /

**Role of Our Compensation & Governance Committee**. *The compensation & governance committee is responsible for overseeing all aspects of our executive compensation program,* including executive salaries, payouts under our bonus plan, the size and structure of equity awards, and any executive perquisites. The compensation& governance committee is solely responsible for determining the compensation of our CEO and reviews and approves the compensation of our other executive officers.

115. During 2019 and 2020, the members of Facebook's **Compensation & Governance Committee** were Thiel, Hastings, and Desmond-Hellmann in 2019, and Thiel, Houston and Andreessen in 2020.

116. The 2019 Proxy further provided the following information in the "Executive Compensation" section:

**Cash Bonuses**. Our 2018 Bonus Plan (Bonus Plan) provides variable cash incentives, payable semi-annually, that are designed to motivate our executive officers to focus on company priorities and to reward them for individual results and achievements. In 2018, the individual target bonus percentage for each named executive officer was unchanged from 2017 at 75% of such executive's base salary. After the 2018 base salary increases noted above, target total cash compensation (base salary plus target bonus) for our named executive officers (other than our CEO) was below the 25th percentile of the target total cash compensation of executives holding similar positions at the companies in our Peer Group. All of our named executive officers, except our CEO, participated in the Bonus Plan in 2018.

For 2018, there were two six-month performance periods under our Bonus Plan, which we refer to as First Half 2018 and Second Half 2018. For each performance period in 2018, the compensation & governance committee approved a set of company priorities in order to focus our executive officers on key areas of performance for the period in question. The First Half 2018 and Second Half 2018 company priorities reflect operational and non-operational objectives established by our compensation & governance committee, in consultation with our CEO and CFO. The company priorities did not have specific target levels associated with them for purposes of determining performance under the Bonus Plan, and our compensation & governance committee had full discretion to determine the level of bonus payout for each performance period.

**2018 Bonus Plan Payouts**. We calculate Bonus Plan payouts to each participant using the **follo**wing formula:

**Base Eligible Earnings ($) x Individual Target Bonus Percentage (%) x** Individual Performance Percentage (%) x Company Performance Percentage (%) = Individual Bonus Payout ($)

**2018 Priorities and Company Performance Percentage**. Our First Half 2018 and Second Half 2018 company priorities as approved by the compensation & governance committee were as follows: grow our user base across all our products; increase sharing, engagement, and meaningful interactions; continue to achieve revenue growth and significant savings from efficiency;

improve product quality; improve security for our community; improve our brand; and make progress toward our long-term investments. None of these priorities were assigned any specific weighting or dollar amount of the target bonus. The compensation & governance committee exercised its discretion in determining the company performance percentage for our First Half 2018 and Second Half 2018 performance after taking into account our delivery of results in the areas identified by the company priorities, as well as our overall business, engineering, and product development achievements.

The First Half 2018 company performance percentage approved by the compensation & governance committee was 90%. In making this determination, the compensation & governance committee focused on our performance across all of the areas identified by the company priorities, with a particular focus on user growth and engagement, revenue growth, and brand in the First Half 2018, and also noted our significant investments in safety and security for our community.

The Second Half 2018 company performance percentage approved by the compensation & governance committee was 100%. In making this determination, the compensation & governance committee focused on our performance across all of the areas identified by the company priorities, with a particular focus on revenue, user growth and engagement, and our progress with respect to improving security for our community in the Second Half 2018.

Individual Performance Percentage. The individual performance percentage is based upon each executive officer's individual performance assessment for the performance period under consideration. Consistent with our pay-for-performance philosophy, a higher performance assessment results in a higher individual performance percentage (and vice-versa) such that it is possible for an executive with a low assessment to get less than their target bonus payout, or no bonus payout whatsoever. In 2018, potential individual performance percentages under our Bonus Plan were 0%, 85%, 100%, 125%, 200%, or 300%. An executive officer meeting our expected high level of performance expectations would receive an individual performance percentage of 100%.

Individual performance assessments for each named executive officer were determined in the discretion of the compensation & governance committee following discussions with our CEO and our COO (except in the case of our COO when her individual performance assessment was being determined). The performance assessment determinations were based on an overall subjective assessment of each executive officer's performance and no single factor was determinative in setting bonus payout levels, nor was the impact of any individual factor on the bonus quantifiable. We operate in a rapidly evolving and highly competitive industry and we set a high bar for performance expectations for each one of our named executive officers. The compensation & governance committee evaluates our named executive officers based on their overall performance, impact, and results, as well as their demonstration of strong leadership, long-term vision, effective execution, and management capabilities. First Half 2018 and Second Half 2018 payout levels and achievements and considerations for each named executive officer were as follows:

**Mark Zuckerberg**. Mr. Zuckerberg did not participate in the Bonus Plan in 2018. Although Mr. Zuckerberg did not participate in the Bonus Plan, the compensation & governance committee separately assessed his performance as our CEO. The compensation & governance committee shared its assessment with the independent members of our board of directors in executive session, and our Lead Independent Director shared this assessment with Mr. Zuckerberg.

**Sheryl K. Sandberg**. Ms. Sandberg received $239,872 for the First Half 2018 bonus based substantially on the overall performance of the company in the first half of 2018. Ms. Sandberg received $398,438 for the Second Half 2018 bonus, which reflected the continued strong growth in business performance and revenue growth, her leadership in response to safety and security concerns on our platform, and her contributions to recruiting key leadership talent.

**David M. Wehner**. Mr. Wehner received $214,494 for the First Half 2018 bonus based substantially on the overall performance of the company in the first half of 2018. Mr. Wehner received $285,000 for the Second Half 2018 bonus, which reflected the delivery of a comprehensive financial plan and budget for fiscal year 2019, continued building of strong relationships with our investors, and the continued strong leadership of our finance, enterprise engineering, real estate, and facilities organizations.

**Christopher K. Cox**. Mr. Cox received $214,494 for the First Half 2018 bonus based substantially on the overall performance of the company in the first half of 2018. Mr. Cox received $285,000 for the Second Half 2018 bonus, which reflected his continued strong leadership of the product organization, his strategy for our family of apps, and his contributions to developing key leadership talent.

**Mike Schroepfer**. Mr. Schroepfer received $214,494 for the First Half 2018 bonus based substantially on the overall performance of the company in the first half of 2018. Mr. Schroepfer received $356,250 for the Second Half 2018 bonus, which reflected his overall leadership of the engineering team, significant gains in the development of technology to assist with the proactive detection of content that violates our policies, and continued improvement in computing efficiency.

The following table summarizes the calculations that were used in determining the cash bonus paid to each of our named executive officers for 2018:

| Named Executive Officer | Performance Period | Base Eligible Earnings ($)[1] | Individual Bonus Percentage (Target Bonus) (%) | Individual Performance Percentage (%) | Company Performance Percentage (%) | Individual Bonus Payout ($) |
|---|---|---|---|---|---|---|
| Sheryl K. Sandberg | First Half 2018 | 418,077 | 75 | 85 | 90 | 239,872 |
| | Second Half 2018 | 425,000 | 75 | 125 | 100 | 398,438 |
| | Total | 843,077 | | | | 638,310 |

| | | | | | | |
|---|---|---|---|---|---|---|
| David M. Wehner | First Half 2018 | 373,846 | 75 | 85 | 90 | 214,494 |
| | Second Half 2018 | 380,000 | 75 | 100 | 100 | 285,000 |
| | Total | 753,846 | | | | 499,494 |
| Christopher K. Cox | First Half 2018 | 373,846 | 75 | 85 | 90 | 214,494 |
| | Second Half 2018 | 380,000 | 75 | 100 | 100 | 285,000 |
| | Total | 753,846 | | | | 499,494 |
| Mike Schroepfer | First Half 2018 | 373,846 | 75 | 85 | 90 | 214,494 |
| | Second Half 2018 | 380,000 | 75 | 125 | 100 | 356,250 |
| | Total | 753,846 | | | | 570,744 |

117. The Proxy also contained the following chart reflecting all compensation paid to Facebook's executive officers:

The following table presents summary information regarding the total compensation awarded to, earned by, or paid to each of the named executive officers for services rendered to us for the years ended December 31, 2018, 2017, and 2016.

| Name and Principal Position | Fiscal Year | Salary ($)[1] | Bonus ($)[2] | Stock Awards ($)[3] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Mark Zuckerberg | 2018 | 1 | — | — | 22,554,542[4] | 22,554,543 |
| CEO | 2017 | 1 | — | — | 9,101,965[4] | 9,101,966 |
| | 2016 | 1 | — | — | 6,015,431[4] | 6,015,432 |
| Sheryl K. Sandberg | 2018 | 843,077 | 638,310 | 18,423,523 | 3,823,508[5] | 23,728,418 |
| COO | 2017 | 795,769 | 640,378 | 21,072,431 | 2,687,643[5] | 25,196,221 |
| | 2016 | 738,077 | 1,293,635 | 19,908,426 | 2,609,319[5] | 24,549,457 |
| David M. Wehner | 2018 | 753,846 | 499,494 | 18,423,523 | 9,250 | 19,686,113 |
| CFO | 2017 | 711,539 | 633,317 | 21,072,431 | 9,000 | 22,426,287 |
| | 2016 | 662,692 | 940,421 | 14,931,596 | 9,566 | 16,544,275 |
| Christopher K. Cox[6] | 2018 | 753,846 | 499,494 | 18,423,523 | 9,250 | 19,686,113 |
| Former CPO | 2017 | 711,539 | 567,404 | 21,072,431 | 9,000 | 22,360,374 |
| | 2016 | 658,846 | 933,209 | 14,931,596 | 9,538 | 16,533,189 |
| Mike Schroepfer | 2018 | 753,846 | 570,744 | 18,423,523 | 9,250 | 19,757,363 |
| CTO | 2017 | 711,539 | 633,317 | 21,072,431 | 9,000 | 22,426,287 |
| | 2016 | 658,846 | 859,356 | 14,931,596 | 9,377 | 16,459,175 |

118. The information in the Proxy about executive compensation was false and misleading because it failed to disclose that the executives' achievement of performance goals was based in large part on the Company's unlawful and discriminatory advertising, hiring and pay practices. The compensation plans gave Defendants a strong incentive to continue concealing the true nature of the Company's discriminatory advertising practices in order to boost the Company's reported financial performance and achieve the performance measures such as earnings, financial return ratios, net income, and stock price, for which they could be awarded bonuses. Indeed, almost all Facebook's revenues come from advertising. But for Facebook's facilitation of discriminatory advertising by its customers, it would not have earned as high of revenues and profits, and thus the Company's executives would not have earned as much compensation. The Proxy was materially misleading by failing to disclose the fact that the Company's advertising revenues were enhanced by the unlawful discriminatory advertising practices alleged herein.

119. The false statements had their desired effect. At Facebook's annual meeting on May 30, 2019, all the incumbent white directors were re-elected. No competing Black or minority candidates made it on the ballot. The advisory executive compensation proposal passed; the shareholder proposals were defeated, including the proposal to replace Zuckerberg as Chairman with an independent Chairman. E&Y was re-appointed as the Company's auditor.

120. Facebook published the results of the voting at its annual meeting in a Form 8-K filed on June 3, 2019.

121. The 2019 Proxy was materially misleading because it failed to disclose:

(a) That the Company's revenues, which were based almost entirely from advertising, were supported by unlawful advertising practices that discriminated against Blacks and minorities in housing and other areas;

(b) That the statement with respect to Director nominees "that the initial list of candidates from which new director nominees are chosen by the board

includes candidates with a diversity of race, ethnicity, and gender" was misleading because the Company has not made substantial efforts to diversify its Board and, even when minorities were put on the Board, Zuckerberg would not listen to such Board members, thus making it impossible to truly diversify the Board.

(c)     That the Company's policies with respect to diversity and anti-discrimination were not effective and were not being complied with;

(d)     That the Board's Governance Committee did not take diversity into consideration when evaluating potential Board candidates, and instead simply claimed to do so in order to create a false appearance of compliance with the law;

(e)     That the Director Defendants did not genuinely believe the statement in the Proxy that it was not in the Company's best interests, or necessary, to have an independent Chairman since the current governance structure was working effectively; in fact, as demonstrated herein and below, the Individual Defendants all knew that Facebook's best interests were not being adequately protected by Zuckerberg serving as Chairman, as amply demonstrated by the consistent claims of discrimination at the Company and the massive advertiser boycott;

(f)     Defendants' knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access, and that rampant unlawful discrimination exists at the Company;

(g)     Defendants' knowledge, learned from Zuckerberg's testimony before Congress and public news reports, that discrimination in advertising and other problems were very serious and needed to be corrected, and that the Company had pledged to correct the problems but then failed to do so;

(h)     That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect

to diversity and anti-discrimination were being complied with;

(i)     That Defendants failed to appropriately address the Company's lack of diversity and discriminatory practices towards minorities in hiring and promotion and misleading claims regarding the same; and

(j)     That, as a result, the Company was at substantial risk of being boycotted by its advertising clients, being subject to large monetary fines, penalties, and adverse due to the fact that the Company was not in compliance with federal and state laws regarding hiring, promotion, advertising, and pay practices.

122.   The 2019 Proxy harmed the Company by interfering with the proper governance on its behalf that requires stockholders' informed voting of directors. As a result of the false or misleading statements in the 2019 Proxy, stockholders voted to re-elect all of the Defendants to the Board, voted in favor of the executive compensation proposal, and voted against requiring Facebook to have an independent Chairman.

123.   The statements in the 2019 Proxy conveyed that the Company's corporate governance structure provided effective oversight of management and Board accountability.  In reality, the Company's corporate governance structure and defective internal controls allowed senior executives and the Board to sidestep real accountability and instead continue perpetuating the discriminatory advertising practices that led to a massive boycott of the Company's advertising services by clients and led to further employee discontent over the Company's discriminatory pay practices and lack of diversity on both the Board and management.

124.   The 2019 Proxy, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to re-elect all of the Defendants to the Board while they were breaching their fiduciary duties to the Company and deliberately concealing material information concerning the Company's discrimination

against Black individuals and other minorities and its effects on the Company's business and reputation.

125.    The Company and its shareholders were harmed by the approval of incentive compensation awards to certain of the Individual Defendants who helped perpetrate the illegal discriminatory hiring, advertising, and compensation practices. Had shareholders known of the underlying misconduct at the Company, they would not have voted to keep the same Directors who were allowing the illegal practices to continue.  Even if the alleged fraudulent discriminatory practices began before the Proxy Statements issued, they continued after the Proxy Statements were issued because Board members elected by shareholders pursuant to the Proxy Statements allowed the practice to continue.

126.    **2020 PROXY** — The statements above that the Director Defendants caused the Company to make in the 2019 Proxy were substantially similar to statements they had caused Facebook to include in the 2020 Proxy, which was filed by Facebook with the SEC on April 10, 2020.  The 2020 Proxy contained a shareholder proposal asking that Facebook be required to have an independent Chairman that was substantially identical to the same proposal in the 2019 Proxy.

127.    The 2020 Proxy was approved by Director Defendants Zuckerberg, Sandberg, Andreessen, Houston, Thiel, Killefer, Kimmitt, Travis and Zients.

128.    For example, similar to the language in the 2019 Proxy, the 2020 Proxy stated the following with respect to the fact that Facebook did not need to have an independent Chairman of the Board since Mr. Zuckerberg and Defendant Kimmitt were allegedly already providing effective oversight of management:

> *We believe that our current board structure is effective in supporting strong board leadership. The board of directors does not require the separation of the offices of Chair and CEO*. However, when the positions of Chair and CEO are held by the same person, as is currently the case with Mr. Zuckerberg, our corporate governance guidelines provide that the independent directors shall designate a Lead Independent Director. Susan D. Desmond-Hellmann served as our Lead Independent Director from 2015 to 2019, and our independent directors designated Ambassador Kimmitt to serve as Lead Independent Director upon his appointment to our board of

directors in March 2020.

As Chairman of our board of directors, Mr. Zuckerberg presides over meetings of the board of directors and may call special meetings of the board of directors. Mr. Zuckerberg brings valuable insight to our board of directors due to the perspective and experience he brings as our founder and CEO. As a result of his leadership since our inception, Mr. Zuckerberg has unparalleled knowledge of our business, products, and operations. As our largest and controlling stockholder, Mr. Zuckerberg is invested in our long-term success.

As our Lead Independent Director, Ambassador Kimmitt provides independent oversight and promotes effective communication between our board of directors and management, including Mr. Zuckerberg. Our Lead Independent Director is appointed annually to serve until his or her successor has been appointed and qualified, or until his or her earlier death, resignation, or removal, or such time as he or she is no longer an independent director.

129.   The 2020 Proxy also stated the following with respect to diversity on the Board:

The policy of our board of directors is to encourage the selection of directors who will contribute to Facebook's success and our mission to give people the power to build community and bring the world closer together. ***Our compensation, nominating & governance committee is responsible for identifying and evaluating candidates for membership on our board of directors***, based on the criteria set forth in our corporate governance guidelines, and has sole authority to recommend nominees to our board of directors. The compensation, nominating & governance committee considers recommendations from other directors, stockholders, management, and others as it deems appropriate and uses the same criteria for evaluating candidates regardless of the source of the recommendation. Our board of directors is responsible for nominating persons for election to our board of directors upon the recommendation of our compensation, nominating & governance committee.

***Facebook is committed to a policy of inclusiveness and to pursuing diversity in terms of background and perspective. As such, when evaluating candidates for nomination as new directors, it is the policy of our compensation, nominating & governance committee to consider candidates with diverse backgrounds in terms of knowledge, experience, skills, and other characteristics, and to ensure that the initial list of candidates from which new director nominees are chosen by the board includes candidates with a diversity of race, ethnicity, and gender***. In evaluating potential candidates for nomination, our compensation, nominating & governance committee considers the foregoing in light of the specific needs of the board of directors at that time. In addition, our compensation, nominating & governance committee considers director tenure in connection with evaluating current directors for nomination for re-election..

130.   The 2020 Proxy also stated the following with respect to Board diversity:

Our board of directors believes that its composition appropriately reflects the knowledge, experience, skills, diversity, and other characteristics required to fulfill its duties. The current director nominees have diverse backgrounds and perspectives that enable them to provide valuable guidance on both strategic and operational issues.

131.   The 2020 Proxy claimed that Facebook was taking substantial steps to increase diversity, and had made "steady progress" in increasing the representation of women, but admitted that the Company had only made "some" progress towards increasing the number of Black and Hispanic people at the Company:

**Diversity & Inclusion**

*Diversity and inclusion are core to everything we do at Facebook*. We work to build a diverse and inclusive workplace where we can leverage our collective cognitive diversity to build the best products and make the best decisions for the global community we serve. We have made progress, but we still have more work to do.

*We have made steady progress in increasing representation of women* globally in technical, non-technical, and leadership roles, *and have made some progress on increasing the numbers of Black and Hispanic people in non-technical roles in the U.S.* For example, since 2014, we have increased the number of Black women at Facebook by a factor of 25 and the number of Black men by a factor of 10. We continue to focus on increasing the number of underrepresented people in technical and leadership roles. We publish our global gender diversity and U.S. ethnic diversity workforce data annually. Our Diversity Report for 2019 provides additional background about our journey and the progress we are making, and is available at https://about.fb.com/news/2019/07/2019-diversity-report/.

132.   The 2020 Proxy stated:

*"We have an obligation to build a culture of inclusion where everyone can thrive."*

133.   The 2020 Proxy also contained a Shareholder Proposal No. 5 to require an independent Chairman.  The Director Defendants, at Zuckerberg's bidding, caused the following statement to be included in the 2020 Proxy in opposition to the proposal:

We believe that our current board structure is effective in supporting strong board leadership. Implementing the proposal is unnecessary because the leadership structure of our board of directors already provides for independent leadership and oversight of management. Susan D. Desmond-Hellmann served as our Lead Independent Director from 2015 to 2019, and our independent directors recently designated Ambassador Kimmitt to serve as Lead Independent Director upon his appointment to our board of directors in March 2020.

134.    The 2020 Proxy also contained the following information about the pay disparity between the CEO and the median employee compensation:

**CEO Pay Ratio**

For the year ended December 31, 2019:
• the median of the annual total compensation of all employees of our company (other than our CEO) was $247,883; and

• *the annual total compensation of our CEO was $23,415,973*.
Based on this information, for 2019, *the ratio of the annual total compensation of our CEO to the median of the annual total compensation of all other employees was 94:1.* We believe this ratio is a reasonable estimate calculated in a manner consistent with Item 402(u) of Regulation S-K under the Exchange Act.

As permitted by SEC rules, to identify our median employee for 2019, we selected total direct compensation as our consistently applied compensation measure, which we calculated as actual salary paid to our employees for 2019 (including overtime for hourly employees), actual bonus or sales commission earned by our employees in 2019, and the value of equity awards granted to our employees in 2019. Further, we used October 31, 2019 to determine our employee population and used the consistently applied compensation measure as described above to determine our median employee. In determining this population, we included all worldwide full-time and part-time employees other than our CEO. We did not include any contractors or workers employed through a third-party provider in our employee population. For employees paid in other than U.S. dollars, we converted their compensation to U.S. dollars using the exchange rates used by us for various purposes in effect on October 31, 2019.

Based on this approach, we selected the individual who represented the median employee for 2019. We then calculated the annual total compensation for this individual using the same methodology we used for our named executive officers in our 2019 Summary Compensation Table. Although we identified a new median employee for 2019, our calculation methodology for 2019 was the same methodology used to calculate our 2018 pay ratio.

135.    The 2020 Proxy also contained a proposal submitted by the Director Defendants asking shareholders to approve executive compensation at the Company, in support of which the Proxy contained the following information, in part, about such compensation:

**Elements of Executive Compensation**
Our executive officer compensation packages generally include:
• base salary;
• performance-based cash incentives; and
• equity-based compensation in the form of RSUs.

We believe that our compensation mix supports our objective of focusing on at-risk compensation having significant financial upside based on individual performance and our performance relative to company priorities. We expect to continue to emphasize equity awards because of the direct link that equity compensation provides between stockholder interests and the interests of our executive officers, thereby motivating our executive officers to focus on increasing our value over the long term.

136.    The Proxy further stated:

2019 Bonus Plan Payouts. We calculate Bonus Plan payouts to each participant using the following formula:

Base Eligible Earnings ($) x Individual Target Bonus Percentage (%) x Individual Performance Percentage (%) x Company Performance Percentage (%) = Individual Bonus Payout ($)

2019 Priorities and Company Performance Percentage. Our First Half 2019 company priorities as approved by the compensation, nominating & governance committee were as follows:

• continue making progress on the major social issues facing the Internet and our company;
• build new experiences that meaningfully improve people's lives today and set the stage for even bigger improvements in the future;
• keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs; and
• communicate more transparently about what we're doing and the role our services play in the world.

Our Second Half 2019 company priorities as approved by the compensation, nominating & governance committee were as follows:

•    continue making progress on the major social issues facing the Internet **and our company, including privacy, safety, and security;**
•    build new experiences that meaningfully improve people's lives today and set the stage for even bigger improvements in the future;
•    keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs; and
•    communicate more transparently about what we're doing and the role our services play in the world.

137.    Based on the supposed achievement of these goals by the executive officers,

the Proxy said the following bonuses were paid:

138.    The following table summarizes the calculations that were used in

determining the cash bonus paid to each of our named executive officers for 2019:

| Named Executive Officer | Performance Period | Base Eligible Earnings ($)[1] | Individual Bonus Percentage (Target Bonus) (%) | Individual Performance Percentage (%) | Company Performance Percentage (%) | Individual Bonus Payout ($) |
|---|---|---|---|---|---|---|
| Sheryl K. Sandberg | First Half 2019 | 435,385 | 75 | 125 | 110 | 448,990 |
| | Second Half 2019 | 440,000 | 75 | 125 | 110 | 453,750 |
| | Total | 875,385 | | | | 902,740 |
| David M. Wehner | First Half 2019 | 390,385 | 75 | 125 | 110 | 402,584 |
| | Second Half 2019 | 395,000 | 75 | 125 | 110 | 407,344 |
| | Total | 785,385 | | | | 809,928 |
| Mike Schroepfer | First Half 2019 | 390,385 | 75 | 200 | 110 | 644,135 |
| | Second Half 2019 | 395,000 | 75 | 200 | 110 | 651,750 |
| | Total | 785,385 | | | | 1,295,885 |
| Jennifer G. Newstead | First Half 2019 | 13,077 | 75 | 100 | 110 | 10,788 |
| | Second Half 2019 | 340,000 | 75 | 100 | 110 | 280,500 |
| | Total | 353,077 | | | | 291,288 |

139.    The Proxy also noted that "Most of our executive officers' target total direct compensation is delivered through equity awards in the form of RSUs" and provided the following information about RSU awards to the executive officers:

| Named Executive Officer | Initial Equity Value ($) | Number of RSUs (#) | Vesting Start Date |
|---|---|---|---|
| Sheryl K. Sandberg | 20,000,000 | 118,949[1] | February 15, 2019 |
| David M. Wehner | 20,000,000 | 118,949[1] | November 15, 2019 |
| Mike Schroepfer | 20,000,000 | 118,949[1] | May 15, 2021 |
| Jennifer G. Newstead[2] | 15,000,000 | 80,611 | August 15, 2019 |

140.    These statements in the 2020 Proxy were false and misleading for the same reasons alleged above with respect to the false statements in the 2019 Proxy.

141.    The 2020 Proxy also contained a statement that Facebook's compensation policies did not create undue risks to the Company:

Our management team and the compensation, nominating & governance committee each play a role in evaluating, monitoring, and mitigating any risk that may exist relating to our compensation plans, practices, and policies for all employees, including our named executive officers. In early 2020, Compensia, the compensation, nominating & governance committee's independent compensation consultant, performed an assessment, in conjunction with management, of our compensation plans, practices, and policies and concluded that *our compensation programs do not create risks that are reasonably likely to have a material adverse effect on the company*.

142. This statement was false and misleading because it failed to disclose the substantial risks posed to the Company by Facebook's discriminatory advertising practices. The Defendants knew that, contrary to Zuckerberg's testimony to Congress in 2018, Facebook had not taken steps to eliminate the discriminatory practices, which in fact continued unabated at the time of the 2020 Proxy.

143. The Defendants also knew that advertising revenues constitute 98% of the Company's revenues – obviously a highly material percentage since it is almost all the Company's revenues. The Defendants also knew that advertising revenue was increasing each year and thus only becoming more critical to the Company's revenues, profits, and operations. Facebook reported companywide ad revenue of $69.7 billion in 2020, up from $55 billion in 2018 and $17.1 billion in 2015.[23]

144. As one article noted:

*Facebook's business model heavily relies on ads, as the majority of social network's revenue comes from advertising. In 2019, about 98.5 percent of Facebook's global revenue was generated from advertising,* whereas only around two percent was generated by payments and other fees revenue. Facebook ad revenue stood at close to 69.7 billion U.S. dollars in 2019, a new record for the company and a significant increase in comparison to the prior year.[24]

---

[23] *See* Sahil Patel, "*Facebook's Tensions With Advertisers Predate the Boycott*," THE WALL STREET JOURNAL, June 30, 2020.

[24] *See* "Facebook's advertising revenue worldwide from 2009 to 2019," available at https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/#:~:text=In%202019%2C%20about%2098.5%20percent,increase%20in%20comparison%20to%20the, last visited July 1, 2020.

## A. Facebook's Compensation, Nominating & Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board

145. The Charter of the Compensation, Nominating & Governance Committee states the following with respect to the duties of the Board members serving on such committee:

> The Compensation, Nominating & Governance Committee (the "Committee") of the Board of Directors (the "Board") of Facebook, Inc. (the "Company") through delegation from the Board, has principal responsibility to assist the Board with respect to compensation, director nomination and governance matters.
>
> With respect to its compensation functions, the Committee's purpose is to assist the Board with respect to compensation matters, including:
>
> ● evaluating, recommending, approving and reviewing executive officer compensation arrangements, plans, policies and programs maintained by the Company;
>
> ● administering the Company's equity-based compensation plans and the Company's bonus plan, whether adopted prior to or after the date of adoption of this charter (the "Charter") (including issuance of stock options and other equity-based awards granted other than pursuant to a plan); reviewing, assessing and making recommendations to the Board regarding non-employee director compensation; and
>
> ● making recommendations to the Board regarding its remaining responsibilities relating to executive compensation.
> With respect to its nominating and governance functions, the Committee's purpose is to assist the Board with respect to director nominations and corporate governance matters, including:
>
> ● identifying, evaluating, and, in its sole authority, recommending potential candidates for nomination to and membership on the Board and certain of its committees, including the Privacy Committee, once constituted;
>
> ● developing and recommending corporate governance guidelines and policies for the Company;
>
> ● overseeing an annual evaluation of the Board and its committees; and
>
> ● advising the Board on corporate governance matters and Board performance matters, including recommendations regarding the size, structure and composition of the Board and its committees.

146. The members of the Committee have breached their fiduciary duties as directors by failing to fulfill these duties. Rather than causing Facebook to comply with the principles it claims to follow with respect to its corporate governance, the Directors have caused Facebook to merely pay lip service to these principles. Instead of recommending well-qualified Black and minority candidates to serve on Facebook's Board, the Committee members have perpetuated a lack of diversity on the Board under the pretext that the existing members' "experience" and long tenure on the Board is beneficial to Facebook.

147. As the saying goes, the rich get richer while the poor get poorer. Serving on Facebook's Board has enriched the already-rich elites whose profitable sinecure has been perpetuated by the Defendants' wrongdoing. Many qualified Black and minority candidates would benefit greatly from the prestige and compensation that comes with a position on Facebook's Board. The following chart sets forth the compensation earned by outside directors on Facebook's Board in 2019:

| Director Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)[1] | Total ($) |
|---|---|---|---|
| Peggy Alford[2] | 29,444 | 304,873 | 334,317 |
| Marc L. Andreessen[3] | 70,000 | 304,873 | 374,873 |
| Erskine B. Bowles[4] | 29,167 | — | 29,167 |
| Kenneth I. Chenault[5] | 70,000 | 304,873 | 374,873 |
| Susan D. Desmond-Hellmann[6] | 92,500 | 304,873 | 397,373 |
| Reed Hastings[7] | 20,833 | — | 20,833 |
| Peter A. Thiel[8] | 50,000 | 304,873 | 354,873 |
| Jeffrey D. Zients[9] | 100,000 | 304,873 | 404,873 |

148. The following chart sets forth the compensation earned by Facebook's executives in 2019:

| Name and Principal Position | Fiscal Year | Salary ($)[1] | Bonus ($)[2] | Stock Awards ($)[3] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Mark Zuckerberg | 2019 | 1 | — | — | 23,415,972[4] | 23,415,973 |
| CEO | 2018 | 1 | — | — | 22,554,542[4] | 22,554,543 |
| | 2017 | 1 | — | — | 9,101,965[4] | 9,101,966 |
| Sheryl K. Sandberg | 2019 | 875,385 | 902,740 | 19,678,923 | 5,687,099[5] | 27,144,147 |
| COO | 2018 | 843,077 | 638,310 | 18,423,523 | 3,823,508[5] | 23,728,418 |
| | 2017 | 795,769 | 640,378 | 21,072,431 | 2,687,643[5] | 25,196,221 |

| | | | | | |
|---|---|---|---|---|---|
| David M. Wehner | 2019 | 785,385 | 809,928 | 19,678,923 | 59,800[6] | 21,334,036 |
| *CFO* | 2018 | 753,846 | 499,494 | 18,423,523 | 9,250 | 19,686,113 |
| | 2017 | 711,539 | 633,317 | 21,072,431 | 9,000 | 22,426,287 |
| Mike Schroepfer | 2019 | 785,385 | 1,295,885 | 19,678,923 | 52,784[7] | 21,812,977 |
| *CTO* | 2018 | 753,846 | 570,744 | 18,423,523 | 9,250 | 19,757,363 |
| | 2017 | 711,539 | 633,317 | 21,072,431 | 9,000 | 22,426,287 |
| Jennifer G. Newstead | 2019 | 353,077 | 2,291,288[8] | 16,309,218 | 183,162[9] | 19,136,745 |

**B.** **The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination**

149. The Director Defendants have known for years that Facebook has been violating federal and state laws regarding anti-discrimination in advertising, diversity, and equal pay.

150. Defendants' knowledge is reflected by the facts alleged herein demonstrating that the Board had knowledge of serious deficiencies in these areas, yet failed to take action.

151. Mr. Zuckerberg even represented to Congress in 2018 that Congress did not need to pass laws to force Facebook to change, since Facebook was already fixing the problems on its own. Yet, thereafter the problems persisted and even increased, as for example discriminatory advertising continued to exist.

152. Eventually, a massive boycott of over 300 of the Company's advertisers was established in late June 2020 due to the Director Defendants' persistent failure to address lack of diversity, discriminatory advertising, and other serious problems at the Company.

**C.** **The Board Has Breached Its Duties by Failing to Ensure an Independent Chairman**

153. There is no independent Chairman of the Board at Facebook. Mark Zuckerberg fills that role. Facebook purports to assign some significance to the fact that the Company has a Lead Independent Director. But Zuckerberg controls all aspects of the management of Facebook and owns a majority of the voting shares of the Company;

Facebook admits in its SEC filings that it is a "controlled company." Zuckerberg is the face of the Company and dominates and controls all persons at Facebook, even the Lead Independent Director.

154. Simply put, the Director Defendants had a fiduciary duty to ensure that the Chairman of the Board was independent. They have completely failed to do so, and their failure to do so has been a huge part of the problem, allowing the lack of diversity to continue at Facebook, both among the management ranks and on the Board itself. As demonstrated below, the lack of an independent Chairman at Facebook has also resulted in the massive boycott of advertising at the Company, which is highly material to Facebook since advertising as a whole represents over 98% of the Company's revenues.

**D.    The Director Defendants Have Breached Their Duties by Continually Re-Hiring Ernst & Young as the Company's Auditor**

155. Ernst & Young is the Company's auditor, and has been so since 2007 – thirteen years and counting.

156. As Facebook's Proxy Statement from 2020 disclosed, the following table sets forth the approximate aggregate fees billed to Facebook by EY for fiscal 2019 and fiscal 2018:

|  | 2019 | 2018 |
|---|---|---|
| Audit fees[1] | $13,270 | $10,857 |
| Audit-related fees[2] | 575 | 805 |
| Tax fees[3] | 8,481 | 7,144 |
| All other fees[4] | 9 | 5 |
| Total fees | $22,335 | $18,811 |

157. Despite billing Facebook over $23 million in fees in 2019, E&Y has completely failed to properly audit and assess the Company's internal controls.

158. Defendants Zients (Chair) and Andreessen, as the members of Facebook's Audit & Risk Oversight Committee, are responsible for selecting and monitoring Ernst & Young. The Company's 2020 Proxy states:

The audit & risk oversight committee of the board of directors has selected Ernst & Young LLP to be our independent registered public accounting firm for the fiscal year ending December 31, 2020, and recommends that the stockholders vote for ratification of such appointment. Ernst & Young LLP has been engaged as our independent registered public accounting firm since 2007. The ratification of the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2020 will be determined by the vote of a majority of the voting power of the shares present or represented at the 2020 Annual Meeting of Stockholders (Annual Meeting) and voting affirmatively or negatively on the proposal. In the event of a negative vote on such ratification, the audit & risk oversight committee will reconsider its appointment.

159.   Defendants Zients and Andreessen, as the members of Facebook's Audit & Risk Oversight Committee, also prepared and included a report in the 2019 Proxy as follows:

**REPORT OF THE AUDIT & RISK OVERSIGHT COMMITTEE OF THE BOARD OF DIRECTORS**

This report of the audit & risk oversight committee is required by the Securities and Exchange Commission (SEC) and, in accordance with the SEC's rules, will not be deemed to be part of or incorporated by reference by any general statement incorporating by reference this proxy statement into any filing under the Securities Act of 1933, as amended (Securities Act), or under the Securities Exchange Act of 1934, as amended (Exchange Act), except to the extent that we specifically incorporate this information by reference, and will not otherwise be deemed "soliciting material" or "filed" under either the Securities Act or the Exchange Act.

The principal purpose of the audit & risk oversight committee is to assist the board of directors in its general oversight of our accounting practices, system of internal controls, audit processes and financial reporting processes. The audit & risk oversight committee is responsible for appointing and retaining our independent auditor and approving the audit and non-audit services to be provided by the independent auditor. The audit & risk oversight committee's function is more fully described in its charter.

Our management is responsible for preparing our financial statements and ensuring they are complete and accurate and prepared in accordance with generally accepted accounting principles. Ernst & Young LLP (EY), our independent registered public accounting firm for 2019, was responsible for performing an independent audit of our consolidated financial statements and expressing an opinion on the conformity of those financial statements with generally accepted accounting principles and as to the effectiveness of our internal control over financial reporting.

The audit & risk oversight committee has reviewed and discussed our audited financial statements for the year ended December 31, 2019 with management and with EY. These audited financial statements are included in our Annual Report on Form 10-K for the year ended December 31, 2019 (Annual Report).

The audit & risk oversight committee has also discussed with EY the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board (PCAOB) and the SEC.

The audit & risk oversight committee also has received and reviewed the written disclosures and the letter from EY required by applicable requirements of the PCAOB regarding EY's communications with the audit & risk oversight committee concerning independence, and has discussed with EY its independence.

Based on the review and discussions described above, the audit & risk oversight committee recommended to the board of directors that the audited financial statements be included in the Annual Report for filing with the SEC.

THE AUDIT & RISK OVERSIGHT COMMITTEE
Marc L. Andreessen
Kenneth I. Chenault
Jeffrey D. Zients (Chair)

160.    E&Y has served as Facebook's auditor *since 2007*, giving rise to a cozy and clubby relationship between E&Y and Facebook which is not conducive to effective auditing.  The Company's compliance with its stated policies concerning the alleged commitment to diversity and prohibition of discriminatory practices in advertising and other areas has been abysmal to the point of being basically non-existent.

161.    The very purpose of an auditor is to assess the Company's internal controls and determining whether they are functioning effectively.  Rather than doing so, Ernst & Young has wrongfully and consistently given Facebook's internal controls a clean bill of health and has failed to point out the obvious – that Facebook lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

162.    Defendants Zients, Andreessen, and Bowles (Bowles was a member in 2019), as the members of the Audit & Risk Oversight Committee, breached their fiduciary duties by failing to perform their duties on the Committee, including failure to ensure that an adequate audit was being performed of the Company's internal controls regarding diversity, anti-discrimination, anti-harassment, pay equity, and other relevant areas of critical importance to the Company.  They also signed the 2019

and 2020 Proxy Statements that contained false statements regarding the Company's internal controls being effective and adequate, which were false and gave a very misleading and inaccurate portrayal of these key issues to stockholders.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### I. General Duties as Directors and Officers

163. By reason of their positions as Facebook's officers and directors and because of their ability to control Facebook's business and corporate affairs, the Individual Defendants owed Facebook and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage Facebook in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Facebook and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

164. Each director and officer owes to Facebook and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of loyalty and fair dealing, in the administration of Facebook affairs and in the use and preservation of its property and assets.

165. The Individual Defendants, because of their positions of control and authority as Facebook's directors and officers, were able to and did directly and/or indirectly, exercise control over the misconduct complained of herein.

166. To discharge their duties as Facebook's officers and directors, the Individual Defendants were required to exercise reasonable and prudent supervision over Facebook's management, policies, practices, and controls of the affairs of the Company. Accordingly, the Individual Defendants were required to:

   a. Manage, conduct, supervise, and direct the employees, businesses, and affairs of Facebook in accordance with laws, rules, and regulations, as well as the charter and by-laws of Facebook;

   b. Ensure that Facebook did not engage in imprudent or unlawful

practices and that the Company complied with all applicable laws and regulations;

c.    Remain informed as to how Facebook was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d.    Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Facebook, and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company;

e.    Preserve and enhance Facebook's reputation as befits a public corporation;

f.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; and

g.    Refrain from unduly benefiting themselves and other Facebook insiders at the expense of the Company.

167.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's operations, business, products, management, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

## II.   The Duty of Reasonable and Prudent Supervision

168.   The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants are required to, among other things:

a.   refrain from acting upon material inside corporate information to benefit themselves;

b.   ensure that Facebook complies with its legal obligations and requirements, including timely notifying its customers of material data misappropriations and security vulnerabilities in its products and disseminating truthful and accurate statements to the investing public;

c.   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

d.   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and compliance with the law;

e.   remain informed as to how Facebook conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

f.   ensure that Facebook was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF FIDUCIARY DUTIES

169.   Each Individual Defendant owed to Facebook and to its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in

managing and overseeing Facebook's affairs, as well as in the use and preservation of its property and assets. The Individual Defendants' misconduct involves a knowing and culpable violation of their obligations as directors and officers of Facebook, the absence of good faith on their part, or a reckless disregard of their duties that they were aware or should have been aware posed a risk of serious injury to Facebook. Each Individual Defendant ratified each other's misconduct because they collectively comprised Facebook's Board at all relevant times.

170. The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to engage in the conduct alleged herein.

171. In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of governmental investigations lawsuits, and advertiser boycotts. As a result, Facebook has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONTROL, ACCESS, AND AUTHORITY

172. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Facebook.

173. Because of their advisory, executive, managerial, and directorial positions with Facebook, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Facebook.

174. Each of the Individual Defendants was the agent of each of the other Defendants and of Facebook, and was at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

175.   In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants further aided and abetted or assisted each other in breaching their respective duties.

176.   During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the facts alleged herein.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

177.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Facebook to conceal from Facebook's users and the investing public the unlawful facts alleged herein, including the fact that the advertising revenues that constitute 98% of the Company's income were plagued by unlawful discriminatory practices in violation of federal and state law.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

178.   The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to conceal from its customers and shareholders the material vulnerabilities on Facebook's platform and advertising practices, as well as the fact that the Company was not effectively complying with its policies and goals with respect to diversity and inclusion.

179.   Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the

accomplishment of that wrongdoing, and was aware of his (or her) overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO FACEBOOK

180.    The Individual Defendants' misconduct has caused extreme reputational damage to the Company.  This is especially harmful to Facebook because the Company is built on customer and client trust.  The Individual Defendants clearly breached this trust by acting in direct contravention of the Company's publicly-touted representations.  This reputational harm has resulted in long-term damage to the Company.

181.    The illegal practices and the Individual Defendants' gross failures to timely address, remedy, or disclose them also severely damaged Facebook's reputation within the business community and in the capital markets, as evidenced by, for example, the more than 300 advertisers who have boycotted Facebook — and the Individual Defendants' knowledge of or conscious disregard of it — since the problems were revealed.

182.    Further, Facebook's customers and current and potential investors expect the Company to promote diversity and to prevent discrimination in all its forms, and to immediately discover and properly address discriminatory practices.  The Company's advertisers and users are less likely to use websites that knowingly permit or encourage unscrupulous behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information.  Facebook's ability to attract advertisers, users and investors is now impaired.

183.    Further, as a direct and proximate result of Defendants' actions, Facebook has expended and will continue to expend significant additional money, including: (a) costs incurred in defending against, and the potential settlement of, civil and governmental lawsuits brought against the Company related to the discriminatory practices; (b) loss of advertising revenue; and (c) costs incurred from the substantial compensation and benefits paid to Defendants, who are responsible for the scheme.

184.    Plaintiff brings this action for the benefit of Facebook to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of federal and state laws.

185.    Facebook is named solely as a nominal defendant.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

186.    Plaintiff is and has continually been a Facebook shareholder during the entire period of wrongdoing alleged herein.  Plaintiff therefore will adequately and fairly represent the interests of Facebook in enforcing and prosecuting its rights.

187.    Facebook's Board at the time this action was initiated consisted of the following nine directors:  Zuckerberg, Sandberg, Andreessen, Killefer, Travis, Thiel, Kimmitt, Houston, and non-Defendant Alford.  Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

## I.    Demand Is Excused Because the Individual Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment

188.    Plaintiff did not make a demand on the Board prior to instituting this action because any demand would have been a wasteful and futile act, and therefore demand is futile.  The wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of Defendants' fiduciary duties.  Those acts, which are detailed above, include, *inter alia*: (a) maintaining policies that allowed advertisers to violate federal and state laws prohibiting discrimination; (b) maintaining woefully inadequate internal controls over the Company's disclosures and governance practices; and (c) causing Facebook to file materially false and misleading SEC filings.

189.    These acts, and the other improper acts set forth in this Complaint, which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment.  Defendants Zuckerberg, Sandberg, Andreessen, Killefer, Travis, Thiel, Kimmitt, and Houston all approved at least some of the wrongdoing.

190.    Defendants' misconduct at the heart of this case constitutes the direct

facilitation of violations of federal and state laws, including knowingly and consciously presiding over the Company's systematic discriminatory practices in hiring, promotion, pay, inclusion, and advertising, as well as failing to stop the proliferation of hate speech on Facebook and concealing Facebook's involvement in the illicit discriminatory scheme. Among other things, the Individual Defendants made, or caused Facebook to make, materially false or misleading statements, including in the 2019 & 2020 Proxy Statements, and Defendants Zuckerberg, Sandberg, Andreessen, Killefer, Travis, Thiel, Kimmitt, and Houston all directly approved at least some of the conduct and failed to cause the Company to stop the unlawful conduct despite being aware of red flags demonstrating the violations of law.

191. Defendants' repeated disregard of their responsibility to safeguard the Company against wrongdoing indicate they knowingly adopted, endorsed, or condoned a business strategy that incorporated the unlawful discriminatory practices and hate speech in advertising and hiring/promotion/pay, which were not a legitimate exercise of business judgment. Demand is therefore excused.

## II. Demand Is Excused Because the Individual Defendants Face a Substantial Likelihood of Liability Due to Their Knowledge or Conscious Disregard of Facts Relating to the Unlawful Practices

192. Demand is also excused because the Individual Defendants face a substantial likelihood of liability for the claims alleged against them in this complaint, given their awareness or conscious disregard of significant red flags relating to the illicit practices which allowed discrimination and hate speech.

193. The Individual Defendants were aware of the unlawful discriminatory practices at Facebook but failed to address and correct the practices. In particular, the Individual Defendants had affirmative obligations to oversee Facebook's compliance with federal and state anti-discrimination laws.

194. All the Individual Defendants were aware of the complaint filed by HUD regarding Facebook's discriminatory advertising practices and yet failed to stop the practices and actually allowed the unlawful advertising to increase.

195.  The members of the Audit Committee consciously ignored their obligations as provided in the Audit Committee Charter, in addition to their duties imposed by law, because despite the numerous lawsuits, investigations, and reports asserting discrimination, which reflected failings in the Company's internal controls, they did not cause Facebook to remediate those control deficiencies.  The Audit Committee's deliberate failure of oversight constituted breaches of their fiduciary duties to Facebook and has resulted in significant harm to the Company.

196.  Further, the Audit Committee members were charged with ensuring the integrity of the Company's financial statements and the adequacy and reliability of disclosures to its stockholders, including the Company's internal controls.  By approving false financial statements and the false 2019 and 2020 Proxies, the Audit Committee members breached their fiduciary duties of candor and loyalty.

197.  The Board members on the Compensation Committee also allowed the Company to pay huge amounts of money to the Company's executives tied to the achievement of financial metrics and goals, which would not have been achieved but for the discriminatory advertising policies and other discriminatory conduct.  They therefore breached their duties of good faith and loyalty to the Company, excusing demand.

198.  Accordingly, there is significant doubt that the Individual Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, as well as other violations of law.

199.  Given their membership on the Audit Committee and/or the Compensation & Governance Committee, their respective responsibilities, and their failures to meet them, the Individual Defendants face a substantial likelihood of liability for the misconduct alleged in this Complaint, thus excusing the demand.

200.  The entire Board had the duty to ensure Facebook's systems were sufficiently well-designed to prevent discrimination in its advertising.  The Board's

duty was heightened by the fact that the government had filed a complaint against Facebook in March 2019. Despite being sued, Facebook's Board allowed the illegal advertising to continue and indeed proliferate. In short, the Board chose profits over compliance with the law, a blatant breach of the Director Defendants' duties of loyalty and good faith. Because the Director Defendants cannot be indemnified for these breaches, they face a substantial likelihood of liability; demand is thus futile.

201. The Board failed to fulfill its duty, and its failure is even more egregious in light of the many "red flag" warnings both before and during the Relevant Period that Facebook's systems were not sufficient to address the misconduct at issue in this Complaint. Given the Board's awareness and deliberate concealment of the extent of the discriminatory advertising and hate speech from the public, it is clear the Board either deliberately or recklessly failed to take remedial actions to stop the practices that allowed the illicit scheme to continue.

202. The Board's egregious breaches of the duties of loyalty and good faith eventually resulted in massive damage to Facebook in June 2020, as its own employees engaged in a massive walkout in protest over the wrongdoing and over 300 of the Company's advertisers boycotted Facebook, materially harming the Company's revenues and profits and tarnishing its goodwill and image.

203. For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of personal liability, demand is futile.

III. **Demand Is Excused Because the Board Is "Controlled" by Defendant Zuckerberg and, thus, the Board Lacks Independence**

204. Demand is futile because the Board is dominated and controlled by Zuckerberg, who controls 59.7% of the voting power of the Company's outstanding stock, and thus has majority voting power over all aspects of the Company.

| Name of Beneficial Owner | Shares Beneficially Owned | | | | % of Total Voting Power[1] |
|---|---|---|---|---|---|
| | Class A | | Class B | | |
| | Shares | % | Shares | % | |
| **Named Executive Officers, Directors, and Nominees:** | | | | | |
| Mark Zuckerberg[2] | 4,284,831 | * | 363,588,585 | 81.8 | 53.1 |
| Shares subject to voting proxy[3] | — | — | 32,595,276 | 7.3 | 4.8 |
| Total[2][3] | 4,284,831 | * | 396,183,861 | 89.1 | 57.9 |
| Sheryl K. Sandberg[4] | 1,341,376 | * | — | — | * |
| David M. Wehner[5] | 72,304 | * | — | — | * |
| Mike Schroepfer[6] | 1,027,456 | * | — | — | * |
| Jennifer G. Newstead[7] | 9,995 | * | — | — | * |
| Peggy Alford[8] | 2,033 | * | — | — | * |
| Marc L. Andreessen[9] | 188,048 | * | — | — | * |
| Kenneth I. Chenault[10] | 3,717 | * | — | — | * |
| Andrew W. Houston[11] | 391 | * | — | — | * |
| Nancy Killefer[12] | 270 | * | — | — | * |
| Robert M. Kimmitt | — | — | — | — | — |
| Peter A. Thiel[13] | 11,561 | * | — | — | * |
| Tracey T. Travis[14] | 270 | * | — | — | * |
| Jeffrey D. Zients[15] | 3,253 | * | — | — | * |
| All current executive officers and directors as a group (15 persons)[16] | 7,023,133 | * | 396,183,861 | 89.1 | 57.9 |
| **Other 5% Stockholders:** | | | | | |
| Dustin Moskovitz[17] | — | — | 32,595,276 | 7.3 | 4.8 |
| Eduardo Saverin[18] | 7,535,009 | * | 45,928,139 | 10.3 | 6.8 |
| Entities affiliated with BlackRock[19] | 158,189,972 | 6.6 | — | — | 2.3 |
| Entities affiliated with Vanguard[20] | 184,022,113 | 7.6 | — | — | 2.7 |
| Entities affiliated with FMR LLC[21] | 123,626,512 | 5.1 | — | — | 1.8 |

205.    In fact, to ensure Zuckerberg's voting control over the Company, the Board consistently recommended to shareholders, at annual meetings from 2014 to 2020, to vote against shareholder proposals that were designed to reduce Zuckerberg's voting power by adopting a one-vote-per-share policy.

206.    Moreover, the Company admits in its SEC filings that Facebook is a "controlled company," with Defendant Zuckerberg possessing the controlling power. According to Facebook's 2017 Proxy:

Because Mr. Zuckerberg controls a majority of our outstanding voting power, *we are a "controlled company"* under the corporate governance rules of the NASDAQ Stock Market LLC (NASDAQ). Therefore, *we are not required to have a majority of our board of directors be independent*, nor are we required to have a compensation committee or an independent nominating function. In light of our status as a controlled company, our board of directors has determined not to have an independent nominating function and to have the full board of directors be directly responsible for nominating members of our board.

207. Demand is futile and therefore excused as to the entire Board because of Zuckerberg's domination and control of the voting power of the Company, and thus the Board. Due to his majority and controlling voting power, Zuckerberg can replace the entire Board if he so chooses. The Board thus lacks independence from Zuckerberg.

208. **Additional Factors Demonstrating Zuckerberg's Domination and Control of Facebook**. Zuckerberg's majority voting control of Facebook is sufficient in and of itself to demonstrate demand futility. But many additional facts demonstrate Zuckerberg's domination and control relevant to the present disputes and claims.

209. **First, Zuckerberg has forced out supposedly independent directors who have disagreed with him on issues framed by this complaint**. Zuckerberg is not only the founder of Facebook, but its "face" and driving force. All major decisions at Facebook are made by Zuckerberg. Not even the supposedly independent directors at Facebook have any say over important matters, except to the extent that they express agreement with Zuckerberg.

210. The short tenures and unexpected departures of Kenneth Chenault and Jeffrey Zients perfectly exemplify Zuckerberg's absolute control and stifling of any dissenting views.

211. In 2018, Facebook created the image that it was trying to diversify its all-white Board by hiring highly-respected and experienced Kenneth Chenault to join its Board. Chenault's appointment gave Facebook the guidance of a highly regarded finance executive and the first Black director on its all-white board, USA Today reported at the time. But then Chenault unexpectedly resigned in March of 2020 because he said Zuckerberg was not listening to his advice. *See* Jeff Horwitz, "Chenault Leaves

Facebook Board After Disagreements With Zuckerberg," THE WALL STREET JOURNAL, March 13, 2020 ("Mr. Chenault grew frustrated that the CEO wasn't taking his advice"). Chenault was forced out by Zuckerberg; Zuckerberg did not want to hear Chenault's dissenting opinion, and quickly got fed up with having Chenault around and thus showed him the door.

212.   The same was true for Zients.  When Zients stepped down from Facebook's Board earlier this year (2020), news reports stated that Zients had similar views as Chenault and was forced off the Board at the same time as Chenault since Zuckerberg squelched his views or did not want to listen to them.  As was reported by the Wall Street Journal at the time of Zients' departure from the Board:

> Mr. Zients was generally aligned with Kenneth Chenault, another Facebook board member that recently gave up his seat, according to people familiar with the matter. The Wall Street Journal reported earlier this month that Mr. Chenault resigned from the company's board following disagreements with founder and Chief Executive Mark Zuckerberg and other Facebook officials. They differed over governance at the company and its policies around political discourse.[25]

213.   In short, Facebook's approach to diversity has been characterized by tokenism:  make a small gesture to satisfy appearances, but don't make any underlying substantial change.  The message at Facebook is set at the top – by Zuckerberg alone, with a subservient Board in tow.

214.   **Additional Facts**:  Defendants Andreessen and Thiel lack independence from Zuckerberg and have demonstrated personal bias in favor of keeping founders in control of the companies they created.

215.   For Andreessen, this bias is deep-rooted in his own experience.  When he and his partner, Ben Horowitz, were trying to get Loudcloud, a company that they co-founded on its feet, the venture capitalist providing their funding advised Horowitz to cut Andreessen out of the project altogether.  Andreessen is still so resentful about that experience that when he and Horowitz founded their own venture capital firm,

---

[25] *See* Jeff Horwitz, *"Facebook Nears Complete Board Overhaul With Latest Exit Jeffrey D. Zients won't seek reelection after joining the board in 2018 as an independent director,"* THE WALL STREET JOURNAL, Mar. 26, 2020.

Andreessen Horowitz, they "set out to design a venture capital firm that would enable founders to run their own companies" without interference from the financial backers.

216.   Andreessen lacks independence from Zuckerberg for the additional reason that his association with Zuckerberg has led Andreessen and his firm to some highly lucrative deals in the past few years.  Specifically, Andreessen Horowitz has seen two of its portfolio companies purchased by Facebook — Instagram and Oculus VR.

217.   Andreessen turned his firm's $250,000 investment in Instagram into $78 million when the $1 billion acquisition by Facebook closed.

218.   Andreessen also would not have even been able to invest in Oculus VR without Zuckerberg.  Andreessen had declined to invest in the company previously, but desperately wanted in by the fall of 2013, according to an October 2015 *Vanity Fair* article.  When Oculus VR's CEO seemed reluctant to allow the investment, Andreessen had Zuckerberg talk to the CEO.  As a result, Andreessen Horowitz got the deal and Andreessen became one of four board members for the fledgling company.  Not very long after, Zuckerberg offered $2 billion for Facebook to acquire Oculus VR.

219.   Andreessen knows that his firm's access to the best investments — its "deal flow" — relies heavily on his relationship with Zuckerberg and Facebook.  In a May 18, 2015 *New Yorker* article titled "*Tomorrow's Advance Man*," Andreessen is quoted as saying that "Deal flow is everything.  If you're in a second-tier firm, you never get a chance at that great company."  Andreessen Horowitz saw its biggest successes after "logo shopping" to add Facebook to the firm's portfolio in 2010.  Within two years of that investment, "Andreessen Horowitz was the talk of the town."

220.   Defendant Thiel's venture capital fund, The Founders Fund, is marketed on the principle that company founders should have long-term control of the companies they create.  In fact, The Founders Fund's website touts Facebook as a primary example of that maxim, stating that "we have often tried to ensure that founders can continue to run their businesses through voting control mechanisms, as Peter Thiel did with Mark Zuckerberg and Facebook."

221. Thiel, like Andreessen, is greatly benefited by his relationship with Zuckerberg and his seat on the Facebook Board. The Founders Fund gets "good deal flow" from this high-profile association.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Fiduciary Duty**
**Against All Individual Defendants and Does 1–30**

222. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

223. The Individual Defendants and Does 1–30 owed and owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

224. The Individual Defendants and Does 1–30, and each of them, as a result of the facts alleged herein, violated and breached their fiduciary duties of candor, good faith, and loyalty.

225. As a direct and proximate result of the Individual Defendants' and Does 1–30's breaches of their fiduciary obligations, the Company has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, defendants are liable to the Company.

### COUNT II
**Aiding and Abetting Breach of Fiduciary Duty**
**Against All Individual Defendants and Does 1–30**

226. Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

227. Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to the Company.

228. The Individual Defendants owed the Company certain fiduciary duties as fully set out herein. By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to the Company.

229.   Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties.  Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

230.   The Company was injured as a direct and proximate result of the aforementioned acts.

### COUNT III
### Abuse of Control
### Against Defendant Zuckerberg

231.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

232.   By virtue of his positions and financial holdings at the Company, defendant Zuckerberg exercised control over the Company and its operations, and owed duties as a controlling person to the Company not to use his positions of control for his own personal interests and contrary to the Company's interests.

233.   Defendant's conduct alleged herein constitutes an abuse of his ability to control and influence the Company, for which he is legally responsible.

234.   As a result of Defendant's abuse of control, the Company has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

235.   Because the acts of Defendants were done maliciously, oppressively, and with intent to defraud, Plaintiff on behalf of the Company is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

/ / /

/ / /

/ / /

**COUNT IV**
**Unjust Enrichment**
**Against All Individual Defendants and Does 1–30**

236.  Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

237.  By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

238.  During the Relevant Period, the Individual Defendants either received annual stipends, bonuses, stock options, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

239.  Plaintiff, as shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

240.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT V**
**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**Against All Individual Defendants**

241.  Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

242.  SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

243. Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2019 & 2020 Proxy Statements. The 2019 & 2020 Proxy Statements contained proposals to the Company's stockholders urging them to reelect the members of the Board, approve executive pay packages, and vote against stockholder proposals for the Company to adopt a True Diversity Board Policy and a proposal regarding Workplace Diversity, to appoint an independent Chairman, and to appoint a Human/Civil Rights expert to the Board. The 2019 & 2020 Proxies, however, misstated or failed to disclose the following information, among others:

(a)     the deficiencies in the Company's internal and disclosure controls that were known to the Board when the 2019 & 2020 Proxies were filed;

(b)     the fact that the Company was not committed to diversity and inclusion in the Company's workforce, and was in fact discriminating against Black and minority candidates with respect to hiring, promotion, and pay, and that the Company's advertising conduct from which it derives 98% of its revenues was plagued by illegal business practices prohibited by federal and state law;

(c)     that it was not true that Facebook promotes equality through its hiring, pay and promotions processes, and that the Individual Defendants did not genuinely believe the statements in the Proxies that Facebook is "*committed to a policy of inclusiveness and to pursuing diversity in terms of background and perspective*" and that "*Our board of directors believes that its composition appropriately reflects the knowledge, experience, skills, diversity, and other characteristics required to fulfill its duties*" and that "*We are committed to building a workforce that is as diverse as the communities we serve;*"

(e)     the Defendants did not believe, and it was not true, that "*We believe*

*that our current board structure is effective in supporting strong board leadership*. Implementing the proposal [to require an independent Chairman] is unnecessary because the leadership structure of our board of directors already provides for independent leadership and oversight of management."

244. The Defendants knew of, but failed to disclose, fraudulent business practices at Facebook that put the Company at material risk — namely, discriminatory hiring and compensation practices as well as discriminatory advertising practices. Had this information been disclosed, shareholders would not have voted to reelect Board members, approve executive compensation packages, and reject an independent board chairman.

245. By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendation to reelect the current Board and vote against stockholder proposals set forth in the Proxy Statements.

246. Plaintiff, on behalf of the Company, seeks injunctive and equitable relief because the conduct of the Individual Defendants interfered with Plaintiff's voting rights and choices at the 2019 & 2020 annual meetings. Plaintiff does not seek any monetary damages for the proxy law violations.

247. This action was timely commenced within three years of the date of the 2019 Proxy and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and Facebook and against all Defendants as follows:

A. Against all of the Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company along with pre- and

post-judgment interest as allowed by law resulting from Defendants' breaches of fiduciary duty, abuse of control, and gross mismanagement;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(1)    a proposal to require at least three current Directors to resign from the Board and setting forth a resolution to replace such Directors with two Black persons and one other minority;

(2)    a proposal to replace Mark Zuckerberg as Chairman with a non-executive director who is independent;

(3)    a proposal to require all Director Defendants to return all their 2020 compensation received from Facebook (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Black people and minorities in corporate America;

(4)    augmentation of the annual Diversity Report to contain more particularized information and the hiring, advancement, promotion, and pay equity of all minorities at Facebook;

(5)    creation of a $1 billion fund to hire Black and minority employees, promote them to more management positions at the Company, establish and maintain a mentorship program at Facebook for Black and minority employees that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(6)    requirement of annual training of Facebook's entire Board and all executive officers, which training should at a minimum focus on diversity,

affirmative action, anti-discrimination and anti-harassment, and other relevant topics;

(7)     a proposal to adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals;

(8)     a proposal to replace Ernst & Young as the Company's auditor;

(9)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater non-controlling shareholder input into the policies and guidelines of the Board;

(10)    a proposal to strengthen Facebook's oversight of its procedures regarding the termination of employees, executives, and board members accused of discrimination;

(11)    a proposal to eliminate the use of Non-Disclosure Agreements at the Company so that current and former employees can report any and all instances of suspected discrimination without threat of legal action; and

(12)    a proposal to eliminate the use of mandatory arbitration for employee disputes and claims of wrongful termination and discrimination.

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Facebook has an effective remedy;

D.    Awarding to Facebook restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E.    Awarding punitive damages at the maximum amount permitted by law;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 2, 2020

Respectfully submitted,
BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

_____s/ Francis A. Bottini, Jr._____
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:   (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff Natalie Ocegueda*

=

DocuSign Envelope ID: FB55F087-A4F8-4A0D-8E40-6BA357B6BDAD

**VERIFICATION**

I, Natalie Ocegueda, declare:

I am a shareholder of Facebook, Inc. ("Facebook") and have continuously held my shares of Facebook stock since May 21, 2012. I have read and reviewed the Shareholder Derivative Complaint and authorized its filing. Based upon my and my counsel's investigation, the contents of the Shareholder Derivative Complaint are true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1, 2020.



_____
Natalie Ocegueda