1   LATHAM & WATKINS LLP
    Elizabeth L. Deeley (Bar No. 230798)
2     *elizabeth.deeley@lw.com*
    505 Montgomery Street, Suite 2000
3   San Francisco, California 94111
    T: +1.415.391.0600 / F: +1.415.395.8095
4
    Andrew B. Clubok (*pro hac vice*)
5   Susan E. Engel (*pro hac vice*)
    Stephen P. Barry (*pro hac vice*)
6     *andrew.clubok@lw.com*
      *susan.engel@lw.com*
7     *stephen.barry@lw.com*
    555 Eleventh Street, Suite 1000
8   Washington, D.C. 20004
    T:  +1.202.637.2200 / F:  +1.202.637.2201
9
    William J. Trach (*pro hac vice*)
10    *william.trach@lw.com*
    200 Clarendon Street
11  Boston, MA 02116
    T:  +1.617.948.6000 / F:  +1.617.948.6001
12
    *Attorneys for Defendants Mark Zuckerberg, Sheryl*
13  *Sandberg, Marc Andreessen, Andrew W. Houston,*
    *Erskine B. Bowles, Jeffrey D. Zients, Susan*
14  *Desmond-Hellmann, Nancy Killefer, Tracey T.*
    *Travis, Robert M. Kimmitt, Reed Hastings, Peter A.*
15  *Thiel, and Nominal Defendant Facebook, Inc.*

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18                 SAN FRANCISCO DIVISION

19  NATALIE OCEGUEDA, derivatively on        CASE NO. 3:20-cv-04444-LB
    behalf of FACEBOOK, INC.,
20                                           **DEFENDANTS' NOTICE OF MOTION AND**
                 Plaintiff,                  **MOTION TO DISMISS PLAINTIFF'S**
21                                           **VERIFIED SHAREHOLDER DERIVATIVE**
          v.                                 **COMPLAINT, AND MEMORANDUM OF**
22                                           **POINTS AND AUTHORITIES IN SUPPORT**
    MARK ZUCKERBERG, SHERYL
23  SANDBERG, MARC ANDREESSEN,
    ANDREW W. HOUSTON, ERSKINE B.            Hearing:  February 4, 2021
24  BOWLES, JEFFREY D. ZIENTS, SUSAN         Time:      9:30 a.m.
    DESMOND-HELLMANN, NANCY                  Location: Courtroom B – 15th Floor
25  KILLEFER, TRACEY T. TRAVIS,              Judge:    Hon. Laurel Beeler
    ROBERT M. KIMMITT, REED HASTINGS,
    PETER A. THIEL, and DOES 1-30,           Action filed July 2, 2020
26
                 Defendants,
27
          -and-
28
    FACEBOOK, INC.,

                 Nominal Defendant.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................. 2

II.     BACKGROUND ............................................................................... 6

III.    ARGUMENT .................................................................................... 9

    A.    Plaintiff Did Not Make A Pre-Suit Demand And Fails To Allege Futility ................................................................................................. 9

          1.    Plaintiff Fails To Establish That A Majority Of The Demand Board Faces A Substantial Likelihood Of Personal Liability ................. 11

               a.    Threshold Pleading Deficiencies Foreclose Plaintiff's Substantial-Likelihood-Of-Personal-Liability Theory ................ 11

               b.    Plaintiff Fails To Allege Substantial Liability On Her Oversight Failure Claim ............................................................... 13

          2.    Plaintiff Fails To Establish That Any Member—Let Alone A Majority—Of The Board Lacks Independence ....................................... 17

          3.    Plaintiff Fails To Establish That Any Challenged Board Decision Was Not A Reasonable Exercise Of Business Judgment ....................... 19

    B.    The Complaint Cannot Be Litigated In This Forum ............................. 19

          1.    Facebook's Forum-Selection Clause Designates The Delaware Court Of Chancery As The Exclusive Forum For This Lawsuit ............ 20

          2.    The Forum-Selection Clause Is Valid And Enforceable ........................ 21

          3.    The Forum-Selection Clause Applies To The Federal Claim ................. 22

    C.    Plaintiff Fails To State A Claim For Violation Of Section 14(a) ........................ 24

          1.    Plaintiff Fails To Allege A Material Misstatement Or Omission ........... 26

          2.    Plaintiff Fails To Allege That The Proxies Were An "Essential Link" To The Purportedly Loss-Generating Corporate Action .............. 32

          3.    Plaintiff's Section 14(a) Claim Is Partially Time-Barred ....................... 34

    D.    Plaintiff's Claims Are Unripe ............................................................... 34

IV.    CONCLUSION ............................................................................... 35

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1

### <u>TABLE OF AUTHORITIES</u>

2
**Page(s)**

3

### CASES

4 *Allen v. Lloyd's of London,*
  94 F.3d 923 (4th Cir. 1996) ........................................................................23

5

6 *Argueta v. Banco Mexicano, S.A.,*
  87 F.3d 320 (9th Cir. 1996) .........................................................................22

7 *Aronson v. Lewis,*
  473 A.2d 805 (Del. 1984) ............................................................................19

8

9 *Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)......................................................................................24

10 *Atl. Marine Const. Co. v. U.S. Dist. Court W.D. Tex.,*
   571 U.S. 49 (2013)................................................................................19, 21

11

12 *B&B Hardware, Inc. v. Hargis Indus., Inc.,*
   575 U.S. 138 (2015)......................................................................................22

13 *Beam v. Stewart,*
   833 A.2d 961 (Del. Ch. 2003) ......................................................................10

14

15 *Beam v. Stewart,*
   845 A.2d 1040 (Del. 2004) ...........................................................................10

16 *Bettis v. Aixtron SE,*
   2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ..............................................30

17

18 *Boeing Co. v. Bradway,*
   2020 WL 3246326 (N.D. Ill. June 8, 2020) ...........................................23, 24

19 *In re BofI Holdings, Inc. S'holder Litig.,*
   2018 WL 2731954 (S.D. Cal. June 7, 2018)..................................................35

20

21 *Bonny v. Society of Lloyd's,*
   3 F.3d 156 (7th Cir. 1993) ............................................................................23

22 *Brehm v. Eisner,*
   746 A.2d 244 (Del. 2000) ......................................................................10, 19

23

24 *Canty v. Day,*
   13 F. Supp. 3d 333 (S.D.N.Y. 2014)..............................................................10

25 *Chandler v. State Farm Mut. Auto Ins. Co.,*
   598 F.3d 1115 (9th Cir. 2010) ......................................................................34

26

27 *In re Citigroup Inc. S'holder Deriv. Litig.,*
   964 A.2d 106 (Del. Ch. 2009).......................................................................10

28

*City of Birmingham Relief & Ret. Sys. v. Hastings*,
  2019 WL 3815722 (N.D. Cal. Feb. 13, 2019) ....................................................................10

*City of Birmingham Ret. & Relief Sys. v. Good*,
  177 A.3d 47 (Del. 2017) .....................................................................................................13

*City of Cambridge Ret. Sys. v. Ersek*,
  921 F.3d 912 (10th Cir. 2019) ...........................................................................................13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) .............................................................................................31

*In re Columbia Pipeline, Inc.*,
  405 F. Supp. 3d 494 (S.D.N.Y. 2019) ...............................................................................25

*Corwin v. Bresler*,
  741 F.2d 410 (D.C. Cir. 1984) .....................................................................................32, 33

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010) .............................................................................................24

*Desaigoudar v. Meyercord*,
  223 F.3d 1020 (9th Cir. 2000) .........................................................................5, 24, 25, 26

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007) ...............................................................................12, 15, 17

*In re Diamond Foods, Inc. Deriv. Litig.*,
  2012 WL 1945814 (N.D. Cal. May 29, 2012) ...................................................................33

*Doe 1 v. AOL LLC*,
  552 F.3d 1077 (9th Cir. 2009) ...........................................................................................21

*E. & J. Gallo Winery v. Andina Licores S.A.*,
  440 F. Supp. 2d 1115 (E.D. Cal. 2006)..............................................................................23

*Edison v. United States*,
  822 F.3d 510 (9th Cir. 2016) .............................................................................................34

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  922 F. Supp. 2d 445 (S.D.N.Y. 2013).................................................................................35

*In re Facebook, Inc. S'holder Data Privacy Litig.*,
  367 F. Supp. 3d 1108 (N.D. Cal. 2019) ..................................................................... *passim*

*Gaines v. Haughton*,
  645 F.2d 761 (9th Cir. 1981) .............................................................................................30

*Golub v. Gigamon Inc.*,
  2019 WL 4168948 (N.D. Cal. Sept. 3, 2019) ....................................................................26

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003)............................................................................................11

*Hastey v. Welch*,
449 F. Supp. 3d 1053 (D. Kan. 2020) ........................................................................33

*Horman v. Abney*,
2017 WL 242571 (Del. Ch. Jan. 19, 2017) .................................................................15

*Huang v. Avalanche Biotechnologies, Inc.*,
2016 WL 6524401 (N.D. Cal. Nov. 3, 2016) ..............................................................25

*In re Impax Labs., Inc. S'holder Deriv. Litig.*,
2015 WL 5168777 (N.D. Cal. Sept. 3, 2015) ..............................................................10

*In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012) .........................................................................26

*Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*,
2016 WL 4076369 (Del. Ch. Aug. 1, 2016) ................................................................14

*In re JPMorgan Chase Deriv. Litig.*,
2014 WL 5430487 (E.D. Cal. Oct. 24, 2014) ..............................................................30

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991) .........................................................................................................9

*Kelley v. Rambus, Inc.*,
2008 WL 5170598 (N.D. Cal. Dec. 9, 2008) ..............................................................32

*Lane v. Page*,
649 F. Supp. 2d 1256 (D.N.M. 2009) .........................................................................34

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ....................................................................................35

*Levitt v. Cathcart*,
980 F.2d 927 (3d Cir. 1992) ........................................................................................33

*Lewis v. Liberty Mut. Ins. Co.*,
953 F.3d 1160 (9th Cir. 2020) ....................................................................................23

*Lipcon v. Underwriters at Lloyd's, London*,
148 F.3d 1285 (11th Cir. 1998) ..................................................................................23

*Lopez v. Ctpartners Exec. Search, Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016) ...........................................................................31

*Lyondell Chem. Co. v. Ryan*,
970 A.2d 235 (Del. 2009) ............................................................................................12

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................................25

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 385 (1970) ..............................................................................................32

*In re MIPS Techs., Inc. Deriv. Litig.*,
   542 F. Supp. 2d 968 (N.D. Cal. 2008) ...................................................................................18

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ...................................................................................31

*Offshore Sportswear, Inc. v. Vuarnet Int'l, B.V.*,
   114 F.3d 848 (9th Cir. 1997) ...............................................................................................22

*Okla. Firefighters Pension & Ret. Sys. v. Corbat*,
   2017 WL 6452240 (Del. Ch. Dec. 18, 2017) .......................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ..............................................................................................................31

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
   774 F.3d 598 (9th Cir. 2014) ...............................................................................................25

*In re Paypal Holdings, Inc. S'holder Deriv. Litig.*,
   2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ............................................................. *passim*

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .............................................................................................31

*In re Polycom, Inc.*,
   78 F. Supp. 3d 1006 (N.D. Cal. 2015) .................................................................................14

*Quinn v. Anvil Corp.*,
   620 F.3d 1005 (9th Cir. 2010) .............................................................................................10

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993) .....................................................................................................10

*Reese v. BP Exploration (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ...............................................................................................31

*Retail Wholesale & Dept. Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*
   52 F. Supp. 3d 961 (N.D. Cal. 2014) ...................................................................................31

*Richards v. Lloyd's of London*,
   135 F.3d 1289 (9th Cir. 1998) .............................................................................................23

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...............................................................................................25

*Roby v. Corp. of Lloyd's*,
   996 F.2d 1353 (2d Cir. 1993)...............................................................................................23

*Rosenbloom v. Pyott*,
   765 F.3d 1137 (9th Cir. 2014) .............................................................................................10

*Ryan v. Gifford*,
   918 A.2d 341 (Del. Ch. 2007)..............................................................................................11

*S. Pac. Transp. Co. v. City of Los Angeles*,
    922 F.2d 498 (9th Cir. 1990) ................................................................... 35

*Salzberg v. Sciabacucchi*,
    227 A.3d 102 (Del. 2020) ....................................................................... 21

*Schwartzman v. McGavick*,
    2007 WL 1174697 (W.D. Wash. Apr. 19, 2007) .................................... 30

*SEC v. Yorkville Advisors, LLC*,
    305 F. Supp. 3d 486 (S.D.N.Y. 2018) .................................................... 16

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ................................................................... 11

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019) .............................................. 28, 29

*Solid Q Hldg. v. Arenal Energy*,
    2017 WL 935891 (D. Utah Mar. 8, 2017) .............................................. 23

*South v. Baker*,
    62 A.3d 1 (Del. Ch. 2012) ...................................................................... 16

*Spenta Enterprises v. Coleman*,
    574 F. Supp. 2d 851 (N.D. Ill. 2008) ..................................................... 23

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ....................................................................... 13

*Stricklin v. Ferland*,
    1998 WL 966023 (E.D. Pa. Nov. 10, 1998) .......................................... 34

*In re Sunbeam Sec. Litig.*,
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) .................................................... 15

*Swanson v. Weil*,
    2012 WL 4442795 (D. Colo. Sept. 26, 2012) ....................................... 33

*Texas v. United States*,
    523 U.S. 296 (1998) ............................................................................ 5, 35

*In re Textainer P'ship Sec. Litig.*,
    2005 WL 3801596 (N.D. Cal. Dec. 12, 2005) ................................. 26, 30

*Tindall v. First Solar Inc.*,
    892 F.3d 1043 (9th Cir. 2018) ................................................................... 9

*Towers v. Iger*,
    912 F.3d 523 (9th Cir. 2018) ................................................................... 12

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ................................................................................ 26

*In re Verisign, Inc. Deriv. Litig.*,
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ...........................................................................34

*Vernon v. Stabach*,
   2014 WL 1806861 (S.D. Fla. May 7, 2014) .....................................................................23

*W. Mining Council v. Watt*,
   643 F.2d 618 (9th Cir. 1981) ...........................................................................................35

*Witchko v. Schorsch*,
   2016 WL 3887289 (S.D.N.Y. June 9, 2016) ..............................................................30, 33

*Wood v. Baum*,
   953 A.2d 136 (Del. 2008) ...........................................................................................10, 12

*In re Yahoo! Inc. S'holder Deriv. Litig.*,
   153 F. Supp. 3d 1107 (N.D. Cal. 2015) ............................................................................20

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
   901 F.3d 1081 (9th Cir. 2018) .............................................................................19, 20, 23

**STATUTES**

15 U.S.C.
   § 78n(a) ............................................................................................................................24
   § 78u-4(b)(2)(A) ....................................................................................................22, 24, 25

DGCL
   § 102(b)(1) ...................................................................................................................12, 21
   § 102(b)(7) ........................................................................................................................12

Private Securities Litigation Reform Act of 1995 .....................................................5, 24, 25, 29

**RULES**

Fed. R. Civ. P.
   9(b).................................................................................................................................5, 25
   12(b)(1)......................................................................................................................1, 2, 34
   12(b)(6)..............................................................................................................1, 2, 24, 35
   23.1.................................................................................................................... *passim*

**REGULATIONS**

17 C.F.R. § 240.14a-9(a) ...............................................................................................................24

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 4, 2021 at 9:30 a.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Courtroom B – 15th Floor, located at 450 Golden Gate Avenue, San Francisco, California 94102, Nominal Defendant Facebook, Inc. ("Facebook" or the "Company"), through its undersigned counsel, will, and hereby does, move to dismiss Plaintiff Natalie Ocegueda's ("Plaintiff") Verified Shareholder Derivative Complaint (the "Complaint" or "Compl.") pursuant to Federal Rule of Civil Procedure ("FRCP") 23.1 and the doctrine of *forum non conveniens*.  The Complaint should be dismissed because (1) Plaintiff failed to make a pre-suit demand on Facebook's Board of Directors (the "Board") and does not adequately plead demand futility, and (2) the forum-selection clause in the Company's Restated Certificate of Incorporation designates the Delaware Court of Chancery as the exclusive forum for Plaintiff's claims.

Defendants Mark Zuckerberg, Sheryl Sandberg, Marc Andreessen, Andrew W. Houston, Erskine B. Bowles, Jeffrey D. Zients, Susan Desmond-Hellmann, Nancy Killefer, Tracey T. Travis, Robert M. Kimmitt, Reed Hastings, and Peter A. Thiel (the "Individual Defendants" and, together with Facebook, "Defendants"), through their undersigned counsel, will, and hereby do, further move to dismiss the Complaint pursuant to FRCP 12(b)(6) for failure to state a claim for violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  The Complaint fails to allege particularized facts demonstrating that Facebook's annual proxy statements contained any false or misleading statement, nor that the Individual Defendants knew or were negligent in not knowing of the existence of a false or misleading statement, nor that the proxy statements were an "essential link" to any resulting corporate harm.

Finally, all Defendants move to dismiss the Complaint pursuant to FRCP 12(b)(1) because all of Plaintiff's claims are based on speculative damages and therefore unripe.

Defendants' joint motion to dismiss (the "Motion") is based on this Notice, the supporting Memorandum of Points and Authorities ("Memorandum"), the Declaration of Stephen P. Barry filed concurrently herewith,[1] the accompanying Request for Judicial Notice, the complete files and

---

[1] All references to "Ex." herein are to the exhibits to the Declaration of Stephen P. Barry.

records in this action, and any additional material and arguments as may be considered in connection with the hearing on the Motion.[2]

Through this Motion, Defendants respectfully request that the Court (i) dismiss the action pursuant to FRCP 23.1 for failure to make a demand on the Board or adequately plead demand futility; (ii) dismiss the action on *forum non conveniens* grounds; (iii) dismiss Plaintiff's federal derivative claim under the Exchange Act for failure to state a claim pursuant to FRCP 12(b)(6); and/or (iv) dismiss the action pursuant to FRCP 12(b)(1) because it is based on speculative damages that have not yet occurred and is therefore unripe.

## ISSUES TO BE DECIDED

1.      Whether the Court should dismiss Plaintiff's Complaint for failure to make a pre-suit demand on the Board or to plead with particularity that such a demand would have been futile, as required by FRCP 23.1 and Delaware law.

2.      Whether the Court should dismiss Plaintiff's Complaint on *forum non conveniens* grounds because Facebook's Restated Certificate of Incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for any derivative action brought on the Company's behalf and any action asserting a claim of breach of fiduciary duty owed by a director or officer of the Company.

3.      Whether the Court should dismiss Plaintiff's Section 14(a) claim for failure to state a claim upon which relief can be granted and because the claim is time-barred.

4.      Whether the Court should dismiss Plaintiff's Complaint because it seeks speculative damages that have not yet occurred and is therefore unripe.

## I.      INTRODUCTION

This is Plaintiff Natalie Ocegueda's second shareholder derivative action brought against Facebook's officers and directors in this Court in the last three years, and it is one of multiple—

---

[2] By agreement of the Parties and in the interest of judicial efficiency, *see* Dkt. No. 41, Defendants are deferring and hereby reserve all additional arguments and requests for relief as to Plaintiff's failure to state a claim under state law for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, abuse of control, and unjust enrichment, and specifically reserve their right to seek dismissal of those claims pursuant to FRCP 12(b)(6) should the claims remain extant following resolution of the instant Motion.

1   six and counting—that her counsel has filed in rapid succession over the past several months

2   against a number of companies in the wake of the national conversation on race.  All six of those

3   recent cases were filed without making a demand on the companies' boards of directors (let alone

4   a "books and records" request under Delaware law).  Each suit rests on the same theory—that the

5   companies lack sufficiently diverse boards or workforces, which supposedly (1) reflects violations

6   of the defendant directors' fiduciary duties to the corporations and their shareholders and (2)

7   renders false or misleading public statements about the companies' commitments to diversity and

8   inclusion.  That failure to make any apparent pre-litigation investigation of the facts or make any

9   demand on the Board, and instead to pursue a cookie-cutter approach to litigation helps explain

10  why Plaintiff gets basic facts wrong about Facebook, the Company's commitment to diversity and

11  inclusion, and the diversity of its executive management and Board.

12          For instance, the Complaint repeatedly alleges that Facebook's Board has only "one Black

13  member," and that the Company's executive management is "all white, with no minorities

14  whatsoever."  Compl. ¶¶ 9, 11, 102, 104.  Both of those claims are demonstrably false.  Facebook's

15  nine-person Board has two Black members—and did throughout most of the time period at issue—

16  and therefore has included a higher percentage of Black members than the general U.S. population

17  during the same timeframe.  (Plaintiff puzzlingly names one current Black director as a Defendant,

18  but she expressly refrains from naming Facebook's other current Black director or a third former

19  Black director whose tenure ended in early 2020.)  And several of Facebook's senior executives

20  are non-white, including the Company's Head of Infrastructure Engineering, Head of New Product

21  Experimentation, Head of Workplace, Chief Diversity Officer, and former Chief Marketing

22  Officer.  On top of that, Plaintiff simply ignores the diversity of Facebook's leadership in multiple

23  other respects.  *Four* out of nine Board members and two out of the five officers that Plaintiff

24  identifies in the Complaint are female.  Peter Thiel, a longstanding member of Facebook's Board,

25  is openly gay.  And the Company recently announced an openly gay replacement for its Chief

26  Marketing Officer.  In short, the composition of both the Board and Facebook's executive

27  management reflects the Company's commitment to diversity of race, as well as ethnicity, sexual

28  orientation, and gender—among other things.

As is clear from publicly available information (highlighted in detail below), Facebook takes seriously its role as a corporate citizen in this country's dialogue about race.  Facebook has been a corporate leader on workplace and Board diversity, and is actively engaged in ongoing efforts to continue improving on that record.  In contrast, this lawsuit—which is wrong on the facts and has no basis in the law—is not serious but rather a crass attempt to take advantage of that movement.  Plaintiff's Complaint must be dismissed for at least three independent reasons.

*First*, the Complaint should be dismissed under FRCP 23.1 because Plaintiff fails to satisfy her threshold burden of demonstrating that she is entitled to sue derivatively on the Company's behalf.  Judge Gilliam promptly dismissed her prior derivative action in this Court because she had no excuse for failing to make a pre-suit demand on Facebook's Board.  *See In re Facebook, Inc. S'holder Data Privacy Litig.*, 367 F. Supp. 3d 1108 (N.D. Cal. 2019) (Gilliam, J.).  The same defect persists here:  Plaintiff admits she did not make a pre-suit demand on the Board and, as with her first suit, she fails to plead with particularity why such a demand would have been futile.  *Id.* at 1124-25.  The Complaint rests on vague theories of liability that the Board's purported failure to address "red flags" related to the Company's hiring, Board nomination, and advertising practices resulted in a boycott by a small number of advertisers beginning in June 2020, as well as allegedly false proxy statements about Facebook's commitment to diversity.  Plaintiff does not allege a single fact suggesting that any member of the current Board at any time acted in dereliction of their duties or disregarded any discriminatory practices, such that they could not have properly exercised their independent and disinterested business judgment in responding to a demand for action.  Judge Gilliam's decision refusing to allow Plaintiff to wrest control of Facebook's litigation decisions thus applies equally here.  *See id.* at 1128.

*Second*, Plaintiff's lawsuit should be dismissed because she filed it in the wrong forum.  As Judge Gilliam recognized, Facebook's Restated Certificate of Incorporation contains a binding forum-selection clause mandating that "any derivative action . . . brought on behalf of the corporation" or "any action asserting a claim of breach of a fiduciary duty owed by . . . any director" of the Company "shall" be filed in the Delaware Court of Chancery.  *Id.* at 1119.  That provision is valid and enforceable, and the entirety of this derivative action—including both

Plaintiff's state-law and her federal-law claims—falls squarely within its scope.  This Court should reject Plaintiff's second attempt to circumvent this provision and dismiss her complaint on *forum non conveniens* grounds.

**Third**, while the Court need not reach the merits of the Complaint in light of these threshold issues,[3] Plaintiff's federal-law claim fails on the merits.  That derivative claim under Section 14(a) of the Exchange Act fails to meet even the most basic pleading requirements, let alone the heightened demands of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA")—and it comes too late to the extent it challenges statements made over a year ago. Plaintiff accuses Individual Defendants of knowingly causing Facebook to make material misrepresentations in its 2019 and 2020 proxy statements about the Company's commitment to diversity.  But even setting aside the logical flaw of Plaintiff's theory that the current Board harmed the Company by causing Facebook unwittingly to issue misleading proxies (before several current members even joined the Board), the Complaint does not and cannot specify any facts showing any statements were false or misleading.  *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022-23 (9th Cir. 2000) (dismissing Section 14(a) claims that failed to meet both PSLRA and Rule 9(b) pleading requirements).  Nor does Plaintiff plead, as she must, that any alleged misstatement was an "essential link" to the advertiser boycott that purportedly harmed Facebook.

**Finally**, the Complaint should be dismissed because Plaintiff's claims are unripe insofar as they are premised on speculative damages that have not yet occurred.  Plaintiff asserts that, as a result of Individual Defendants' alleged actions, Facebook "will continue to expend significant additional money" defending against lawsuits (like this one, ironically) and paying undeserved compensation to its directors and officers, and may lose "advertising revenue." Compl. ¶ 183.  But no relief can be granted for claims that "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998).

For all of these reasons, the Complaint should be dismissed in its entirety.

---

[3] The Parties agreed to defer arguments on the merits of Plaintiffs' state-law claims.  Dkt. No. 41.

## II.     BACKGROUND

*Facebook's Business.*  Facebook is a Delaware corporation headquartered in Menlo Park, California.    Compl. ¶ 37.   The Company "enables people to connect, share, discover, and communicate with each other on mobile devices and personal computers."  Ex. A at 7.  Facebook users generally can decide what information to share or restrict based on their own criteria, subject to certain limits.  Compl. ¶ 37.  For example, Facebook publishes "Community Standards" that "apply to ads and include policies that, for example, ban hate speech, harmful content, and content designed to intimidate voters or stop them from exercising their right to vote."  Ex. B at 72.  And Facebook's Terms of Service prohibit users from doing or sharing anything "unlawful, misleading, discriminatory or fraudulent."  Ex. I.  The Company's mission is "to give people the power to build community and bring the world closer together."  Ex. B at 72; Ex. A at 7.

Facebook has consistently maintained a board of directors comprising highly regarded professionals from varying backgrounds.  Compl. ¶¶ 38-49.  Two current members of Facebook's nine-member Board—Tracey Travis and Peggy Alford—are Black, and four—Ms. Travis, Ms. Alford, Sheryl Sandberg, and Nancy Killefer—are women.  Ex. B at 3.  A former Black director, Kenneth Chenault, stepped down in March 2020 to join Berkshire Hathaway.  Compl. ¶ 1.

Since 2012, Facebook's Restated Certificate of Incorporation has included a forum-selection clause requiring that any derivative claims be brought in the Delaware Court of Chancery. Ex. F, Art. IX.  The same governing document also exculpates directors from personal liability for breaches of fiduciary duty to the fullest extent permitted by law.  *Id.* Art. VII, ¶ 1

*Facebook's 2019 Proxy Statement.*     Each year, Facebook issues a proxy statement notifying stockholders of items subject to vote at the Company's annual meeting.  *Id.* ¶ 96. Facebook publicly filed its 2019 proxy statement with the United States Securities and Exchange Commission ("SEC") on April 12, 2019 (the "2019 Proxy").  *Id.*; Ex. C.  The 2019 Proxy contained recommendations from Facebook's then-current directors—Defendants Zuckerberg, Sandberg, Andreessen, Bowles, Desmond-Hellmann, Hastings, Thiel, and Zients, as well as non-defendant Chenault—concerning the election of candidates to the Board; the appointment of Ernst & Young LLP as Facebook's independent auditor; and stockholder proposals related to, among other things,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

appointing an independent Board chairman, enacting a Board diversity policy, and workforce diversity.  Ex. C at 3-4.  The 2019 Proxy also contained general statements about the Company's governance, transparency, and commitments to diversity, sustainability, and social good.  *Id*.

***Facebook's 2020 Proxy Statement.***  Facebook publicly filed its 2020 proxy statement on April 10, 2020 (the "2020 Proxy" and, together with the 2019 Proxy, the "Proxies").  Compl. ¶ 97; Ex. B.  Like the 2019 Proxy, the 2020 Proxy contained various recommendations from the then-current Board—including Defendants Zuckerberg, Sandberg, Andreessen, Houston (who had just joined the Board in February 2020), Kimmitt (who joined in March 2020), Killefer (who joined in March 2020), Travis (who also joined in March 2020), Thiel, and Zients, as well as non-defendants Alford and Chenault (whose term as a director would conclude at the annual meeting).  Compl. ¶ 97; Ex. B at 10-11.  The 2020 Proxy also reiterated Facebook's business values.

***Facebook's Commitment to Diversity.***  Facebook has long been committed to "building a workforce that is as diverse as the communities [it] serve[s]."  *Id.* ¶¶ 52, 103.  Every year since 2014, the Company has voluntarily published its global gender diversity and U.S. ethnic diversity workforce data.  *Id.* ¶ 52.  In 2015, Facebook implemented a "Diverse Slate Approach" that requires hiring managers to consider candidates from underrepresented backgrounds when interviewing for open positions.  *Id.*  Facebook regularly invests in workforce community groups and events to "empower, inspire, and provide resources to help [its] people grow professionally."  *Id.*  And over the years, the Company has developed numerous internal training programs designed to foster diversity—covering topics such as "Managing Unconscious Bias," "Be the Ally," and "Managing Inclusion."  *Id.*  Those initiatives have yielded progress.  Facebook increased the number of female employees globally from 31% in 2014 to 37% in 2019, and increased "the number of Black women at Facebook by a factor of 25 and the number of Black men by a factor of 10" during the same span.  Ex. B at 52, 81; Compl. ¶ 131; Ex. C at 47 (noting "steady increases in hiring rates for underrepresented people since" starting the "Diverse Slate Approach").

Facebook is also committed to diversity and inclusion at the Board level.  Under its corporate governance guidelines, the Board considers individuals from diverse backgrounds and ensures that the initial list of candidates from which new director nominees are chosen reflects a

diversity of race, ethnicity, and gender.  Compl. ¶ 52; Ex. B at 53.  Since the Board adopted this diversity policy in 2018, a *majority* of *new* nominees have been Black or women.  In addition, in 2019, two of eight total nominees were Black.  Ex. C at 50 (nominating Ms. Alford and Mr. Chenault).  Likewise, in 2020, two of nine total nominees were Black.  Ex. B at 56 (Ms. Alford and Ms. Travis).  And in 2019 and 2020 combined, seven of twelve total nominees were women.

*Housing, Employment, and Credit-Related Advertising Changes.*  In August 2018, the United States Department of Housing and Urban Development ("HUD") issued a public charge alleging that Facebook users were able to publish housing advertisements on the platform that discriminated based on race, ethnicity, and gender, and other characteristics.  Compl. ¶¶ 65-66.  In September 2018, the American Civil Liberties Union ("ACLU") filed a lawsuit alleging that advertisers were discriminating based on gender in "help wanted" advertisements on Facebook.  *Id.* ¶ 67.  In March 2019, in an effort to prevent advertisers from using any discriminatory tactics, the Company removed age, gender, and ZIP code targeting for all advertisements offering housing, employment, and/or credit opportunities.  *Id.* ¶ 76.

*Facebook Advertiser Boycott.*  In May 2020, Facebook faced criticism for not censoring a post from President Trump related to Black Lives Matter protesters.  *Id.* ¶ 79.  Certain businesses announced plans to stop advertising on Facebook because they considered the President's remarks "hate speech."  *Id.* ¶¶ 80-84.  Mr. Zuckerberg explained the Company's decision not to remove the post:  "I disagree strongly with how the President spoke about this, but I believe people should be able to see this for themselves, because ultimately accountability for those in positions of power can only happen when their speech is scrutinized out in the open."  Ex. D; *see also* Compl. ¶ 79.  Notwithstanding some companies' decisions to temporarily discontinue advertising on Facebook, the Company reported successful financial results for the fiscal quarter even in the face of the global COVID-19 pandemic and a corresponding economic slowdown—including an 11% year-over-year advertising revenue increase.  Ex. E at 27.  And although Plaintiff alleges that Facebook's stock price declined 8.3% immediately after the boycott announcement on June 26,

2020, Compl. ¶ 20, the value of the Company's shares fully recovered just three days later, and increased over 49% during the relevant quarter.[4]

***Plaintiff's Lawsuits.***   Plaintiff did not make a demand on the Board and filed this shareholder derivative action on July 2, 2020, purporting to assert claims on Facebook's behalf against Individual Defendants for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, abuse of control (against Mr. Zuckerberg only), unjust enrichment, and violation of Section 14(a) of the Exchange Act.  Compl. ¶¶ 222-47.  Plaintiff alleges that, as a result of Individual Defendants' purported wrongdoing, Facebook suffered damages including (1) reputational harm "evidenced by" the June 2020 "boycott," *id.* ¶ 181; (2) investors being "less likely to invest" in the Company, *id.* ¶ 182; and (3) the expenditure of "significant additional money" for lost advertising revenue, compensation paid to Defendants "responsible for the scheme," and—remarkably—costs to defend against lawsuits *like the one Plaintiff herself filed*, *id.* ¶ 183.  Plaintiff names as Individual Defendants eight current Board members, including Tracey Travis but not Peggy Alford—both of whom are Black.  *Id.* ¶¶ 38-41, 45-47, 49.  She also names four former Board members, not including Kenneth Chenault, who is Black and served on Facebook's Board until 2020.  *Id.* ¶¶ 42-44, 48, 91.  All but two Individual Defendants are independent directors in that they are not also Facebook employees.  *Id.*

## III.    ARGUMENT

### A.    Plaintiff Did Not Make A Pre-Suit Demand And Fails To Allege Futility

It is a "basic principle of corporate governance" that a corporation's decisions—"including the decision to initiate litigation—should be made by the board of directors."  *In re Facebook,* 367 F. Supp. 3d at 1123   (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991)). Because derivative actions "effectively wrest[] control from the board of directors," FRCP 23.1 dictates that "a shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile."  *Id*; *Tindall v. First Solar Inc.*, 892 F.3d 1043,

---

[4] During the second quarter of the 2020 fiscal year, Facebook's stock price increased from $159.60 on April 1, 2020 to $237.55 on July 1, 2020.  *See* https://finance.yahoo.com/quote/FB/.

1046 (9th Cir. 2018). These pleading requirements are "stringent," *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010), and Delaware courts have admonished plaintiffs who resort to derivative actions alleging demand futility without first seeking the corporation's books and records to investigate any claims, *Beam v. Stewart*, 833 A.2d 961, 982-83 (Del. Ch. 2003).

Although Rule 23.1 controls "the adequacy of a plaintiff's pleadings, the substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief"—here, Delaware. *City of Birmingham Relief & Ret. Sys. v. Hastings*, 2019 WL 3815722, at \*4 (N.D. Cal. Feb. 13, 2019). Delaware law is "clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare." *Canty v. Day*, 13 F. Supp. 3d 333, 345 (S.D.N.Y. 2014). Corporate directors "are entitled to a *presumption* that they were faithful to their fiduciary duties,' and 'the burden is upon the plaintiff . . . to overcome that presumption.'" *In re Impax Labs., Inc. S'holder Deriv. Litig.*, 2015 WL 5168777, at \*4 (N.D. Cal. Sept. 3, 2015) (quoting *Beam v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004)). To overcome that presumption, Plaintiff must "allege particularized facts that 'create a reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)). The inquiry focuses on the capability of the *existing* Board—"as of the time the complaint is filed"—to consider a pre-suit demand, *Rales*, 634 A.2d at 934, and Plaintiff must allege facts specific to *each* director, *In re Paypal Holdings, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at \*5 (N.D. Cal. Jan. 18, 2018). "'[C]onclusory allegations are not considered.'" *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quoting *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000)). And "inferences that are not objectively reasonable cannot be drawn in the plaintiff's favor." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

Plaintiff admits she did not make a demand on the Facebook Board before filing this lawsuit. For largely the same reasons that Judge Gilliam just last year dismissed *this very Plaintiff's* claims against Facebook for failure to make a pre-suit demand, Plaintiff's demand futility allegations do not come close to satisfying the stringent standards of Rule 23.1 and

Delaware law.  *See In re Facebook*, 367 F. Supp. 3d at 1123-24 & n.5.  She fails to allege any particular facts showing that a majority of nine Facebook directors serving at the time she filed suit—the "Demand Board"[5]—are personally "interested" in and therefore incapable of objectively considering a demand because they "face a substantial likelihood of liability for the claims alleged against them."  Compl. ¶ 192; *see also id.* ¶¶ 193-203.  Nor does she allege any particular facts showing that the Board as a whole is "dominated and controlled by" Mr. Zuckerberg and therefore unable to act independently.  *Id.* ¶ 204; *see also id.* ¶¶ 205-21.  Finally, she fails to allege any facts suggesting that any Board "actions" were not valid exercises of business judgment.  *Id.* ¶¶ 188-91.

### 1.   Plaintiff Fails To Establish That A Majority Of The Demand Board Faces A Substantial Likelihood Of Personal Liability

Directors are deemed "interested" only "when the potential for liability is not a mere threat but instead may rise to a substantial likelihood."  *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007); *see also Guttman v. Huang*, 823 A.2d 492, 502-03 (Del. Ch. 2003); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999), *superseded by statute on other grounds as stated in Burbrink v. Campbell*, 734 F. App'x 416 (9th Cir. 2018) (requiring plaintiff to plead "particular facts showing that the directors' actions were so egregious that they faced a significant threat of liability").  That strict standard is not met for any director here, much less five of the nine directors comprising the Demand Board as of July 2, 2020, as required to establish demand futility.

### a.   Threshold Pleading Deficiencies Foreclose Plaintiff's Substantial-Likelihood-Of-Personal-Liability Theory

Plaintiff alleges that Individual Defendants face a substantial likelihood of personal liability for breach of fiduciary duties based on a purported failure of oversight relating to Facebook's commitment to diversity and its 2019 and 2020 Proxies.  Compl. ¶¶ 193-203.  That theory fails at the outset because Plaintiff fails to plead particularized facts sufficient to satisfy any of the three threshold conditions necessary to establish a substantial likelihood of liability—

---

[5] The Demand Board consists of Individual Defendants Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg, as well as non-defendant Peggy Alford.

(1) actual knowledge of illegal conduct, (2) on a director-by-director basis, (3) for the proper group of directors, *i.e.*, the Demand Board.

**First**, the standard for showing a substantial likelihood of liability is higher than usual here because of the exculpatory provision in Facebook's governing documents. Pursuant to Section 102(b)(7) of the Delaware General Corporation Law, Article VII of Facebook's Restated Certificate of Incorporation exculpates directors from personal liability for breaches of fiduciary duty to the fullest extent permitted by law. Ex. F, at Art. VII, ¶ 1. Because "directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if [Plaintiff] pleads a non-exculpated claim against the directors based on particularized facts." *In re Facebook*, 367 F. Supp. 3d at 1124 (citing *Wood*, 953 A.2d at 141). Specifically, as Judge Gilliam held in applying this exact provision against Plaintiff:

> Because Article VII . . . includes an exculpatory provision that shields Facebook's directors from liability for breaches of fiduciary duty to the fullest extent permitted by the Delaware General Corporation Law . . . Plaintiff[] must plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had actual or constructive knowledge that their conduct was legally improper.

*Id.*; *see also In re Paypal*, 2018 WL 466527, at *3 (quoting *Wood*, 953 A.2d at 141). "Negligent or even reckless conduct is insufficient," *id.*, and directors could be liable "[o]nly if they knowingly and completely failed to undertake their responsibilities" to the Company and its shareholders, *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243-44 (Del. 2009). As with her first suit, the Complaint contains no particularized allegations that any director acted with scienter, and her suit must be dismissed on this ground alone.

**Second**, Plaintiff relies almost entirely on broad allegations leveled against the Board as a whole, despite the black-letter requirement that she "plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Towers v. Iger*, 912 F.3d 523, 529 (9th Cir. 2018) (quoting *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007)). This pleading failure, too, is fatal.

**Third**, Plaintiff's attempt to excuse demand is even weaker here than in her prior suit because of a mismatch between the Demand Board and the timing of the alleged misconduct. Four of the nine Demand Board directors—Mr. Houston, Ms. Killefer, Mr. Kimmitt, and Ms. Travis—

joined less than two months before the 2020 Proxy was issued, and a fifth, Ms. Alford, who is not named as a Defendant, joined in May 2019, after publication of the 2019 Proxy. Ex. G (noting start dates of Facebook directors). Those individuals necessarily cannot be culpable for misconduct by the Board outside their tenure—and Plaintiff explicitly concedes as much. Compl. ¶¶ 41, 45-47 (noting that Houston, Killefer, Travis, and Kimmitt are "not sued herein for any conduct that pre-dated [his or her] joining of the Board"). The most Plaintiff could muster is that some of these new directors "reviewed and approved" the 2020 Proxy a few weeks after assuming their positions. But virtually all of the events Plaintiff relies on to suggest knowledge of allegedly improper policies and practices pre-date those individuals' appointment to the Board. *See City of Cambridge Ret. Sys. v. Ersek*, 921 F.3d 912, 922-23 (10th Cir. 2019) (rejecting demand futility allegations where six of twelve current board members joined *after* challenged events occurred). These include allegations concerning prior litigation and congressional testimony in 2018 and 2019 related to platform settings that "allowed advertisers" to restrict advertisements using certain geographic and other parameters, Compl. ¶¶ 57-61, 65-67, 76, 78; personnel changes in 2018, *id.* ¶¶ 23-24; a 2019 Ernst & Young "audit" assessing "how Facebook measures and reports data about video advertisements," *id.* ¶ 77; and public news articles on a variety of topics from 2018 and 2019, *id.* ¶¶ 64, 68-71. As such, Plaintiff necessarily cannot plead conscious and bad-faith misconduct *on a director-by-director basis* for *at least* half of the Demand Board.

b. <u>Plaintiff Fails To Allege Substantial Liability On Her Oversight Failure Claim</u>

Plaintiff's substantial-likelihood-of-personal-liability theory rests on a claim that Individual Defendants failed to fulfill their fiduciary duty of oversight. Such a so-called "*Caremark* claim" is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017). Directors cannot be held liable on a *Caremark* claim unless one of two prongs is satisfied: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW

DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:20-cv-04444-LB

requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  Plaintiff also must demonstrate that the directors' failure of oversight "resulted in damage to the corporation" by causing a "corporate trauma." *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at \*20 (Del. Ch. Dec. 18, 2017) ("corporate trauma . . . must be sufficiently similar to the misconduct implied by the 'red flags' such that the board's bad faith, 'conscious inaction' proximately caused the trauma") (citation omitted).  Plaintiff fails to make any of these showings.

Plaintiff does not satisfy the first *Caremark* prong because she admits that Facebook had relevant internal policies relating to diversity and inclusion, as well as financial controls, in place throughout the relevant period.  For example, Plaintiff admits that Facebook has programs and policies to further diversity and inclusion in its workforce and Board.  *See, e.g.*, Compl. ¶ 52 (describing "Diverse Slate Approach, which sets the expectation that hiring managers will consider candidates from underrepresented backgrounds when interviewing for an open position," as well as "thriving Facebook Resource Groups and [its] Community events such as Women's Community Summit, Black Community Summit, Latin Community Summit, and Pride Community Summit," "Managing Unconscious Bias" training, and "Managing Inclusion" and "Be The Ally" programs); *see also id.* (noting that "it is the policy of our board of directors to consider candidates with diverse backgrounds . . . and to ensure that the initial list of candidates from which new director nominees are chosen includes candidates with a diversity of race, ethnicity, and gender").  Plaintiff also acknowledges that the "principal purpose" of Facebook's Audit & Risk & Oversight Committee is to assist the Board in overseeing a "system of internal controls" and "audit processes."  *Id.* ¶ 159.  Those are precisely the kind of facts courts have pointed to in rejecting *Caremark* claims. *See, e.g.*, *In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1015 (N.D. Cal. 2015) (rejecting *Caremark* allegations of "inadequate" oversight where complaint conceded "existence of [the] Audit Committee, the Committee's duties, and . . . Code of Business Ethics and Conduct").

Plaintiff fares no better with the second *Caremark* prong, which requires that she allege facts showing Individual Defendants "had knowledge of certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding [their] duty to address that misconduct." *Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*, 2016 WL 4076369, at

*8 (Del. Ch. Aug. 1, 2016).  Plaintiff points to a wide range of historical events as purported "red flags"—including congressional testimony by Mr. Zuckerberg, *e.g.*, Compl. ¶¶ 57-62, 78, various public news articles, *id.* ¶¶ 64, 68-69, 73-77, an audit of Facebook's reporting related to video advertisements, *id.* ¶ 77, and lawsuits related to purportedly discriminatory ads, *id.* ¶¶ 67, 76.  She alleges the Board acted in bad faith by disregarding these purported red flags, allowing executives to be paid based on discriminatory policies and conduct, and allowing Facebook to publish purportedly misleading Proxies.  *Id.* ¶¶ 190, 196-97.

Plaintiff's conclusory allegations do not show any substantial likelihood of *Caremark* liability:  none of the purported "red flags" demonstrates the inadequacy of, or the Company's failure to comply with, its stated diversity and anti-discrimination policies.  *Id.* ¶¶ 121, 181.  Plaintiff does not identify bad faith conduct by any director in connection with the purported "red flags," which she also fails to connect to any "massive damage to Facebook" purportedly occurring with the June 2020 advertiser boycott, *id.* ¶¶ 17-21, 181, 202.  *See Desimone*, 924 A.2d at 940 ("Delaware courts routinely reject the conclusory allegation that . . . internal controls must have been deficient, and the board must have known so.").  Indeed, Facebook's strong financial performance in the wake of the boycott announcement makes Plaintiff's assertion of *any* corporate trauma implausible on its face.  *See supra* Section II.

*First*, Plaintiff has not alleged how Mr. Zuckerberg's congressional testimony about Facebook's purported "history" of "allowing" advertisers to post discriminatory housing ads and about its proposed cryptocurrency and related network were "red flags" alerting Facebook's Board about anything.  *See In re Facebook*, 367 F. Supp. 3d at 1125.  To sustain her pleading burden, Plaintiff must allege "particularized facts about what [Individual Defendants] knew, when [they] knew it" and "what [they were] actually told" about the alleged red flags.  *Horman v. Abney*, 2017 WL 242571, at *12 (Del. Ch. Jan. 19, 2017).  But apart from citing a handful of cherry-picked news reports concerning small portions of that testimony, Plaintiff has not alleged facts establishing what any Individual Defendant actually knew as a result of Mr. Zuckerberg's statements—let alone explained how any Individual Defendant was put on notice of the purported harm (stemming from the advertiser "boycott") that allegedly materialized much later.  *See In re*

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW

*Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1346 (S.D. Fla. 1999) ("conclusory, fact-deficient allegation" of "red-flags" insufficient).

**Second**, Plaintiff similarly fails to explain how news articles discussing a former employee's opinions about supposed shortcomings in Facebook's diversity efforts were "red flags" of *illegal action or corporate wrongdoing*.  *See In re Facebook*, 367 F. Supp. 3d at 1125 ("As to what constitutes a red flag, evidence of illegality is the 'proverbial red flag.'").  Beyond citing a single Facebook spokesperson, Compl. ¶ 71, nothing in the Complaint suggests any Individual Defendant even knew about the articles or complaints on which Plaintiff relies, *see In re Facebook*, 367 F. Supp. 3d at 1126 ("As to the complaints raised by former Facebook employees . . . Plaintiff[] fail[s] to plead particularized facts showing that a majority of the Board was even aware of these complaints.").  In any event, alleged concerns raised by one former employee two years ago do not constitute "pervasive, glaring 'red flags.'"  *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 530 (S.D.N.Y. 2018); *South v. Baker*, 62 A.3d 1,18 (Del. Ch. 2012) (rejecting argument that three isolated incidents at large corporation were "red flags").

**Third**, despite elsewhere criticizing Ernst & Young for "consistently giv[ing] Facebook's internal controls a clean bill of health," Compl. ¶¶ 30, 161, Plaintiff alleges that a 2019 Ernst & Young audit "revealed deficiencies in Facebook's processes and internal controls," *id.* ¶ 77. Plaintiff devotes just a single paragraph to that "audit," but admits that Ernst & Young's review focused on "how Facebook measures and reports data about video advertisements" and had nothing to do with the allegations of inadequate diversity driving her claims.  *Id.*

**Fourth**, Plaintiff points to the HUD charge and the ACLU's lawsuit against third parties in August and September 2018, respectively, concerning allegedly discriminatory housing and "help-wanted" ads on the Facebook platform, and vaguely references "five discrimination lawsuits" settled in March 2019.  Compl. ¶¶ 65-67, 76.  But those prior proceedings cannot represent a *failure* to act; indeed, Plaintiff admits that Facebook made adjustments to significantly limit the targeting options available to advertisers.  *Id.* ¶ 66; *In re Facebook*, 367 F. Supp. 3d at 1126.  And again, Plaintiff has not explained why the Board should have anticipated the June 2020 "boycott" or otherwise taken (or avoided) particular actions in light of these past lawsuits,

1    particularly given that Facebook's policies have always prohibited discrimination.  *In re Facebook*,

2    367 F. Supp. 3d at 1125.

3    **Finally**, even if Plaintiff had identified a "red flag," she does not allege any bad faith

4    conduct by any particular director resulting in harm to Facebook.  Plaintiff alleges that demand

5    should be excused because the Compensation Committee's oversight failure allowed the Company

6    to overpay executives based on discriminatory policies and conduct, *id.* ¶ 197, the Audit & Risk

7    Oversight Committee's oversight failure caused the Company to rehire Ernst & Young as its

8    auditor, *id.* ¶¶ 155-62, and Individual Defendants' oversight failure led Facebook to make

9    misstatements in the 2019 and 2020 Proxies, *id.* ¶¶ 190, 196.  But the Complaint nowhere specifies

10   "what the Individual Defendants did to 'encourage' these unlawful [] practices, or why it must be

11   that the Individual Defendants knew they were engaging in an unlawful scheme." *In re Facebook*,

12   367 F. Supp. 3d at 1127.  And Plaintiff does not allege "any particularized facts demonstrating

13   how each Individual Defendant was involved in, prepared, or even knew about" any purported

14   misstatements or omissions in the 2019 and 2020 Proxies. *Id.*  In any event, as discussed in Section

15   III.C below, Plaintiff's own allegations confirm the *truth*, not the falsity, of the proxy statements,

16   which do not support a federal securities claim.

17               2.       **Plaintiff Fails To Establish That Any Member—Let Alone A**
                          **Majority—Of The Board Lacks Independence**
18

19         Plaintiff also fails to allege with particularity that the Facebook Board is "controlled" by

20   Mr. Zuckerberg and thus lacks independence.  Compl. ¶ 204.[6]  Judge Gilliam once again dismissed

21   precisely *this claim* brought by *this Plaintiff* just last year, holding that the "mere fact that

22   Zuckerberg is a controlling shareholder is not enough to establish his lack of independence" and

23   "the fact that Zuckerberg is a controlling shareholder does not automatically mean that the other

24   Individual Defendants are incapable of exercising judgment." *In re Facebook*, 367 F. Supp. 3d at

25   1128.  Plaintiff has not alleged anything different in this case and, given the presence of five new

26

27   [6] The "independence" of the remaining directors matters only if Plaintiff first demonstrates that
     Mr. Zuckerberg is "interested" in this lawsuit because he faces a substantial likelihood of personal
     liability for the claims alleged. *See Desimone*, 924 A2d at 928; *Beam*, 845 A.2d at 1052.  Because
28   Plaintiff has not alleged particularized facts sufficient to satisfy that threshold requirement, *see
     supra* Section III.A.1, her assertion that the Demand Board lacks independence is irrelevant.

1    directors since her prior failed lawsuit for whom Plaintiff does not even attempt to allege a lack of

2    independence, her present pleading fails too.

3         Plaintiff has not even attempted to allege that *a majority* of the Demand Board is not

4    independent in any way.  She pleads individual allegations concerning a purported lack of

5    independence as to just two current Board members (besides Mr. Zuckerberg)—Messrs.

6    Andreessen and Thiel.  Compl. ¶ 214.  But Plaintiff must allege that *five* members (*i.e.*, a majority)

7    of the Demand Board "in place at the time of the complaint" were not independent in order to

8    excuse her demand obligation.  *In re MIPS Techs., Inc. Deriv. Litig.*, 542 F. Supp. 2d 968, 975

9    (N.D. Cal. 2008).  On that basis alone, Plaintiff's independence theory of demand futility fails.

10        In any event, none of Plaintiff's allegations shows that *any* Facebook director was beholden

11   to Mr. Zuckerberg when the Complaint was filed.  Based on their alleged actions in relation to

12   entities in which they have a separate interest, Plaintiff suggests that Messrs. Andreessen and Thiel

13   have "demonstrated personal bias in favor of keeping founders in control of the companies they

14   created."  Compl. ¶ 214.  First, Judge Gilliam has already rejected Plaintiff's claim that Messrs.

15   Andreessen and Thiel were not independent for purposes of demand futility.  *See In re Facebook*,

16   367 F. Supp. 3d at 1115-16.  Second, Plaintiff's vague allegations regarding personal bias of

17   keeping founders in control of companies is irrelevant to Messrs. Andreessen's and Thiel's

18   independence as it pertains to Facebook and Mr. Zuckerberg specifically.  Plaintiff also alleges

19   that Mr. Zuckerberg and Mr. Andreessen had previous business relationships, and that Mr. Thiel's

20   venture capital fund gets "good deal flow" from Mr. Thiel's role on the Board.  *Id.* ¶¶ 216-221.

21   But such conclusory allegations about "past connections," "close relationships," "business

22   ventures," and "well-established connections" are insufficient to refute the presumption of

23   independence.  *In re Facebook*, 367 F. Supp. 3d at 1128-29.

24        Finally, Plaintiff makes irrelevant and unsubstantiated allegations about relationships

25   between Mr. Zuckerberg and two *former* directors—asserting that Mr. Zuckerberg "forced out"

26   Mr. Chenault and Jeffrey Zients because they did not agree with him.  Compl. ¶¶ 209-213.  But

27   alleged disagreements between Mr. Zuckerberg and two former directors say nothing about the

28   independence of the *current* Board members who would have considered a pre-suit demand here.

### 3. Plaintiff Fails To Establish That Any Challenged Board Decision Was Not A Reasonable Exercise Of Business Judgment

Plaintiff also alleges in cursory fashion that demand is excused because Individual Defendants' conduct did not amount to "a legitimate exercise of business judgment." Compl. ¶¶ 188-91. This attempt to invoke the "*Aronson* standard" for demand futility fails too. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled in part on other grounds*, *Brehm*, 746 A.3d 244. *Aronson* applies to a shareholder's challenge to a specific board decision and allows a plaintiff to show *either* that the Demand Board is interested and not independent *or* that a challenged decision was not an exercise of reasonable business judgment. But as its own terms suggest, Plaintiff must identify a *specific* Board decision in order to invoke the *Aronson* standard's business judgment prong. Plaintiff fails to do that and, not surprisingly then, her vague allegations fail to show any board transaction was not a valid exercise of business judgment.

### B.     The Complaint Cannot Be Litigated In This Forum

Plaintiff's Complaint must be dismissed for the independent reason that it was filed in the wrong court. Facebook's Certificate of Incorporation contains a forum-selection clause designating the Delaware Court of Chancery as the exclusive forum for any derivative action purporting to assert claims on the Company's behalf, as well as any action alleging that the Company's directors breached their fiduciary duties. The "appropriate way to enforce [the] forum-selection clause . . . is through the doctrine of *forum non conveniens*." *Atl. Marine Const. Co. v. U.S. Dist. Court W.D. Tex.*, 571 U.S. 49, 60 (2013). The analysis proceeds in two steps: the Court must determine (1) whether the lawsuit falls within the scope of the forum-selection clause, and if it does, (2) whether the clause is valid and enforceable. *See Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086-87 (9th Cir. 2018) (citing *Atl. Marine*, 571 U.S. 49).

Plaintiff's lawsuit falls within the scope of the forum-selection clause in two separate respects—it is a derivative action and it asserts a claim for breach of fiduciary duty against the Company's directors. The clause is also valid and enforceable—and, having already mounted an unsuccessful challenge to the same provision in her prior derivative lawsuit against Facebook, Plaintiff is estopped from arguing otherwise. In any event, Judge Gilliam's ruling in her first suit

was correct and its reasoning applies with equal force here.  The plain language of the forum-selection clause precludes her from proceeding with *any* derivative claim outside the Delaware Chancery Court, and even though that court lacks jurisdiction to hear her Exchange Act claim, it can provide ample remedies for the alleged misconduct.  No more is required.  The Court should enforce the forum-selection clause and dismiss the Complaint on *forum non conveniens* grounds.

### 1.    Facebook's Forum-Selection Clause Designates The Delaware Court Of Chancery As The Exclusive Forum For This Lawsuit

Plaintiff's derivative action falls squarely within Facebook's forum-selection clause. Courts "apply federal contract law to interpret the scope of a forum-selection clause," including "'general principles for interpreting contracts.'"  *Sun*, 901 F.3d at 1086 (citation omitted).  Here, the plain language of the clause is unambiguous and dispositive:

> Unless the corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware *shall*, to the fullest extent permitted by law, be the *sole and exclusive forum* for (1) *any derivative action* or proceeding brought on behalf of the corporation, (2) *any action asserting a claim of breach of a fiduciary duty* owed by, or other wrongdoing by, any director, officer, employee or agent of the corporation to the corporation or the corporation's stockholders, . . . in each such case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.  Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the corporation shall be deemed to have notice of and consented to the provisions of this ARTICLE IX.

Ex. F, Art. IX (emphases added).[7]

The forum-selection clause encompasses Plaintiff's lawsuit for two independent reasons. First, it is a "derivative action"—"Plaintiff Natalie Ocegueda . . . brings this *shareholder derivative action on behalf of Facebook* and against certain present and former directors and officers of Facebook, Inc."  Compl. at 2 (emphasis added); *see also id.* ¶ 30.  Facebook's forum-selection broadly clause covers "*any* derivative action or proceeding brought on behalf of the corporation." Ex. F, Art. IX (emphasis added).  Second, Plaintiff brings claims against current and former Facebook directors and officers for allegedly breaching their fiduciary duties.  Compl. ¶¶ 169-71,

---

[7] "[C]ourts routinely take judicial notice of certificates of incorporation when ruling on motions to dismiss in derivative actions."  *In re Yahoo! Inc. S'holder Deriv. Litig.*, 153 F. Supp. 3d 1107, 1117 (N.D. Cal. 2015) (collecting cases).

222-30.  Facebook's provision separately covers "any action asserting a claim of breach of a fiduciary duty owed by, or other wrongdoing by, any director [or] officer." Ex. F, Art. IX.

### 2.    The Forum-Selection Clause Is Valid And Enforceable

Facebook's forum-selection clause is valid and enforceable, and Plaintiff is barred from arguing to the contrary.  Plaintiff unsuccessfully challenged *the enforceability of the same forum-selection clause* in her prior suit, *see In re Facebook*, 367 F. Supp. 3d at 1115, 1119, and Judge Gilliam's rejection of her objections precludes her from relitigating the same arguments here.

***First***, the clause is facially valid under Delaware law.  Just months ago, the Delaware Supreme Court confirmed that forum-selection clauses governing shareholder claims are valid and enforceable under Delaware's General Corporation Law ("DGCL").  *See Salzberg v. Sciabacucchi*, 227 A.3d 102 (Del. 2020).  In *Salzberg*, the Court held that corporate charters may include a provision governing the forum in which shareholders may bring claims involving "intra-corporate litigation," regardless whether the claims are based on state or federal law.  *Id.* at 114 (citing DGCL § 102(b)(1)).  *Salzberg* explained that federal claims alleging misleading statements to shareholders are "intra-corporate affairs" claims because they involve "an important aspect of a corporation's management of its business and affairs and of its relationship with its stockholders." *Id*.  And a provision "that seeks to regulate the forum in which such 'intra-corporate' litigation can occur is a provision that addresses the 'management of the business' and the 'conduct of the affairs of the corporation,' and is, thus, facially valid." *Id*. (quoting DGCL § 102(b)(1)).

*Salzberg* is dispositive on the facial validity of Facebook's forum-selection clause.  Here, as in *Salzberg*, the forum-selection clause is in the Company's Certificate of Incorporation.  And here, as in *Salzberg*, the clause designates an exclusive forum for litigating "intra-corporate affairs," such as a shareholder derivative action.  That ends the analysis as to facial validity.

***Second***, Facebook's forum-selection clause is also enforceable here—and Plaintiff is estopped from challenging its enforceability.  As an initial matter, the party seeking to avoid a forum selection clause bears a 'heavy burden' to establish a ground upon which [the court] will conclude the clause is unenforceable." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009) (citation omitted); *see also Atl. Marine*, 571 U.S. at 63 (holding that a facially valid forum selection

1   clause should be "given controlling weight in all but the most exceptional cases").  Plaintiff has

2   not even attempted to allege facts that would make this one of those exceptional cases.  *Doe 1*, 552

3   F.3d at 1083.   The Complaint contains no allegations that the forum-selection clause was

4   incorporated as a result of "fraud, undue influence, or overweening bargaining power," that the

5   selected Delaware forum is "so gravely difficult" that Plaintiff will be "deprived of [her] day in

6   court," or that enforcement of the clause would contravene strong California public policy.

7   *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 325 (9th Cir. 1996) (citation omitted).

8        Further, in Plaintiff's first derivative suit, Judge Gilliam squarely *rejected* her arguments

9   that the forum-selection clause was unenforceable.  *See In re Facebook*, 367 F. Supp. 3d at 1120-

10  22.  Having vigorously contested Facebook's forum-selection clause in a prior proceeding, the

11  *same* Plaintiff cannot relitigate the *same* provision against the *same* Defendants yet again.

12  *Offshore Sportswear, Inc. v. Vuarnet Int'l, B.V.*, 114 F.3d 848, 849 (9th Cir. 1997) (confirming

13  collateral estoppel applies to dismissals based on a forum-selection clause).  Collateral estoppel

14  operates to "prevent repetitious litigation of what is essentially the same dispute."  *B&B Hardware,*

15  *Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 157 (2015).  Judge Gilliam was right to reject Plaintiff's

16  challenge to the forum-selection clause before, and this Court should reach the same result.

17              3.    **The Forum-Selection Clause Applies To The Federal Claim**

18       By its plain terms, Facebook's forum-selection clause applies with equal force to *both*

19  Plaintiff's state derivative claims *and* federal derivative claim under the Exchange Act.  The clause

20  unequivocally states that Delaware's Court of Chancery "shall" be the exclusive forum for "*any*

21  derivative action."  Ex. F, Art. IX (emphasis added).  That language is mandatory, exclusive, and

22  encompasses *all* derivative claims—whether arising under state or federal law.[8]

23

24

---

25  [8] In Plaintiff's prior derivative suit, the court dismissed her state-law claims on *forum non*
    *conveniens* grounds, but did not address whether the forum-selection clause also required dismissal
26  of her federal derivative claims under the Exchange Act, *see In re Facebook*, 367 F. Supp. 3d at
    1120, instead dismissing the federal claim for failure to plead demand futility, *id.* at 1131.
27  Facebook did not argue in its opening submission in support of dismissal that the forum-selection
    clause applied equally to the federal derivative claims.  Subsequent to that submission, the Ninth
28  Circuit issued its *Sun* decision, which, along with the other case law cited above, makes clear that
    the clause applies with equal force to both state and federal derivative claims.

1    Under well-established precedent, the fact that the Delaware Court of Chancery lacks

2  jurisdiction over Plaintiff's Exchange Act claim makes no difference to the forum-selection clause

3  analysis.  Courts must enforce a "forum-selection clause unless the contractually selected forum

4  affords the plaintiffs *no remedies whatsoever*."  *Sun*, 901 F.3d at 1089 (emphasis added).  In *Sun*,

5  the Ninth Circuit enforced a provision that designated California as the exclusive forum, despite

6  plaintiffs' argument that doing so would prevent them from bringing their claims under the

7  Washington State Securities Act.  *Id.* at 1084.  The Ninth Circuit rejected plaintiffs' argument

8  because they "could still pursue relief for fraud, breach of fiduciary duty, or negligent

9  misrepresentation" under California law.  *Id.* at 1089-90 (citing *Richards v. Lloyd's of London*,

10  135 F.3d 1289, 1296 (9th Cir. 1998)).

11    The Ninth Circuit has reached the same conclusion when the selected forum was a foreign

12  country.  *See Richards*, 135 F.3d at 1296.  In *Richards*, the designated forum (England) precluded

13  *all* of the specific state and federal causes of action asserted.  Nonetheless, the court enforced the

14  defendant company's forum-selection clause by its terms.  Similar to its rationale in *Sun*, the Ninth

15  Circuit recognized that the plaintiffs would not be left without *any* claim for redressing the wrong

16  alleged because English law "provides a variety of protections for fraud and misrepresentations in

17  securities transactions."  *Id.* (citations omitted); *Lewis v. Liberty Mut. Ins. Co.*, 953 F.3d 1160,

18  1168-70 (9th Cir. 2020) (applying *Sun* to enforce designation of Australia as exclusive forum,

19  despite plaintiffs' arguments about different "substantive law between California and Australia").[9]

20    Another district court recently reached the exact same conclusion under conditions

21  virtually identical to this case.  In *Seafarers Pension Plan on behalf of Boeing Co. v. Bradway*, the

22

23  [9]  Numerous other courts of appeals have held the same.  *See, e.g.*, *Bonny v. Society of Lloyd's*, 3
    F.3d 156 (7th Cir. 1993); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993); *Allen v. Lloyd's*
24  *of London*, 94 F.3d 923 (4th Cir. 1996); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285
    (11th Cir. 1998).  As have many district courts.  *See, e.g.*, *Spenta Enterprises v. Coleman*, 574 F.
25  Supp. 2d 851, 857 (N.D. Ill. 2008) (enforcing forum-selection provision "even when doing so
    meant that parties could not bring their federal securities claims"); *Solid Q Hldg. v. Arenal Energy*,
26  2017 WL 935891, *2 (D. Utah Mar. 8, 2017) (enforcing clause selecting state forum even though
    complaint asserted claim subject to exclusive federal jurisdiction); *Vernon v. Stabach*, 2014 WL
27  1806861, *6 (S.D. Fla. May 7, 2014) (same); *see also E. & J. Gallo Winery v. Andina Licores S.A.*,
    440 F. Supp. 2d 1115 (E.D. Cal. 2006) ("[T]hat a forum or choice of law specified by contract
28  affords remedies that are different or less favorable to laws of forum preferred by plaintiff is not
    alone valid basis to deny enforcement of forum selection and choice of law provisions.").

1  plaintiff sued Boeing and certain of its directors, asserting a federal derivative claim under Section

2  14(a) of the Exchange Act based on alleged misrepresentations in the company's proxy statements.

3  2020 WL 3246326 (N.D. Ill. June 8, 2020).   Like Facebook's Certificate of Incorporation,

4  Boeing's bylaws designated the Delaware Chancery Court as the exclusive forum for derivative

5  actions brought on behalf of the corporation.  *Id.* at *1.  The plaintiff argued—and the court

6  acknowledged—that enforcing Boeing's bylaw would effectively leave the plaintiff without any

7  forum in which to pursue its Exchange Act claim.  But the court nonetheless enforced Boeing's

8  forum-selection clause and dismissed the plaintiff's derivative claims in their entirety.   Of

9  particular relevance, the court observed that "Delaware law provides for a cause of action that is

10  'substantially similar' to a federal derivative cause of action against corporate directors for failing

11  to do exactly what Plaintiff contend[ed] that the Defendant directors failed to do," and thus offered

12  an adequate remedy based on "precisely" the same allegations.  *Id.* at *2.  The "weight of authority"

13  therefore supported dismissal on *forum non conveniens* grounds.  *Id.* at *4.

14         The same analysis applies here.  Facebook's forum-selection clause covers "any derivative

15  action," Plaintiff's Exchange Act claim is a "derivative action," and it makes no difference that the

16  Delaware Chancery Court cannot hear that particular claim because it affords Plaintiff ample

17  alternatives to seek identical relief for the same alleged conduct.

18         **C.      <u>Plaintiff Fails To State A Claim For Violation Of Section 14(a)</u>**

19         Plaintiff's derivative claim under Section 14(a) of the Exchange Act also fails on the merits.

20  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual

21  matter, accepted as true, to state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*,

22  556 U.S. 662, 678 (2009).  A court need not accept as true allegations that are "merely conclusory,

23  unwarranted deductions of fact, or unreasonable inferences."  *Daniels-Hall v. Nat'l Educ. Ass'n*,

24  629 F.3d 992, 998 (9th Cir. 2010).

25         Section 14(a) requires a plaintiff to allege that a proxy statement contained a material

26  misrepresentation or omitted a material fact necessary to make the affirmative statements in the

27  proxy not false or misleading.  15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9(a); *Desaigoudar*, 223

28  F.3d at 1022.  The PSLRA requires the plaintiff to specify "(1) each statement alleged to have been

misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." *Desaigoudar*, 223 F.3d at 1023.  And where, as here, a plaintiff's federal securities claim sounds in fraud, the heightened pleading standards of Rule 9(b) also apply.  *Id.* at 1022-23.[10]  The complaint must include specific facts giving rise to a "strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000).  Finally, the plaintiff must plead particularized facts demonstrating that the portion(s) of the proxy statement challenged as false or misleading directly authorized and caused the corporate action that led to the harm alleged.  *In re Paypal*, 2018 WL 466527, at *4; *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

Plaintiff alleges that Individual Defendants violated Section 14(a) by causing Facebook to make materially false or misleading statements in the 2019 and 2020 Proxies.  Compl. ¶¶ 94-144.  Plaintiff challenges statements related to (1) Facebook's "commitment to diversity" in its workforce, *id.* ¶¶ 98, 103, 111, 131-32; (2) Facebook's commitment to diversity at the Board level, *id.* ¶¶ 100-01, 105-06, 108, 129-30; and (3) an advisory vote on Facebook's executive compensation, *id.* ¶¶ 112-14, 116-18, 134-36, 141.[11]  Plaintiff alleges these statements were false because Facebook "has not made substantial efforts to diversify its Board," Facebook's diversity policies "were not being complied with," and Individual Defendants "failed to appropriately address the Company's lack of diversity."  *Id.* ¶ 121.  According to Plaintiff, the Proxies misled investors into voting for proposals electing nominated directors and approving—in an advisory manner—Facebook's executive compensation.  *E.g.*, *id.* ¶ 119.  Plaintiff also claims these alleged misstatements caused advertisers to "boycott" Facebook in June 2020.  *Id.* ¶ 181.

---

[10] Plaintiff alleges the Individual Defendants *knew* the Proxies were false, but intentionally caused them to issue.  *See, e.g.*, Compl. ¶¶ 26, 142-43, 191.  Because Plaintiff alleges a single course of conduct "grounded in alleged fraudulent conduct," the Complaint must meet the more demanding pleading standards of Rule 9(b) and the PSLRA "even if [plaintiff] disclaim[s] reliance on a fraud theory."  *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019); *see also In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885-86 (9th Cir. 2012); *Huang v. Avalanche Biotechnologies, Inc.*, 2016 WL 6524401, at *8-9 (N.D. Cal. Nov. 3, 2016).

[11] Plaintiff also purports to challenge the statement in the Proxies that Facebook believed it need not have an independent, non-employee Board Chairman.  Compl. ¶¶ 128, 133.  But Plaintiff never explains how that statement was false or misleading.  *See Desaigoudar*, 223 F.3d at 1023.

1      Plaintiff's allegations are deficient.  Her claim rests on conclusory accusations about the

2    Board's supposed shortcomings, but the Complaint is devoid of any particularized facts supporting

3    those accusations or demonstrating that any challenged statement was false or misleading—or

4    even material.  Moreover, Plaintiff comes nowhere close to alleging facts establishing that any

5    Individual Defendant acted negligently (let alone with scienter), or that the challenged statements

6    proximately caused the alleged harm.

7              1.      **Plaintiff Fails To Allege A Material Misstatement Or Omission**

8      Plaintiff's claim fails at the first element.  To allege a false or misleading statement,

9    Plaintiff must plead, with particularity, each alleged misstatement and the reason(s) why the

10   statement was false or misleading.  *Golub v. Gigamon Inc.*, 2019 WL 4168948, at *5 (N.D. Cal.

11   Sept. 3, 2019).  Vague allegations followed by generalized explanations of how the statements

12   were false or misleading are insufficient.  *In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*,

13   859 F. Supp. 2d 572, 578 (S.D.N.Y. 2012).  And a statement is material only if "there is a

14   substantial likelihood that a reasonable shareholder would consider it important in deciding how

15   to vote."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

16          ***Facebook's Commitment to Diversity in its Workforce.***  Plaintiff challenges statements

17   about workforce diversity and accuses the Company of "discriminatory hiring practices."  But

18   Plaintiff alleges no facts showing *how* Facebook's hiring practices were discriminatory or *how* any

19   particular challenged statement was false or misleading.  *See Desaigoudar*, 223 F.3d at 1023; *In*

20   *re Textainer P'ship Sec. Litig.*, 2005 WL 3801596, at *6 (N.D. Cal. Dec. 12, 2005).

21          The 2019 and 2020 Proxies, for example, expressed Facebook's commitment "to building

22   a workforce that is as diverse as the communities we serve," and described "[d]iversity of ideas"

23   as "core to our business."  Ex. C at 47, 69; Ex. B at 81; Compl. ¶¶ 103, 111.  The Company

24   disclosed the trainings it offers its personnel "to help employees better understand diverse

25   perspectives," including "comprehensive managing bias training . . . to understand the issues that

26   affect underrepresented communities and actively solicit input from people who may feel

27   excluded."  Compl. ¶ 111; *see also id.* ¶ 52 (describing diversity and inclusion programs).  And

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:20-cv-04444-LB

the 2020 Proxy discussed Facebook's progress in "increasing the numbers of Black and Hispanic people in non-technical roles in the U.S." *Id.* ¶ 131.

Plaintiff alleges these statements were false because Facebook's executive team does not presently include any Black employees. *Id.* ¶ 11. That allegation is simply wrong—Facebook's Head of New Product Experimentation is Black, as is its Chief Diversity Officer. Exs. H, J. The composition of Facebook's senior management only underscores the *truth* of Facebook's statements about diversity at least five senior executives during the relevant period were non-white, Exs. H, J, K, and two of the six executives Plaintiff identifies are women, Compl. ¶ 11.

Plaintiff's own allegations (and the documents she relies on) acknowledge Facebook's efforts to increase the diversity of its workforce and its related progress—and thus reinforce the truth of the statements she challenges. The Proxies describe numerous programs Facebook has implemented—including the Diverse Slate Approach (discussed *supra*), Facebook University (a training program for college freshmen from underrepresented groups with an interest in STEM), a "Managing Unconscious Bias" training (aimed at reducing the effects of workplace bias and increasing understanding of diverse perspectives), a "Managing Inclusion" training (aimed at teaching managers to understand the issues that affect underrepresented communities and actively solicit input from people who may feel excluded), a "Be The Ally training (giving Facebook employees tools to identify and support someone who may be experiencing bias), and annual events such as the Women's Community Summit, Black Community Summit, Latin Community Summit, and Pride Community Summit (which help foster community and professional development). *See, e.g.*, Ex. C at 47-48; Ex. B at 81-82; Compl. ¶¶ 103, 111. Those efforts, as the Complaint recognizes, have met with increasing success. Facebook disclosed in its 2020 Proxy that it had increased the number of female employees globally at Facebook from 31% in 2014 to 37% in 2019, and further that it had increased "the number of Black women at Facebook by a factor of 25 and the number of Black men by a factor of 10" since 2014—facts that Plaintiff does not challenge. Ex. B at 52, 81; Compl. ¶ 131; *see also* Ex. C at 47 ("We have seen steady increases in hiring rates for underrepresented people since we started" the "Diverse Slate Approach").

***Facebook's Board Nomination Process.***   Plaintiff also challenges disclosures in the Proxies related to Facebook's process for nominating individuals to its Board.  *See, e.g.*, Compl. ¶¶ 100-01, 108, 129-30.   Specifically, Plaintiff contests Facebook's statement that "when evaluating candidates for nomination as new directors, ***it is the policy of our board of directors to consider candidates with diverse backgrounds*** . . . ***and to insure that the initial list of candidates from which new director nominees are chosen by the board includes candidates with a diversity of race, ethnicity, and gender.***"   *Id.* ¶¶ 100, 129.   Plaintiff similarly asserts it was false or misleading for Facebook to represent that its "board of directors also periodically reviews its composition to ensure that it appropriately reflects the knowledge, experience, skills, diversity, and other characteristics required to fulfill its duties," and that the Board "believes that its composition appropriately reflects [those characteristics] required to fulfill its duties."  *Id.* ¶ 101. According to Plaintiff, these statements were false and misleading because "regardless of whether the Company's Compensation and Governance Committee . . . ever made any efforts to recruit any Black individuals and other minorities to the Board, only one Black individual currently serves on the Board."  *Id.* ¶ 102.  Plaintiff is wrong.  Facebook has two Black directors and has had two since the 2019 Proxy, and four out of nine directors are women.  Ex. G.  Regardless, Plaintiff's belief that the Company should have more than "one Black individual" on its Board does not demonstrate the falsity of the Company's statements about diversity.

Plaintiff's theory of falsity ultimately hinges on a bald assertion that "the Board has never in good faith actively sought minority candidates."  *Id.*  But such a "conclusory allegation of falsity" is insufficient to sustain a securities claim.  *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 413 (S.D.N.Y. 2019).  Plaintiff cites nothing to suggest the Board does not, in fact, "consider candidates with diverse backgrounds"; indeed, that the Board includes individuals of varying race, sexual orientation, and gender confirms the truth of Facebook's statements.

***Facebook's Executive Compensation.***  Finally, Plaintiff challenges statements related to Facebook's executive compensation—including disclosures about measuring executive performance for bonuses, compensation charts, and statements related to "a non-binding advisory [shareholder] vote on the compensation program for [the Company's] named executive officers."

Compl. ¶¶ 113-14, 116-18, 134-36, 141.  Plaintiff alleges without any support that most or all of "[t]he information in the [Proxies] about executive compensation was false and misleading" because it omitted that executives' performance goals were based "in large part" on purportedly "unlawful and discriminatory advertising, hiring, and pay practices."  *Id.* ¶ 118; *see also id.* ¶ 140.

As an initial matter, Facebook expressly disclosed the Company-wide priorities used, in part, to determine bonuses for *all* employees, including to "grow our user base across all our products; increase sharing, engagement, and meaningful interactions; continue to achieve revenue growth and significant savings from efficiency; improve product quality; improve securities for our community; improve our brand; and make progress toward our long-term investments."  *Id.* ¶ 116.  The Company reported each year the exact amount of each officer's compensation.  Facebook also reported that an independent consultant conducted an annual review to confirm each year that its compensation plans were "not reasonably likely to have a material adverse effect on" the Company.  *E.g.*, Ex. B at 25.  Plaintiff does not dispute the accuracy of those disclosures.  *Id.* ¶ 116.  Instead, she offers a fuzzy assertion that unspecified aspects of Facebook's compensation plans "gave Defendants a strong incentive to continue concealing the true nature of the Company's discriminatory advertising practices."  *Id.* ¶ 118.  That theory makes no sense.  To start, Ms. Sandberg is the only Individual Defendant alleged to have participated in the executive compensation bonus program, *id.* ¶ 116, and Plaintiff fails to explain how any other Individual Defendant would have been incentivized to engage in unlawful behavior by virtue of a program in which they did not participate, *see Sjunde*, 417 F. Supp. 3d at 413.  But more fundamentally, there is simply no factual basis at all for Plaintiff's underlying assertion—save generalized references to a small number of prior lawsuits that Facebook has since resolved, Compl. ¶ 76, Plaintiff has not cited a single advertisement that she contends was unlawful or discriminatory, nor attempted to identify the proportionate impact of any such advertisements on Facebook's overall revenue (and the corresponding effect, if any, on executive compensation).  And her passing references to purportedly illicit hiring practices are equally unsupported.  Because Plaintiff "has not identified, with the particularity required by the PSLRA, why" Defendants' alleged "omission . . . caused the

1    . . . identified statements to be materially misleading," her Section 14(a) claim as to the executive

2    compensation statements fails.  *In re Textainer*, 2005 WL 3801596, at *6.

3            ***The Alleged Misstatements Or Omissions Are Immaterial.***  Plaintiff's Section 14(a) claim

4    fails for the independent reason that it relies on statements that are immaterial as a matter of law.

5            ***First***, Plaintiff's claim, at its core, is that Individual Defendants failed to disclose their

6    allegedly deficient oversight of Facebook's diversity and inclusion efforts—the same purported

7    misconduct animating her primary fiduciary duty and related claims under state law.  But the Ninth

8    Circuit has unequivocally held that such alleged nondisclosure of a purported "breach of fiduciary

9    duty . . . is *never* material for § 14(a) purposes."  *Gaines v. Haughton*, 645 F.2d 761, 776-77 (9th

10   Cir. 1981), *overruled on other grounds*, *Matter of McLinn*, 739 F.2d 1395 (9th Cir. 1984).  Alleged

11   director misconduct "traditionally regulated by corporate law . . . is simply not material or

12   otherwise within the ambit of federal securities laws" and "need not be disclosed in proxy

13   solicitations for director elections."  *In re JPMorgan Chase Deriv. Litig.*, 2014 WL 5430487, at

14   *18 (E.D. Cal. Oct. 24, 2014).  Accordingly, courts have "consistently [] rejected" any "attempt to

15   use [Section] 14(a) and Rule 14a-9 as an avenue for access to the federal courts in order to redress

16   alleged mismanagement or breach of fiduciary duty."  *Witchko v. Schorsch*, 2016 WL 3887289, at

17   *7 (S.D.N.Y. June 9, 2016).  Here, Plaintiff's Section 14(a) claim is "essentially [a] breach of

18   fiduciary duty claim[] alleging mismanagement"—including a failure to adequately monitor

19   Facebook's diversity and anti-discrimination efforts—and therefore fails to state a securities

20   violation.  *Schwartzman v. McGavick*, 2007 WL 1174697, at *11 (W.D. Wash. Apr. 19, 2007).

21           ***Second***, the scant information Plaintiff does rely on in an attempt to prove the purported

22   falsity of Defendants' challenged statements was *publicly available* to investors at or before the

23   time of those statements.  Plaintiff cites prior litigation, Mr. Zuckerberg's congressional testimony,

24   and 2018 and 2019 news articles to show that statements in Facebook's subsequent Proxies were

25   false or misleading.  *See, e.g.*, Compl. ¶¶ 69-70 (citing public sources to suggest Facebook "has

26   very few Blacks among its employees").  But any such public information would *necessarily* have

27   been known to Facebook shareholders *before* the Proxies were issued, and therefore cannot form

28   the basis of a material misstatement.  *See Bettis v. Aixtron SE*, 2016 WL 7468194, at *12 (S.D.N.Y.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

Dec. 20, 2016) (rejecting federal securities claim based on information previously "reported by news and media outlets" and thus already "in the public domain").  By the same token, events *post*-dating Facebook's Proxies—particularly the Company's response to a post by President Trump—cannot form the basis of a material misstatement or omission at the time the Proxies were issued.  *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 (9th Cir. 2011).

*Third*, the challenged statements are largely inactionable corporate optimism.  For example, Plaintiff argues it was materially false or misleading for Facebook to state "We are committed to building a workforce that is as diverse as the communities we serve," and "We believe retention, people development, and inclusion are just as crucial as recruiting."  Compl. ¶ 103.  But such "vague statements of optimism" are neither falsifiable nor material.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).  Indeed, statements about a company's commitment to "a diverse workforce" and "an inclusive and positive working environment" are "precisely the type of 'puffery' that [courts] have consistently held to be inactionable."  *Lopez v. Ctpartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 19, 26-29 (S.D.N.Y. 2016); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 976-77 (N.D. Cal. 2015) ("commitment to" ethical practices was "inherently aspirational and hence immaterial"); *Retail Wholesale & Dept. Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 965, 970 n.2 (N.D. Cal. 2014) ("commitment to the highest standards of governance").

**Plaintiff Has Not Pled Facts Establishing The Falsity Of Any Opinion Statements.** Facebook's subjective assertions about its workforce and Board structure trigger strict pleading requirements under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), which Plaintiff fails to meet.  To allege an actionable opinion statement, Plaintiff must plead that Defendants "d[id] not honestly hold the stated belief and the belief is objectively incorrect."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017).  Plaintiff makes conclusory assertions to that effect, s*ee, e.g.*, Compl. ¶ 109, but Plaintiff has not even tried to allege *facts* showing, for example, that any Individual Defendant did not "believe retention, people development, and inclusion are just as crucial as

recruiting" for Facebook.   Compl. ¶¶ 52, 103.   Plaintiff's challenges to other expressions of subjective belief fail for the same reason—including:

- "We believe that having diverse suppliers helps us build better products for our global community, *id.* ¶ 52;
- "Our board of directors believes that its composition appropriately reflects the knowledge, experience, skills, diversity, and other characteristics required to fulfill its duties," *id.* ¶¶ 101;
- "We believe that implementing the proposal [related to board nominee qualifications disclosures] is unnecessary because our current disclosures effectively describe our board membership criteria," *id.* ¶ 106;
- "We believe that our current board structure is effective in supporting strong board leadership," *id.* ¶¶ 108, 128, 133;
- "Our compensation & governance committee and our board of directors believe that these policies are effective in implementing our compensation philosophy and in achieving our goals," *id.* ¶ 113;
- "We believe [a 94:1 ration is a reasonable estimate calculated in a manner consistent with Item 402(u) of Regulation S-K under the Exchange Act," *id.* ¶ 134; and
- "We believe that our compensation mix supports our objective of focusing on at-risk compensation having significant financial upside based on individual performance and our performance relative to company priorities, *id.* ¶ 135.

### 2.   Plaintiff Fails To Allege That The Proxies Were An "Essential Link" To The Purportedly Loss-Generating Corporate Action

Plaintiff also fails to demonstrate that "the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction" that ultimately caused the harm alleged.  *Mills v. Elec. Auto-Lite Co.,*, 396 U.S. 375 385 (1970).  This "essential link requirement can only be established when the proxy statement at issue *directly* authorizes the loss-generating corporate action." *Kelley v. Rambus, Inc.*, 2008 WL 5170598, at *7 (N.D. Cal. Dec. 9, 2008); *see also In re Paypal*, 2018 WL 466527, at *4.  As a corollary, "damages [that] are not a result of the corporate action authorized by the proxy statement . . . are not the type of damages sought to be remedied by section 14(a)." *Corwin v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984).

The harm alleged here is "extreme reputational damage to the Company" resulting in Facebook "expend[ing] significant additional money" to defend against lawsuits like this one, lost revenue stemming from the June 2020 advertiser boycott (which, as discussed, is not represented in Facebook's strong second-quarter revenues and stock price increase), and compensation purportedly resulting from discriminatory practices.  Compl. ¶¶ 180, 183.  But none of those

purported harms was "authorized by" the 2019 or 2020 Proxies.  Plaintiff cannot reasonably demonstrate, for example, that shareholder votes based on the Proxies somehow facilitated an advertiser boycott in June 2020.  On the contrary, Plaintiff herself alleges that the boycott was prompted by Facebook's decision not to remove a post by President Trump.  *Id.* ¶¶ 16-17.  The challenged statements have nothing to do with permitting (or curbing) hate speech by Facebook users.  And Plaintiff does not—and cannot—allege facts suggesting the Proxies, or any resulting shareholder vote, "authorized" certain advertisers' recent actions.  *See Corwin*, 741 F.2d at 428.

Plaintiff's additional allegations of harm—including litigation costs, executive compensation, and reelection of board members—fare no better.  Plaintiff cannot manufacture a corporate harm simply by creating the need for Facebook to incur legal fees, and Plaintiff has not tied past settlement of lawsuits related to housing and job advertisements to the votes tendered in connection with the Proxies.  And the compensation paid to Facebook's executives—or any Individual Defendant, for that matter—was subject only to a non-binding *advisory vote* by shareholders.  Ex. C at 3; Ex. B at 33.  But "[a]dvisory votes do not authorize any corporate action" and therefore cannot form the basis of the "essential link" needed to state a Section 14(a) claim. *Hastey v. Welch*, 449 F. Supp. 3d 1053, 1064 (D. Kan. 2020); *see also Swanson v. Weil*, 2012 WL 4442795, at *9 n.7 (D. Colo. Sept. 26, 2012) (holding plaintiff could not allege loss causation based on advisory executive compensation vote); *Witchko*, 2016 WL 3887289, at *7 (same).

Finally, Plaintiff's allegation that the Proxies misled shareholders to "reelect the current Board," Compl. ¶ 245, is "precisely the sort of claim that courts have repeatedly found insufficient to satisfy the transaction causation requirement" of Section 14(a), *Levitt v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992).  "A claim that the reelection of the directors was an essential link to loss-generating corporate action because of the directors' subsequent mismanagement cannot form the basis of liability under Section 14(a)."  *In re Diamond Foods, Inc. Deriv. Litig.*, 2012 WL 1945814, at *7 (N.D. Cal. May 29, 2012); *see also In re Paypal*, 2018 WL 466527, at *4 (same).[12]

---

[12] Plaintiff's passing allegation that absent the misleading Proxies, shareholders would not have voted against having an independent board chairman, Compl. ¶ 244, fails for the same reasons—having an independent chairman has nothing to do with any alleged corporate harm.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:20-cv-04444-LB

3.    **Plaintiff's Section 14(a) Claim Is Partially Time-Barred**

The limitations period for a Section 14(a) claim is the earlier of one year after discovery of the alleged violation or three years from the alleged violation's occurrence. *In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1212 (N.D. Cal. 2007). A plaintiff need not know all of the facts underlying the complaint to have been on inquiry notice of a purported violation. Rather, the statute of limitations is triggered "when a prospective plaintiff receives notice of his or her claim" such that she becomes aware of warnings that "there were either misleading statements or significant omissions involved." *Lane v. Page*, 649 F. Supp. 2d 1256, 1298 (D.N.M. 2009). That restriction precludes Plaintiff's claim in part.

As discussed *supra*, Plaintiff asserts that portions of the 2019 Proxy were false or misleading based on occurrences in 2018 and 2019—including news articles, past lawsuits, and congressional testimony. These events largely preceded the issuance of the 2019 Proxy on April 12, 2019. For example, Plaintiff points to Mr. Zuckerberg's congressional testimony in April 2018, Compl. ¶¶ 57-59, news articles in July and November 2018, *id.* ¶¶ 64, 68-69, the August and September 2018 HUD charge and ACLU lawsuit against third parties, *id.* ¶ 65, and five lawsuits settled in March 2019, *id.* ¶ 76. To the extent Plaintiff now relies on such pre-existing information to suggest that statements in the 2019 Proxy were false or misleading when made, she necessarily would have been immediately on notice of those purported misrepresentations at the time of the 2019 Proxy's public filing in April 2019. The time for Plaintiff to raise her Section 14(a) claim as to the 2019 Proxy therefore expired in April 2020—several months before she filed her complaint. *See Stricklin v. Ferland*, 1998 WL 966023, at *4 (E.D. Pa. Nov. 10, 1998) (finding Section 14(a) claim time-barred where, "[a]ccording to the complaint, the underlying facts which made the[] two proxies misleading were known to the plaintiff" more than a year before the complaint was filed).

D.    <u>**Plaintiff's Claims Are Unripe**</u>

Because ripeness "pertain[s] to federal courts' subject matter jurisdiction," it is "properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Edison v. United States*,

822 F.3d 510, 517 (9th Cir. 2016).  A court treats a facial subject-matter jurisdiction challenge in the same way as a Rule 12(b)(6) motion, *see Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014), and "cannot construe the complaint so liberally as to extend [its] jurisdiction beyond its constitutional limits," *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

Plaintiff's claims are at least partially unripe.  *S. Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990).  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas*, 523 U.S. at 300 (citation omitted).  Plaintiff seeks to recover on behalf of Facebook "costs incurred in defending against, and the potential settlement of, civil and governmental lawsuits brought against the Company related to the discriminatory practices," "loss of advertising revenue," and payment of executive compensation.  Compl. ¶ 183.  But "when a derivative claim is premised on the outcome of separate litigation, the company may seek indemnification for the costs and liability of that litigation from individual officers and board members only if the allegations of those individuals' misconduct are proven true."  *In re BofI Holdings, Inc. S'holder Litig.*, 2018 WL 2731954, at *9 (S.D. Cal. June 7, 2018).  Plaintiff fails to allege any connection between her claims against Individual Defendants and the March 2019 settlement with housing groups.  And because her claimed damages for costs incurred in this action and the pending HUD charge and ACLU suit against third parties "depend[] on the future outcome of litigation," they are "by definition contingent" and, therefore, "unripe."  *Id.*; *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 474-75 (S.D.N.Y. 2013), *aff'd sub nom. In re Facebook, Inc., Initial Pub. Offering Deriv. Litig.*, 797 F.3d 148 (2d Cir. 2015).  The same is true for alleged lost advertising revenue.  Plaintiff has not alleged any such loss, and Facebook continues to see positive financial results.  Ex. E at 27.

## IV.   CONCLUSION

For the foregoing reasons, the Court should dismiss this action for failure to make a pre-suit demand on the Facebook Board as required by FRCP 23.1, pursuant to the doctrine of *forum non conveniens*, for failure to state a claim under FRCP 12(b)(6) for violation of Section 14(a) of the Exchange Act, and/or because Plaintiff's claims are unripe.

| 1 | Dated:  October 5, 2020 | Respectfully submitted, |
|---|---|---|
| 2 | | LATHAM & WATKINS LLP |

3

4
By /s/ *Andrew B. Clubok*
    Andrew B. Clubok

5

6
LATHAM & WATKINS LLP
Elizabeth L. Deeley (Bar No. 230798)
 *elizabeth.deeley@lw.com*

7
505 Montgomery Street, Suite 2000
San Francisco, California 94111

8
T: +1.415.391.0600 / F: +1.415.395.8095

9
Andrew B. Clubok (*pro hac vice*)
Susan E. Engel (*pro hac vice*)

10
Stephen P. Barry (*pro hac vice*)
 *andrew.clubok@lw.com*

11
 *susan.engel@lw.com*
 *stephen.barry@lw.com*

12
555 Eleventh Street, Suite 1000
Washington, D.C. 20004

13
T:  +1.202.637.2200 / F:  +1.202.637.2201

14
William J. Trach (*pro hac vice*)
 *william.trach@lw.com*

15
200 Clarendon Street
Boston, MA 02116

16
T:  +1.617.948.6000 / F:  +1.617.948.6001

17
Daniel R. Gherardi (Bar No. 317771)
 *daniel.gherardi@lw.com*

18
140 Scott Drive
Menlo Park, California 94025

19
T:  +1.650.328.4600 / F:  +1.650.463.2600

20
*Attorneys for Defendants Mark Zuckerberg,*
*Sheryl Sandberg, Marc Andreessen, Andrew W.*

21
*Houston, Erskine B. Bowles, Jeffrey D. Zients,*
*Susan Desmond-Hellmann, Nancy Killefer,*

22
*Tracey T. Travis, Robert M. Kimmitt, Reed*
*Hastings, Peter A. Thiel, and Nominal*

23
*Defendant Facebook, Inc.*

24

25

26

27

28